Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE NATHANAEL COUSINS, MAGISTRATE JUDGE


```
UNITED STATES OF AMERICA,      )
                               )
               Plaintiff,      )
                               )
         v.                    )    NO. 5:19-cr-00377-WHA
                               )
ANTHONY SCOTT LEVANDOWSKI,     )
                               )
               Defendant.      )    San Jose, California
_____)    Wednesday, September 4, 2019
```


### TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING OF PROCEEDINGS

FTR 11:10 a.m. - 11:49 a.m. =  39 minutes

APPEARANCES:

| | | |
|---|---|---|
| For Plaintiff: | | DAVID L. ANDERSON, ESQ. |
| | | United States Attorney |
| | | 150 Almaden Boulevard, Suite 900 |
| | | San Jose, California  95113 |
| | BY: | **KATHERINE WAWRZYNIAK** |
| | | **ANDREW F. DAWSON** |
| | | Assistant United States Attorneys |

| | | |
|---|---|---|
| For Defendant: | | Ramsey & Ehrlich, LLP |
| | | 803 Hearst Avenue |
| | | Berkeley, California  94710 |
| | BY: | **ISMAIL JOMO RAMSEY, ESQ.** |
| | | **MILES F. EHRLICH, ESQ.** |

Also Present:  ANTHONY GRANADOS
               United States Pretrial Services


Transcribed by:        Leo T. Mankiewicz, Transcriber
                       leomank@gmail.com
                       (415) 722-7045

<u>Wednesday, September 4, 2019</u>

11:10 a.m.

(Defendant present in court.)

P R O C E E D I N G S

**THE CLERK:**  Calling criminal 19-0377, United States versus Anthony Scott Levandowski.

**MS. WAWRZYNIAK:**  Good morning, your Honor. Catherine Wawrzyniak and Andrew Dawson for the United States.

**THE COURT:**  Good morning.

**MR. RAMSEY:**  Good morning, your Honor.  Ismail Ramsey and Miles Ehrlich of Ramsey & Ehrlich on behalf of Mr. Levandowski, who's present and out of custody.

**THE COURT:**  Good morning to you all.

**MR. EHRLICH:**  Good morning.

**PRETRIAL SERVICES OFFICER:**  Good morning, your Honor.  Anthony Granados, United States Pretrial.

**THE COURT:**  Good morning.  All right, I think we have three procedural things to address today, by my list.  One is the appointment of counsel, and that last week defense counsel specially appeared just to check in on the representation issue.

Second is to assess the post-bail report from Pretrial Services recommending a modification of release conditions and to consider any additional information and arguments that the parties have about the conditions of release.

1          And then third is just to discuss the procedures going

2     forward in the case, next dates in the case.  The case was

3     reassigned to Judge Alsup in San Francisco yesterday.  We need

4     to set a date before Judge Alsup for the initial appearance

5     there, and also to assess if that change in venue to San

6     Francisco suggests that we should have a different magistrate

7     judge assigned for the pretrial proceedings.

8          I'll take your input on that.  My instinct is we may not

9     have many more pretrial proceedings, so there's not much to

10    transfer to a different judge, but if you think it would be

11    more efficient to have a different judge in San Francisco work

12    on it, we could seek to have someone assigned.  I have not

13    conferred yet with Judge Alsup on that topic.  He may have an

14    opinion about it, but we'll proceed here as we began the

15    hearing last week, on the detention and release issues.

16         I anticipate that on the question of criminal discovery,

17    which in San Jose is assigned to a magistrate judge, in San

18    Francisco Judge Alsup will want to have a first opinion about

19    whether there's going to be criminal discovery assigned to

20    someone different than Judge Alsup; but my understanding his

21    usual practice is to keep that himself, not assign, but that

22    will be a decision that he will make.  For the moment, that

23    will just be an open issue that will have to be discussed at a

24    later appearance.

25         So that's my list of the procedural things for today.  You

1    may have others, but let me start at the top, back on the issue

2    of counsel.  Any change or requests about the appointment of

3    counsel issue?

4            **MR. RAMSEY:**  No, no change, your Honor.  I'm sorry,

5    I should have made clear that we are still specially appearing

6    on behalf of bail.  We are in the process of still trying to

7    finalize the retention.  We think that will happen.  I think in

8    a few weeks' time -- I'm right now getting ahead of myself in

9    terms of the next dates, but the date that we were going to

10   request was going to be the 24th -- 25th, excuse me, on

11   Wednesday at 11, to come back to deal with the I.D. of counsel

12   issues.  We think we should have it finalized by then.

13           **THE COURT:**  And you're referring to a date to return

14   here for a further appearance.

15           **MR. RAMSEY:**  Yes, your Honor.

16           **THE COURT:**  And I'll get back to you on that date.

17   As far as the first date before Judge Alsup, did you have one

18   in mind?

19           **MR. RAMSEY:**  We did not.  It depends on whether the

20   Court wanted us to have finalized the idea of counsel, the

21   general appearance, before we went to Judge Alsup or not.

22           **THE COURT:**  I don't -- from my point of view,

23   I don't think there's any reason to delay getting before him.

24   He may have some structural issues of discovery and things

25   which he wants to set.  So my encouragement would be to get on

1  his calendar in the near future.

2          **MR. RAMSEY:**  So we have not conferred with the U.S.

3  Attorney's Office, but I think the 24th, that Tuesday

4  afternoon, would work for us.  I note Judge Alsup might have a

5  fairly full calendar that day but, you know, I'm not sure

6  whether he wants us to come in that quickly or not, but that's

7  what we'd recommend.

8          **THE COURT:**  My deputy is checking on that issue.

9  I will be serving in San Diego the week of the 23rd through the

10  27th, so I'm not available on the 25th.

11          **MR. RAMSEY:**  We could do the following week, then,

12  your Honor.

13          **THE COURT:**  We could do the following week.  So any

14  day the following week we're available, at 1:30.

15          **MR. RAMSEY:**  The 2nd of October.

16          **THE COURT:**  Yeah.  So we can set a further

17  appearance here October 2nd at 1:30 p.m.

18          **MR. RAMSEY:**  Thank you, your Honor.

19          **MR. EHRLICH:**  At 11?

20          **MR. RAMSEY:**  Yes, at 11.

21          **MS. WAWRZYNIAK:**  Sorry, did you say 1:30, your

22  Honor?

23          **THE COURT:**  1:30 on October 2nd.

24          **MR. RAMSEY:**  Oh, 1:30.  Thank you.

25          **THE COURT:**  I'll be back on general criminal duty at

1   that time.  All right, so we'll continue the special appearance

2   of counsel with a next appearance on the --

3              **MR. RAMSEY:**  Yeah, your Honor --

4              **THE COURT:**  Yes.

5              **MR. RAMSEY:**  -- if you're going to be on duty

6   that -- that's Wednesday.

7              **THE COURT:**  That is Wednesday.

8              **MR. RAMSEY:**  Yeah, that's fine.  That works best.

9   Thank you.

10              **THE COURT:**  If that works for you.

11              **MR. RAMSEY:**  Thank you.

12              **THE COURT:**  All right, and if we have any further

13   conditions of release issues, we can use that same date for a

14   follow-up on those.  So let's turn to that next.

15       The Court did receive a post-bail report from Pretrial

16   Services.  Attached to it is a document identified as Draft

17   Balance Sheet dated August 28th, 2019.  Those two documents

18   together have a variety of financial information about

19   Mr. Levandowski.

20       The Court last week released Mr. Levandowski on a

21   combination of conditions with the concern raised by the

22   government of risk of nonappearance, and the conditions are

23   motivated to mitigate those risks.  There's been no new

24   information provided about danger to the community.

25       The conclusion of the recommendation is that the

1    conditions imposed are appropriate, including the electronic

2    monitoring, but it is recommended that the amount of the bond

3    be increased to $10 million, and that's secured by real

4    property or cash.

5        I don't know if the parties have yet had an opportunity to

6    evaluate that recommendation, but I will consider your -- any

7    additional information and recommendations that you have about

8    bail modifications, starting on the defense side.

9        **MR. RAMSEY:**  Yes, your Honor.  A couple things.

10   One, I want to make sure that -- I understand the information

11   you have.  So I understand you got the balance sheet.  I'm not

12   sure whether the Court was provided with the more -- I wouldn't

13   say more detailed, but the more detailed statement of

14   financial -- Financial Statement of Debtor that the government

15   had asked from us previously --

16       **THE COURT:**  I do have that.  I have a three-page --

17       **MR. RAMSEY:**  -- that we provided on to Pretrial

18   Services.

19       **THE COURT:**  -- three-page document that says,

20   "Balance Sheet, Draft."

21       **MR. RAMSEY:**  Okay, I have --

22       **THE COURT:**  Yeah.

23       **MR. RAMSEY:**  I have copies, but I could pass it up

24   to the Court, just so that the Court has it.

25       **THE COURT:**  I would consider that.  And that's a

1    document you say the government already has received.

2    **MR. RAMSEY:**  The government has received it and we

3    provided this to Pretrial Services as well.

4    **THE COURT:**  Thank you.  If you don't mind --

5    **MR. RAMSEY:**  Thank you.

6    **THE COURT:**  And I'll make this part of the

7    confidential pretrial information.

8    **MR. RAMSEY:**  We, obviously, disagree with the --

9    about the request to -- or the recommendation to modify the

10   amount of the bond.  We think that the bond that the government

11   proposed initially is sufficient.  I don't think that there are

12   any facts that have changed.

13   Just so the Court knows, before we came to the Court at

14   the last appearance, we had provided to the government a

15   balance sheet that was more of a summary fashion.  It didn't

16   have the full breakout, but we had provided essentially the

17   documents that I gave you just now to the government.  So they

18   had that, and that was the greater detail of the balance sheet.

19   And so I just want to point out that the investigation by

20   Pretrial, and the information that we provided, provided no

21   additional information about Mr. Levandowski's financial

22   information than was already present before when the government

23   had indicated that the $300,000 secured cash posting by

24   Mr. Levandowski was sufficient, and Mr. Levandowski has posted

25   that $300,000 cash, but we think it's important to look to the

1   actions of both Mr. Levandowski and, quite frankly -- this is

2   an unusual case -- to look at the actions of the government, in

3   determining whether the -- what the least restrictive

4   conditions are that would reasonably assure his appearance.

5        So I think there are two parts to that question:

6   Obviously, first, whether there are conditions which could

7   assure his appearance, and two, what are the least restrictive

8   ones.

9        Mr. Levandowski has done numerous things to demonstrate

10  that he intends to face these charges, and these are things

11  that weren't necessarily captured in the report.  So I want to

12  make sure that the Court has this information.

13       First, and I know that the Court mentioned this at the

14  last appearance, the referral obviously was two years ago from

15  Judge Alsup to the United States Attorney's Office for a

16  criminal investigation, and Mr. Levandowski has steadfastly

17  maintained a position to address these issues in court.  He

18  intervened in the civil case, as you know, to protect various

19  rights, including his Fifth Amendment privilege, so that he'd

20  be in a position to address these.

21       In the last two years, he has also traveled

22  internationally extensively.  He's always returned.  He's

23  always had criminal counsel who's been retained, and who has

24  been interacting with the U.S. Attorney's Office through this.

25       Then with respect to the last couple of weeks, he -- the

Pretrial Services report indicates that his passports have been turned in, essentially.  I think was the language.  Both passports have been turned over to U.S. Pretrial Services, but I think it's important to note that Mr. Levandowski six weeks ago, in discussions with the government, voluntarily suggested on his own to give up the passports, and this is where we talk about the start of the government actions which I think show the government's confidence that he would appear for court appearances.

When we first contacted the government and asked to give over Mr. Levandowski's passports, the government told us that that was not necessary, and that if we wished, we could just keep the passports in our law firm, which we did.

So that was the first step where the government was saying, well -- we were suggesting to do something, take an action to assure his appearance, and the government's response was, "No, we're okay, we think that he's going to show up.  You just keep the passport."

Then after that, it became -- around the 15th, we let -- now know that that was after they obtained an indictment.  At the time we didn't know that.  They contacted us and said that they wanted to revisit the passport issue and asked whether we would be willing to surrender the passport.  Mr. Levandowski immediately agreed to do that, and the FBI came and obtained those.  But again, that was an action by Mr. Levandowski,

showing that he intended to face these charges in court.

Shortly thereafter, Mr. Levandowski observed individuals outside of his business taking pictures of the building who seemed to be doing some surveillance.  He believed that those were federal agents.  So he didn't retreat to the building, he didn't try to get in his car and take off.  He actually did the exact opposite.  He went across the street to the agent in the car to introduce himself and to tell them that he was there and to inquire about what was going on.

What did the government do?  It turns out that there was an active arrest warrant at this time.  The government agent -- the FBI agent, instead of getting out of the car and saying "Put your hand behind your back" and proceeding to arrest him, if they had been concerned about flight risk, instead, the agent falsely told him that he was there as an insurance investigator taking pictures for something completely unrelated.

Mr. Levandowski then said, "Okay, fine," turned around and left, but the government did absolutely nothing to arrest him when there was an active warrant.  There was not a concern about him fleeing.

After that, Mr. Levandowski still had some concerns, wasn't really sure about whether this was an investigator or not, an insurance investigator.  So that's when, after we had discussions, we were able to confirm that it was a FBI agent,

1    and we believe that there likely was an active arrest warrant.

2         And what did Mr. Levandowski decide to do?  Live very --

3    first of all, that evening, contact the U.S. Attorney's Office

4    and tell them, "It looks like there's an arrest warrant.  It

5    looks like an arrest is imminent.  There's no need to surveille

6    or to -- or to arrest me.  I have children and so forth.

7    I want to self-surrender," as we've been saying for months.

8    And what happened in response to that?  No response.

9         So that evening -- and also, I'd push -- I'd like to pass

10   up to the Court a series of e-mails which document all of this,

11   your Honor.

12              **THE COURT:**  Thank you.  Received.

13              **MR. RAMSEY:**  So what happened that evening was no

14   response.  So the first thing the next morning, with no

15   response from the government, was for Mr. Levandowski to go

16   with myself to the federal building in San Francisco, not being

17   absolutely sure whether there was an arrest warrant or not, but

18   just suspecting it, and then knowing that there was some

19   surveillance going on.  So Mr. Levandowski came to the

20   courthouse, go into the Marshals Office, essentially at 9:00

21   o'clock before duty calendar, knowing that he'd be brought to

22   Magistrate Judge Laporte.

23         As we entered the courthouse, we e-mailed the U.S.

24   Attorney's Office and indicated, "We now don't have a response

25   to our e-mail from last night.  What we are doing is he's going

to go self-surrender.  We are headed to the Marshals Office."

We then got an immediate response, which was essentially, "Hold on, wait, let's talk."

So we were literally on the 20th floor outside the entrance to the Marshals Office to self-surrender, and I had a phone call with the U.S. Attorney's Office, who said, "No, don't self-surrender."  There was an active warrant for Mr. Levandowski's arrest.  He was on the doorstep of the U.S. Marshals Office to self-surrender, and the government said, "Don't do it.  Go ahead and wait.  Wait to come down to court in San Jose on Tuesday," four days hence.

So there was zero concern at that point by the U.S. Attorney's Office that Mr. Levandowski was likely not to appear.

So they gave us a date.  They then said that this was going to be on your calendar and that we should come on Tuesday, and asked us to provide financial information, which we had been talking about doing previously.  So then that, obviously, was accelerated.

We provided the financial information, we provided what I provided to you, your Honor, in terms of the Statement of Debtor and a more abbreviated balance sheet, and it was as of six months ago, I believe it was, but it was essentially the same information.  It showed a slightly larger net worth, because we then updated it after we came to the court last

week, of $72 million.

But even with the $72 million net worth, what was the government's action, and what did they do in terms of assuring Mr. Levandowski's appearance?  They proposed initially a $300,000 bond, along with various sureties, which we had suggested previously, which was his parents, his father and his stepmother, his good friend Randy Miller and business partner, and then we also suggested his brother, who the government said "No, we don't have to worry about that, we don't need the brother, that's unsecured.  Others will be sufficient."

So then when we were accepting that, it became, "Oh, wait, we're going to have to think about it for a little bit.  We don't have total visibility into his finances," and that they would want an investigation from Pretrial Services.  This is despite the fact that they had two years to investigate his finances and showed absolutely nothing that was inconsistent with the finances that we sent.  The only thing they said is that he received essentially $120 million in bonuses and kind of, where did it go, because his net worth is $72 million, but we all know that there are taxes that are paid on $120 million, and in this particular situation, it's easy to determine because Google actually withheld taxes, and so it's readily apparent on the W-2.

So, and in addition to that, he had a family law settlement with his wife.  So $120 million is -- not his wife,

1    I'm sorry, his ex.  And so his -- the $120 million is not

2    $120 million.  It's $120 million pretax, and before the child

3    support settlement.  So, you know, it was a number much closer

4    to 52, but --

5                    THE COURT:  Yeah, they say a hundred million dollars

6    doesn't go as far as it used to.  So I've got some questions

7    for you, from what you've submitted.

8         So one, the date of the long-form Financial Statement of

9    Debtor, when was that as of?

10                   MR. RAMSEY:  Okay, the one I gave to you --

11                   THE COURT:  The long -- kind of the longer form.

12                   MR. RAMSEY:  -- your Honor, that is as of the

13   28th -- I'm sorry, of August.

14                   THE COURT:  Okay, so that's August 28th,

15   August 28th.  Thank you, and I don't want to breach some

16   confidentiality, so I'm going to refer to the page

17   number first.

18                   MR. RAMSEY:  Yes.

19                   THE COURT:  There's a section under Liabilities,

20   which is section 6, and part 3 of that is on page 9, refers to

21   judgments or debts, and they're identified as two amounts.

22                   MR. RAMSEY:  Yes.

23                   THE COURT:  Are those confidential, those -- both

24   the existence of those and the amounts, or can I discuss those

25   publicly?

1    (*Sotto voce* discussion between counsel and another person.)

2         **MR. RAMSEY:**  Yes, so there is a confidentiality

3    obligation to the first one, your Honor.  That's in

4    arbitration.

5         **THE COURT:**  All right.

6         **MS. WAWRZYNIAK:**  Although, your Honor, that figure

7    was disclosed in Uber's public filing.

8         **MR. RAMSEY:**  I mean, we're happy to discuss --

9    I don't know if the Court wants to do it *in camera*.  I'm just

10   trying to be careful not to --

11        **THE COURT:**  I'm trying to be careful about it, and

12   I -- but what I want to understand is, this is identified as

13   being preliminary, and I'm trying to understand what that

14   means.  Does it mean, is it on appeal?  Is it --

15        **MR. RAMSEY:**  There was a preliminary award given by

16   the arbitrators.  They have not issued a final award yet, and

17   people are waiting for the final award.  When they have the

18   final award, then they obviously will go to the Superior Court

19   to get enforcement that, but there just was a preliminary

20   award.

21      I will point out, you know, we presented this information

22   for full disclosure just so the Court had it.  If you notice on

23   the balance sheet, it's actually not on the balance sheet --

24        **THE COURT:**  That's what I'm trying to understand is,

25   it's in one place and not the other.

1    **MR. RAMSEY:**  Right.  We haven't -- that's sort of

2    the one thing, and this was sort of an "other," and we just

3    wanted to give full disclosure, but in terms of, you know,

4    discussing his net worth, we have essentially set that aside,

5    but we just wanted to give disclosure that those are out there.

6    I think that was because the government said that they wanted

7    to have greater visibility, and we just wanted to provide, we

8    thought, more information rather than less, but that's not the

9    amount that we're saying --

10   **THE COURT:**  Yeah, I just want to understand that

11   both the timing of it being preliminary, like, what was going

12   to make it final, or not, and the second is the contingent

13   liability, just to understand what that is.

14   **MR. RAMSEY:**  Right, and the other one is that he's a

15   guarantor for some loans that relate to some real estate

16   developments, and so there's, you know, the potential, but he's

17   a guarantor.

18   **THE COURT:**  All right, so that's not a judgment, but

19   it's a contractual guarantee.

20   **MR. RAMSEY:**  Correct, your Honor.

21   **THE COURT:**  All right, so --

22   **MR. RAMSEY:**  And also, with respect to the first

23   one, too, there's a possibility that he'd be indemnified for

24   that, which I think may have been contingent.  So it may --

25   I mean, again, it's a contingent thing.  It's not -- it's

1   definitely not something that we're relying on in any way to

2   discuss what we think appropriate conditions are.

3            **THE COURT:**  All right.  So your conclusion is that

4   the conditions of release which I imposed last week are

5   sufficient to vindicate the risk of nonappearance, and you're

6   not recommending any changes at this time.

7            **MR. RAMSEY:**  Yes, that's right, your Honor.  And

8   also, I do want to emphasize also, and I want to be careful

9   about going into the details in public court, but the lack of

10  liquidity.  I mean, I did discuss with the Pretrial Services

11  Office sort of where this sort of amount might come from, and

12  I understand, you know, there's not -- lawyers and legal folks

13  are not always real familiar with financial statements, which

14  I understand, but the one thing that was referenced was sort of

15  the pass-through investments, but that amount, you know,

16  approximately $11 million, is actually the least liquid thing

17  that is here.  That is actually his capital contributions that

18  have been made to a real estate -- to various real estate

19  developments.

20       So that's sort of money that's gone out.  He has an

21  investment there, but it's completely illiquid.  It's part of a

22  building -- there are buildings that are actually being built.

23  I think there's one that's been completed, but -- and that he

24  doesn't control himself.  It's a collection of various entities

25  that control the various real estate entities, and that's the

1  additional attachment that we provided to you.

2          **THE COURT:**  All right.  Thank you for all of that.

3  Let me get the government's --

4          **MR. RAMSEY:**  And could I just --

5          **THE COURT:**  Yes.

6          **MR. RAMSEY:**  I'm sorry, your Honor.  I just do want

7  to add one thing, but what we've looked at, in terms of the

8  most important thing is that we thought of the conditions was,

9  I think what traditionally Pretrial looks at are what are the

10  emotional ties that can be used to ensure that he stays here,

11  and we think, you know, his family, obviously, his parents

12  losing the home that they've lived in for more -- I think

13  upwards of 20 years, you know, we thought that was the most

14  significant thing.

15      His close friend, who he's known since college, that's

16  another tie.  And also, we offered his brother, who I know

17  still stands willing to offer an unsecured bond.  He doesn't

18  own property.

19      But those are the emotional ties that we think would

20  provide the greatest pressure.  But we do think the actions of

21  Levandowski, and quite frankly, the actions of the government,

22  and when we talk about the least restrictive conditions that

23  could reasonably assure his appearance, we think that the

24  conditions that are in place are sufficient.

25          **THE COURT:**  And you mentioned his brother.  Is he

1    present today?

2                **MR. RAMSEY:**  He is present.  He came again today,

3    your Honor.  And we had suggested $200,000 unsecured to be the

4    amount.

5                **THE COURT:**  For his brother.

6                **MR. RAMSEY:**  Yes, and we had suggested that to the

7    government before, and quite frankly, they said that's not

8    necessary, and so -- so that's why that had not been included

9    but, you know, from the time that we have the initial

10   suggestion of what the bond should be till now, I think with

11   the Pretrial Services investigation, there's nothing that has

12   changed.  It's the same information.

13               **THE COURT:**  Thank you very much.

14               **MS. WAWRZYNIAK:**  The government fully supports

15   Pretrial in its recommendation to increase the bond amount to

16   $8 million.  When we were here last week, I told your Honor

17   that the preliminary conditions were just that for the

18   government.  We thought that that was an appropriate starting

19   point.  When we were negotiating those conditions with the

20   defense, we were very mindful of what Mr. Levandowski was

21   representing as his liquid assets.  And so that's the $300,000

22   figure was drawn from that initial assessment.

23        But we did feel, and as we said last week, that we should

24   have the court's experts, who do this in virtually every felony

25   case, do a deeper dive, a deeper investigation and take a look,

1    and we think that the figure that they came up with, which

2    represents approximately 15 percent of the defendant's net

3    worth, is completely reasonable under the circumstances.

4         **THE COURT:**  What facts have you learned since your

5    initial request to the Court of a $2 million bond, what have

6    you learned between then and now to make you say that

7    $10 million is the right amount now and $2 million was right

8    last week?

9         **MS. WAWRZYNIAK:**  Well, last week I tried to set down

10   a marker and say that we were focused on two things.  One was

11   the point of moral suasion, which entails looking at the

12   defendant's family relationships and ties, those moral ties

13   that bind him to this district.

14        The second thing that we were looking at was sort of, what

15   is the appropriate fraction of net worth that he needs to have

16   personally at stake so that it would hurt too much to walk away

17   from it?  And that analysis is the part that is more

18   complicated, and we wanted a more objective set of eyes to go

19   over the financial figures and opine on that, and we feel like

20   that has now happened, and the figure that they've come up with

21   is $10 million.

22        When we look at the asset information that was provided,

23   it appears to us that there are several different options for

24   how Mr. Levandowski could come up with an additional $8 million

25   of secured bond in this case and, you know, we don't want to

1    wade into telling him what assets specifically need to be

2    liquidated, what the tax consequences are.  It's very

3    complicated.  But this is a defendant that is uniquely situated

4    and has the means to engage the experts, do that analysis, and

5    could easily come up with an additional $8 million.

6         There's this notion floating around that we, the

7    government, somehow were derelict in failing to investigate the

8    current state of his finances.  I would just submit to your

9    Honor that our focus in our criminal investigation was whether

10   we could prove the crimes that have been charged.  Suggesting

11   that we should somehow be very up-to-date on his finances as of

12   2019 is just not reasonable, because the financial picture is

13   not evidence of the crimes at issue.

14        Moreover, given the defendant's long-standing

15   relationships with various counsel and financial planners,

16   information that the government previously obtained, we don't

17   have confidence that it's current as of today.

18        So given the asset sheet that we see in front of us now,

19   we think that it seems very reasonable for the defendant to

20   think through the different options and come up with an

21   additional $8 million secured bond.

22        We think that a secured bond is better than an unsecured

23   bond because it is more easily enforceable, obviously, and the

24   assets will be tied up for the pendency of this case.

25        One of the points that I said last week, which I want to

1   reiterate, is just that we're concerned about Mr. Levandowski
2   appearing at each and every stage of this proceeding.  We were
3   not concerned that he would not make his initial appearance.
4         That's why we, from the government's perspective, we were
5   engaged in a good-faith negotiation with Mr. Ramsey starting
6   approximately in mid-July of 2019 and, you know, throughout
7   those negotiations, it's true we did believe that he would show
8   up for his initial appearance, but now we're looking forward in
9   this case and we just want to make sure that he has enough at
10  stake so that as the case progresses, he does not flee at some
11  point, and we want to make sure that we essentially just get it
12  right now, while we have time and with the benefit of the input
13  from Pretrial Services.
14        So with that, I will submit.
15              **THE COURT:**  All right, thank you.
16          **MR. RAMSEY:**  Your Honor, a couple more things.
17              **THE COURT:**  Yes.
18          **MR. RAMSEY:**  One, I just want to point out, a
19  fraction of the net worth is -- I don't believe that's the
20  standard.  I mean, the standard is the least restrictive
21  conditions which can reasonably assure Mr. Levandowski's
22  appearance.
23        And in terms of the liquid assets, because that's the
24  important thing to look at in the balance sheet, when you look
25  at the current assets as of the 28th, in terms of bank

1    accounts, we're looking at just over a million dollars, and

2    then we're talking about securities that aren't tied up in

3    retirement accounts or so forth, there's an extra $267,000.  So

4    you're talking about one-point -- call it one-point -- I want

5    to make sure I get the right number here -- about 1.3-plus.

6         I would just note Mr. Levandowski, of that, already posted

7    $300,000.  He's obviously in the process of retaining counsel,

8    and I fear that there's also an attempt to sort of squeeze all

9    the liquidity out of Mr. Levandowski, which I do believe could

10   implicate his Sixth Amendment rights to a choice of counsel.

11        But that being said, that is the number of liquid assets,

12   and you can see a big chunk of that, of what's even remaining

13   after the $300,000, is already in various legal retainers.

14        And so the other areas -- and like I said, when I spoke to

15   Pretrial Services this morning and asked, where do you think

16   $10 million can come up from, you know, the pointing was to the

17   investments that are pass-throughs, and those are capital

18   contributions that have already been made to real estate

19   developments.  So there is zero chance of being able to

20   liquidate that in any sort of short period.

21        And I would say, though, Mr. Levandowski's investments

22   have been largely in real estate, which is significant, because

23   although he's not in a position to post them, if there is a

24   judgment that comes forward because a bond is forfeited, the

25   Financial Litigation Unit -- and obviously, your Honor, you're

1   familiar with the entire unit of the Department of Justice

2   that's dedicated to this -- could still enforce a judgment, and

3   there still would be holdings there that relate to real estate.

4   So there still is an opportunity to do that.

5       I do believe that the current conditions are -- will

6   reasonably assure his appearance.  There is nothing that has

7   changed.  I would say that if the Court felt that there should

8   be an additional amount of bond, it should be unsecured, and

9   Mr. Levandowski stands ready to sign a greater bond that's

10  unsecured.  The government would still have the ability to

11  enforce that.

12      And then the other additional condition, if the Court

13  believes it's necessary, would be to have his brother sign on

14  an unsecured -- secured bond as well, but given his limited

15  liquidity, he's not in a situation where he could easily

16  generate $8 million or $10 million, as the government says.

17  The balance sheet lays out what his current assets are in

18  accounts that relate to liquid securities and various bank

19  accounts.

20          THE COURT:  All right, thanks very much.  Here's my

21  order on the conditions of release.

22      I am going to add, if he's willing to, Max, the

23  defendant's brother, as an unsecured co-signer, up to the

24  amount of $200,000, because I do think adding an additional

25  lever to encourage Mr. Levandowski's appearance in court would

1    be appropriate.

2         I'm not going to increase the amount of the bond at this

3    time.  We're focused on that issue because that's what's

4    recommended by Pretrial, but there are many other conditions

5    that we've imposed which are calculated to secure

6    Mr. Levandowski's appearances, including the electronic

7    monitoring, the stay away from airports order, the property

8    being posted by family members and a friend and business

9    partner as well, all those combined to set reasonable limits on

10   his behavior to assure that he'll come to court when ordered.

11        Much of the information reported today was known to the

12   Court last week, so it's a bit of a rehash, including the

13   information about Mr. Levandowski's efforts to turn himself in

14   while he had an arrest warrant and the government's reluctance

15   to bring him in at that point in time.  That's not a change in

16   circumstances.  The new information I have is the additional

17   financial information that came from the defense through

18   Pretrial.

19        And I too am not an accountant, a finance wizard that can

20   parse this level of detail without any further investigation to

21   know that it's off by a factor of five.  My assessment, based

22   on what I've heard, through proffer and looking at these

23   records, is that a $2 million bond is sufficient, and adding

24   Max will help to assure the appearance of Mr. Levandowski.

25        But I just got this 15 minutes before court today, and the

1    government has been evaluating it, and so has Pretrial.  So it

2    may be that I could be persuaded with a more careful and even

3    expert guidance that there really are liquid assets here that

4    could be posted as additional security.

5         And we'll come back on October 2nd, and if there's more

6    financial information, both information that the government

7    doesn't have yet and learns, or further argument that -- and

8    really understanding these financials, that I've been snookered

9    into approving the amount, but based on what I have before me,

10   I think that the amount set, in combination with the other

11   conditions, is sufficient.  So that's my interim thoughts as to

12   the release conditions.

13        So if we can bring forward Max, I know he's been

14   listening, and get him added to the bond.  And do we have a

15   copy -- good morning.

16             **MR. MAXIM LEVANDOWSKI:**  Good morning.

17             **THE COURT:**  Could you just identify yourself into

18   the microphone, there?

19             **MR. MAXIM LEVANDOWSKI:**  Maxim Levandowski.

20             **THE COURT:**  Thanks for being here, and you've been

21   here today, and you were here at the court appearance last

22   week, correct?

23             **MR. MAXIM LEVANDOWSKI:**  That's correct.

24             **THE COURT:**  And were you listening when we reviewed

25   the conditions of release?

1    **MR. MAXIM LEVANDOWSKI:** Yes, your Honor.

2    **THE COURT:** All right, and I'm putting you on the

3    spot here, but it's been proposed by the defense, and I think

4    it will be helpful, to add you to the release order on an

5    unsecured bond up to the amount of $200,000.

6    And what that means is, it's a way of helping to ensure

7    that your brother will come to court when ordered and will

8    comply with the other conditions of release.

9    If you agree to add yourself as a co-signer, it means the

10   government could seek a judgment against you up to $200,000 if

11   he does not come back to court when ordered or if he violates

12   one of the conditions of release, and you should only do that

13   if you think he's a good candidate, that he's going to come to

14   court when ordered and he's going to comply, because you'll be

15   putting your own economic liberty at stake by doing so, and

16   that helps to assure the Court that if you're willing to insure

17   him, that makes me more confident that he will do as is; and it

18   puts an extra pressure on him to comply, knowing that you have

19   some economic stake in the game as well.

20   So that's the purpose of it. It does not require you to

21   put any money in the court's coffers now. It's just a promise

22   to pay, and you'll have -- there will be further proceedings if

23   there is a forfeiture, but a promise to pay if there's been a

24   violation.

25   Do you understand all that?

1        **MR. MAXIM LEVANDOWSKI:**  I do, your Honor.

2        **THE COURT:**  All right, and Mr. Levandowski, the

3   conditions otherwise previously set will be remaining in place.

4   We're just adding your brother as an unsecured creditor in that

5   amount.  Do you understand that?

6        **THE DEFENDANT:**  I understand, your Honor.

7        **THE COURT:**  All right, thank you.  And you,

8   Mr. Levandowski, agree to continue to comply with the

9   conditions of release?

10       **THE DEFENDANT:**  Of course, your Honor.

11       **THE COURT:**  All right, thank you.

12       And Maxim -- sorry to call you by your first name -- do

13   you agree to be a co-signer, up to $200,000?

14       **MR. MAXIM LEVANDOWSKI:**  I do agree.

15       **THE COURT:**  All right, then let me have my deputy

16   print out a place for you to sign on to be added to the

17   conditions of release.

18       And I'll say that you're invited to come to all court

19   appearances.  You're not -- you're invited to come, you're not

20   required to come to them.  Sometimes the conditions will change

21   over the course of the case, and your obligations as a

22   co-signer will be in place unless you get a court order

23   excusing you.

24       So if you changed your mind down the road that you no

25   longer wish to be a co-signer on the bond, this is a contract

1   and you need a court order to excuse you.  So if you change

2   your mind, you do need to ask the Court to excuse you if that's

3   what you wish.

4          **MR. MAXIM LEVANDOWSKI:**  Okay.

5          **THE COURT:**  And we will give you a copy of the

6   conditions of release as well, so you'll have those with you.

7          **MR. MAXIM LEVANDOWSKI:**  Thank you.

8          **THE COURT:**  All right, Mr. Ramsey is writing, there,

9   and we're getting a signature.

10      Let me check with my deputy to see if we have any more

11  intelligence about Judge Alsup's schedule in San Francisco.

12         **THE CLERK:**  Tuesday at 2:00 o'clock, your Honor.

13  I have his schedule --

14         **THE COURT:**  So it's the 24th -- well, do the parties

15  wish to put it on the 24th of September before him, or did

16  you...?

17         **MS. WAWRZYNIAK:**  That's fine for the government,

18  your Honor.

19         **MR. RAMSEY:**  Yes, that's fine, your Honor.

20         **THE COURT:**  All right, so we'll set an initial

21  appearance before Judge Alsup in San Francisco Tuesday the

22  24th of September at 2:00 p.m.

23      Let's talk about the Speedy Trial Act.  I had mentioned it

24  last week.

25      Mr. Levandowski, you have a right to a speedy trial, which

1    means a trial within 70 days of being charged.  That time

2    period can be extended.  Let me check with the attorneys to see

3    if they wish to extend the speedy trial clock.

4                **MR. RAMSEY:**  Just one second, your Honor.

5                     (Pause in proceedings.)

6         Yes, your Honor, we would agree to an exclusion based on

7    continuity of counsel.

8                **THE COURT:**  All right, and any -- Ms. Wawrz- -- does

9    the government agree to that?

10                **MS. WAWRZYNIAK:**  We agree, your Honor.

11                **THE COURT:**  All right.  So I will exclude the date

12    from the first appearance here, which -- remind me what date we

13    were here.

14                **MS. WAWRZYNIAK:**  We were here on August 27th, your

15    Honor.

16                **THE COURT:**  The 27th.  So I'll exclude from

17    August 27th through September 24, 2019 for the continuity of

18    counsel.  The finding of that is in the interest of justice.

19    And we'll touch base on that again at next court dates.

20         All right, I think that's everything on my agenda, but let

21    me check to see if I missed anything.

22         Anything further from the government?

23                **MS. WAWRZYNIAK:**  No, your Honor.

24                **THE COURT:**  And from the defense?

25                **MR. RAMSEY:**  No, your Honor.

1          **THE COURT:**  All right, did we get a signed copy from

2   Maxim?  All right, so we've modified the conditions of release,

3   just adding the co-signer.  Otherwise, the conditions remain in

4   place, and we can touch base on them again on October 2nd,

5   including the electronic monitoring condition and the amount of

6   bond.

7      All right, thanks very much.  Have a good day.

8          **MR. EHRLICH:**  Thank you, your Honor.

9          **MR. RAMSEY:**  Thank you, your Honor.

10                                                 <u>11:49 a.m.</u>

11                        ---o0o---

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4

5        I, Leo Mankiewicz, certify that the foregoing is a true

6   and correct transcript, to the best of my ability, of the above

7   pages of the official electronic sound recording provided to me

8   by the U.S. District Court, Northern District of California, of

9   the proceedings taken on the date and time previously stated in

10  the above matter.

11       I further certify that I am neither counsel for, related

12  to, nor employed by any of the parties to the action in which

13  this hearing was taken; and, further, that I am not financially

14  nor otherwise interested in the outcome of the action.

15

16                                                    09/05/2019

17                 Signature of Transcriber          Date

18

19

20

21

22

23

24

25