DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KATHERINE L. WAWRZYNIAK (CABN 252751)
ANDREW F. DAWSON (CABN 264421)
Assistant United States Attorneys

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-7200
> FAX: (415) 436-7234
> katherine.wawrzyniak@usdoj.gov
> andrew.dawson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>    Defendant. | CASE NO. CR 19-377 WHA<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date: August 4, 2020<br>Time: 2:00 p.m.<br>Hon. William Alsup |

**INTRODUCTION**

The defendant, Anthony Scott Levandowski, stands before the Court to be sentenced following his guilty plea to Theft and Attempted Theft of a Trade Secret, in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). While there is no dispute about how to calculate the applicable Guidelines or CHC in this case, Levandowski's objections to the draft PSR raise a concern that he is still in denial about the full breadth of his conduct. As explained further below, any objections to the final PSR should be overruled. Given the egregiousness of the conduct in this case and the need to deter similar conduct in the future, the government respectfully recommends a mid-range Guidelines sentence of 27 months in prison.

**DISCUSSION**

**A.     Offense Conduct**

The events surrounding Anthony Levandowski's unhappy parting from Google in late 2015/early 2016 have been the subject of two prior legal proceedings—the *Waymo v. Uber* civil case (No. CV 17-939 WHA) and the *Google v. Levandowski* JAMS arbitration (Case Reference No. 1100086069).  Those same events are central to this criminal case and have significant consequences for Levandowski's ongoing bankruptcy case (No. 20-30242).  Thousands of hours have been spent reconstructing the timeline of events and attempting to assign motivations to the various players.

The reason those few months have cast such a long shadow is simple: Levandowski's conduct was brazen and shocking.  At a time when a handful of technology companies were in an all-out race to build self-driving cars, he jumped from one competitor to another.  That alone was newsworthy.  But what came to light after his departure was that while he was negotiating with Uber, and specifically, promising to deliver custom LiDAR on a very short timeframe, he raided Google's repositories and stole proprietary information that would have undoubtedly been useful to him.  That was criminal.

**1.     The Theft, in Context**

Levandowski's dialogue with Uber began around May 2015. (PSR ¶ 13.)  By that time, Levandowski had become dissatisfied with his work and role at Google's Project Chauffeur[1].  (PSR ¶¶ 9-10.)  At first, things with Uber moved slowly, and Uber executives contemplated having a vendor relationship with the new company, Ottomotto[2], that Levandowski was planning to form.  (PSR ¶ 13-15.)  Eventually, in fall 2015, the talks turned to acquisition.  (*Id.*)

An intense period of negotiation began in December 2015, culminating with the signing of a term sheet in February 2016.  (PSR ¶ 16.)  The following chronology illustrates key events during this period:

| DATE | EVENT |
|---|---|
| December 11, 2015 | Levandowski downloaded over 14,000 Chauffeur files, including LiDAR engineering schematics, from Google's SVN server to his Google-issued laptop |

---

[1] In December 2016, Project Chauffeur became Waymo LLC.

[2] The new company was initially referred to in documents as NewCo. It was first incorporated as 280 Systems, Inc. but later changed its name to Ottomotto.

| December 14, 2015 | Levandowski transferred all 14,000 SVN files from his Google-issued laptop to his personal MacBook |
|---|---|
| December 20, 2015 | Levandowski met with Uber CEO Travis Kalanick at Uber regarding the acquisition |
| December 21, 2015 | Levandowski uploaded Chauffeur LiDAR files to his personal Dropbox account |
| January 4, 2016 | Levandowski downloaded approximately 5 Chauffeur files from Google Drive to his personal MacBook |
| January 4, 2016 | Levandowski met with Uber executives at Uber regarding Uber's acquisition of Ottomotto.  The idea of tying payouts to goals or milestones was raised |
| January 9-12, 2016 | Uber and Ottomotto negotiated milestone payments based on development of LiDAR |
| January 11, 2016 | Levandowski downloaded the Chauffeur Weekly Update—the document he has how admitted was a trade secret—from Google Drive to his personal MacBook |
| January 12, 2016 | Levandowski held an Ottomotto recruitment meeting at his home in Palo Alto; current Google employees attended |
| January 25, 2016 | Levandowski held another Ottomotto recruitment meeting at his home in Palo Alto; offer letters distributed |
| January 27, 2016 | Levandowski resigned from Google without notice |
| February 22, 2016 | Uber and Ottomotto signed a draft Term Sheet for Uber's acquisition of Ottomotto; Schedule A-1 tied incentive compensation to achievement of specific LiDAR milestones |
| February 24, 2016 | Levandowski las accessed the Chauffeur Weekly Update document on his personal MacBook |

Organized in this way, the facts speak for themselves.  It is evident that Levandowski did not download the Google files for any legitimate purpose related to his Google employment because by the time he took them, he was in serious negotiations with Uber and was also busy recruiting Google employees to jump ship with him.  Moreover, as a high-level manager, Levandowski was not a regular user of the SVN repository.  He accessed it only once, on December 11, 2015, having requested credentials and downloaded the special software about a week prior.  (*See* Transcript of Jury Trial Proceedings, Volume 5, Case No. 17-cv-939, ECF 2661, at 1010-1016.)  And tellingly, Levandowski never returned any of the files he took to Google.  (*See* Declaration of Assistant United States Attorney Katherine L. Wawrzyniak in Support of United States' Sentencing Memorandum (Wawrzyniak Decl.), Ex. 1.)

## 2.    The Charges and Plea Agreement

The Indictment in this matter alleged thirty-three violations of 18 U.S.C. § 1832.  Each count

was based upon an individual file that Levandowski downloaded between November 2015 and January 2016.  Twenty-six of the charged files were from SVN.  Seven were from the Project Chauffeur Google Drive.  (ECF 1.)

From early on, it was clear that the battle in the case would be over whether the government could prove, beyond a reasonable doubt, that the thirty-three files were trade secrets; that is, that each file was (i) actually secret, (ii) reasonably protected, and (iii) economically valuable.  *See* 18 U.S.C. § 1839(3); NINTH CIRCUIT MODEL JURY INSTRUCTION, No. 8.141C.  In November and December 2019, the parties litigated a motion for a bill of particulars, during which the government maintained that each document, as a whole, qualified as a trade secret.  (ECF 52-67.)

When Levandowski decided to plead guilty to Count 33 of the Indictment in March 2020, he rendered a protracted battle of the experts unnecessary, thereby saving the government considerable resources.  In the Plea Agreement (ECF 77), he admits that the Chauffeur Weekly Update, an internal tracking document, is a trade secret.  This is a sixty-one page spreadsheet that defined quarterly goals for the Project Chauffeur team and catalogued myriad technical problems that engineers had encountered and overcome.  (PSR ¶ 21.)  The Court reviewed this document during the sealed portion of the hearing on December 3, 2019.  (Wawrzyniak Decl. ¶ 3.)  Levandowski further admits that he intended to use the Chauffeur Tracking document to benefit himself and Uber.  (ECF 77.)

### B.      Levandowski's Objections to the PSR

In the lead up to sentencing, Levandowski took the rather incredible position that the PSR's offense conduct section should be limited to the facts in paragraph two of the parties' plea agreement. He specifically sought to excise paragraphs 13-20 of the PSR—not because of factual inaccuracies—but because "this case did not go to trial and the government's allegations have not been subject to cross-examination or proven to be true."  (*See* Addendum to the PSR.)  This argument has no legal basis.

First, pursuant to 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  That statutory provision has been explicitly incorporated into Section 1B1.4 of the Sentencing Guidelines, which contains the following commentary: "For example, if the defendant committed two robberies, but as part

of a plea negotiation entered a guilty plea to only one, the robbery that was not taken into account by the guidelines would provide a reason for sentencing at the top of the guideline range and may provide a reason for an upward departure." *See also* USSG § 1B1.3 (relevant conduct includes all acts and omissions committed by defendant).

Second, the Federal Rules of Evidence do not apply at a sentencing hearing, and a sentencing judge "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider or the source from which it may come." *United States v. Christensen*, 732 F.3d 1094, 1102 (9th Cir. 2013) *quoting Nichols v. United States*, 511 U.S. 738, 747 (1994); *see also* USSG § 6A1.3, cmt.  Thus, it is irrelevant whether there has been cross-examination on any given point.

Third, facts relevant to sentencing generally need only be proven by a preponderance of the evidence.  *See United States v. Watts*, 519 U.S. 148, 156 (1997); *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005) ("As a general rule the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing.")  "Written statements of counsel or affidavits of witnesses may be adequate under many circumstances."  USSG § 6A1.3, cmt.

In this instance, challenged paragraphs 13-18 provide important context for Levandowski's theft.  Levandowski's taking of the files is only part of the story; to see why he did it, the Court can and should look at what else he was doing at the time.  Put another way, the details about Levandowski's contacts and negotiations with Uber support the inference that he intended to convert a trade secret to the economic benefit of someone other than the owner thereof, which is an element of the crime to which he has pled guilty.  *See* NINTH CIRCUIT MODEL JURY INSTRUCTIONS, No. 8.141B.  Thus, these facts are directly relevant to the offense conduct.

Moreover, the facts in paragraphs 13-18 hew closely to reliable and uncontroverted documentary and testimonial evidence which satisfies the preponderance standard.  Probation and defense counsel are in receipt of the specific emails, excerpts of deposition testimony, and other documents which support the factual assertions.  (Wawrzyniak Decl. ¶ 4.)  Levandowski's claim that the facts are "unproven" is surprising given this evidence, as well as prior factual findings in the civil case and the JAMS arbitration.  (*See, e.g.*, Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief, Case No. 17-cv-939, ECF 426, at 2-8 (May 11, 2017).)

As for paragraph 19, the language in the final PSR tracks the language in paragraph two of the parties' plea agreement. Paragraph 20 states that the government alleged that 33 of the files Levandowski took were trade secrets; this is background information for paragraph 21, which discusses the agreed upon trade secret, Count 33, in more detail. As drafted, the PSR draws an appropriate and clear distinction between what was originally alleged and what resulted from the plea agreement.

In short, there is no legal basis to strike any part of paragraphs 13 through 20 of the PSR. To the extent that Levandowski maintains his objections, the Court should overrule them and adopt the PSR as drafted.

### C.     The Guidelines Calculation

None of the disputed content in the PSR affects the Guidelines calculation under Section 2B1.1. Probation, the government, and defendant agree that the base offense level is 6, and there is a 14-level increase for loss value more than $550,000 but less than or equal to $1,500,000. No other specific offense characteristics or adjustments apply. Thus, the adjusted offense level is 20. After the three-level reduction for acceptance of responsibility, the total offense level is 17.

Levandowski has no criminal history, so the Guidelines Range is 24-30 months.

### D.     Statutory Sentencing Factors

Together, the seriousness of the offense and the need to deter criminal conduct counsel in favor of a mid-range Guidelines sentence.

It has been suggested in the letters of support, and elsewhere, that what Levandowski did was not that bad, and that a substantial custodial sentence might unduly chill employee mobility in Silicon Valley. This case is worlds apart from the situation where an engineer takes his or her know-how from one job to the next.

If Levandowski was unhappy at Google, he was free to leave. He was free to talk to whomever he wanted about new opportunities. He could have resigned and started consulting for Uber, drawing on his many years of experience in the industry. He could have collected his Chauffeur Bonus Plan bonus and gone off to academia to run a lab specializing in LiDAR. He could have quit and started a new company; plenty of other Project Chauffeur alumni have done just that, even within the self-driving car

space, and not been bothered by either Google or law enforcement.[3]

But Levandowski did the exact thing that Congress criminalized: he took a trade secret on his way out the door.  Actually, he swept pretty broadly, indiscriminately taking the entire SVN repository.  Section 1832 was intended to target this form of industrial espionage—"the disgruntled former employee who walks out of his former company with a computer diskette full of engineering schematics."  H.R. Rep. 104-788, at *5, 1996 U.S.C.C.A.N. 4021, at *4024.  Further evidence of Levandowski's criminal intent is that he used at least some of what he took:  he last accessed the Chauffeur Weekly Update on February 24, 2016, and it is not difficult to imagine him referencing the goals and metrics in the spreadsheet as he negotiated back and forth with Uber about LiDAR milestones in mid-January.  Likewise, it seems plausible he consulted the Chauffeur Weekly Update in February when troubleshooting issues as the Ottomotto team got up and running.

In the short term, the theft benefitted Levandowski.  In the period before his crime was detected, he negotiated a lucrative deal.  He took on a leadership role at Uber, something he felt he had been denied at Google.  Had the Stroz Friedberg due diligence process not raised red flags, the stolen files might have made him the savior of Uber's self-driving program.

At some level, that is what Levandowski's actions suggest he wanted, to be seen as the singular inventor of the self-driving car, the way Alexander Graham Bell is credited with inventing the telephone.  Part of what animates the "it's-not-that-bad" school of thought is the misplaced notion that Levandowski was entitled to take the files because they represented his life's work.  The argument is that his passion and dedication to the mission justified his methods.  This is wrong, not only because it upends black letter law, but also because it erases the real and vital contributions of dozens of other talented professionals.  Levandowski did not just steal things he had created; he stole the work of others brought together as a team on Project Chauffeur and supported by Google's infrastructure and resources.  Those other contributors are less well known, to be sure, but they also put their blood, sweat, and tears into Project Chauffeur.  Their hard-earned know-how and negative know-how were documented in the

---

[3] Sebastian Thrun, one of the co-founders of Project Chauffeur, left Google to found Udacity.  Jiajun Zhu now runs Nuro, a robotics and AI company.  Chris Urmson is the CEO of Aurora, and there are numerous other examples.

1   Chauffeur Weekly Update; their hardware designs were stored in the SVN.  The model of the singular

2   genius has its place in Silicon Valley lore, but it should not be used in this case to excuse, in any way,

3   Levandowski's crime.

4          This was also a crime with significant negative fallout.  First and most obviously, Waymo was

5   adversely affected.  As the Victim Impact Statement says, Levandowski's "misconduct was enormously

6   disruptive and harmful to Waymo, constituted a betrayal, and the financial effects would likely have

7   been even more severe had it gone undetected."  (Wawrzyniak Decl. Ex. 1.)  Waymo seeks, and

8   Levandowski has agreed to pay, $756,499.22 in restitution under the Mandatory Victim Restitution Act,

9   which represents costs incurred by Waymo and/or Google in the course of assisting the government's

10  investigation.  Second, Levandowski's conduct hurt his teammates and colleagues, especially the people

11  who followed him from Google to Ottomotto.  Some of these individuals had no idea the plan all along

12  was for Levandowski to sell the company to Uber; they bought into Levandowski's promises that they

13  would build something great from the ground up, only to realize later they had been part of the

14  headcount he had promised to deliver.  Others were fine with the quick acquisition, but felt their own

15  reputations were tarnished when Levandowski's theft later came to light.  Finally, there is the impact on

16  the industry and community more broadly.  Would we be closer to having self-driving cars on the road

17  today if two of the major players in the industry had not become entrenched in litigation?  It is an

18  unanswerable question, but the various legal disputes spawned by the events of late 2015/early 2016

19  have certainly consumed outsize resources and demanded time and attention from otherwise busy

20  engineers and executives.

21         It is for all these reasons that this is not a run-of-the-mill trade secret case, meriting a slap on the

22  wrist.  This was an offense that shook an emerging industry.  Through sentencing in this matter, the

23  Court has an opportunity to shape behavior.  A substantial prison sentence will deter future thefts, while

24  a non-custodial sentence will encourage them.  Absent loss of liberty as punishment, there is a risk that

25  the penalty merely becomes a cost of doing business.

26  //

27

28

UNITED STATES' SENTENCING MEMO.          8
CR 19-377 WHA

**CONCLUSION**

With full consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court sentence Anthony Levandowski to 27 months of imprisonment; 3 years of supervised release (with conditions to be fixed by the Court and the special Suspicionless Search condition agreed upon); the $40,000 fine recommended by Probation; and a $100 mandatory special assessment.  The Court should also order that the agreed-upon $756,499.22 restitution payment be made to Waymo LLC.


DATED:  July 28, 2020                                    Respectfully submitted,

                                                         DAVID L. ANDERSON
                                                         United States Attorney


                                                         _____/s/_____
                                                         KATHERINE L. WAWRZYNIAK
                                                         ANDREW F. DAWSON
                                                         Assistant United States Attorneys