RAMSEY & EHRLICH LLP
MILES EHRLICH - #237954
miles@ramsey-ehrlich.com
ISMAIL RAMSEY - #189820
izzy@ramsey-ehrlich.com
AMY CRAIG - #269339
amy@ramsey-ehrlich.com
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

Attorneys for Defendant
ANTHONY LEVANDOWSKI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| United States, | Case No.: CR 19-00377-WHA |
| Plaintiff, | |
| v. | **DEFENDANT ANTHONY LEVANDOWSKI'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE UNDER 18 U.S.C. § 3553 (A)** |
| Anthony Levandowski, | |
| Defendant | |
| | Date:      August 4, 2020 |
| | Time:      2:00 pm |
| | Courtroom:  Courtroom 12 - 19th Floor |
| | **REDACTED PUBLICLY FILED** |

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND ...................................................................................................4

  A.  Personal Background ......................................................................................4

    i.  The DARPA Challenge ............................................................................5

    ii.  Mr. Levandowski's work at Google ........................................................6

  B.  Procedural Background...................................................................................7

    i.  *Waymo v. Uber* ......................................................................................7

    ii.  *Google v. Levandowski* .......................................................................10

    iii.  *United States v. Levandowski* ............................................................10

III.  THE LEGAL STANDARD ................................................................................11

IV.  PRESENTENCE REPORT ................................................................................13

V.  SECTION 3553(A) FACTORS COMPEL A DOWNWARD VARIANCE.................13

  A.  Nature and circumstances of the offense. .......................................... xviii

    i.  Mr. Levandowski never used any of the Google documents in his possession.....13

    ii. The Chauffeur Weekly Update cannot be used to replicate Waymo's technology…………………………………………………………………...14

  B.  History and characteristics of the defendant. ...........................................15

    i.  Mr. Levandowski exhibits an incredible work ethic. ...........................16

    ii.  Mr. Levandowski's relentless determination to realize self-driving vehicles is founded in his desire to prevent traffic fatalities due to driver error. .................17

    iii.  Despite his demanding work schedule, Mr. Levandowski never hesitates to take the time to mentor others, freely giving them his time and attention. ...............18

    iv.  Mr. Levandowski has never hesitated to step up to help others in their time of need, freely offering his time, advice, money, a place to stay, or job. ...............19

v.  Mr. Levandowski is an exceptional father to his two young sons. .....................20

vi. Mr. Levandowski will continue to use his expertise for the public good. ..........21

C.  The purposes of sentencing—just punishment, specific deterrence, and general
   deterrence. ........................................................................................................21

D.  The need to avoid unwarranted sentencing disparities ...............................................23

E.  The need to provide restitution to any victims of the offense..................................25

F.  The types of sentences available..............................................................................25

   i. The dire threat posed by COVID-19 calls for a sentence of home confinement...25

   ii. The pandemic also reinforces the need for Mr. Levandowski to be available to
      care for his young sons. ........................................................................................27

VI. CONCLUSION.................................................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Statutes**

18 U.S.C. §3553(a) ............................................................................................... passim

USSG §5E1.2(c)(3) ................................................................................................. 13

**Federal Cases**

*Gall v. United States*, 552 U.S. 38 (2007) .......................................................... 11

*Kimbrough v. United States*, 552 U.S. 85 (1997). ............................................... 11

*Koon v. United States*, 518 U.S. 81 (1996) ......................................................... 11

*United States v. Ameline,* 409 F.3d 1073 (9th Cir. 2005) .................................... 12

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) ........................................ 12

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ............................................ 4

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ................................... 25

*United States v. Hernan Padilla*, CR 19-603 WHA (N.D. Cal.) .......................... 26

*United States v. Lance Green*, CR 20-74 CW (N.D. Cal.) ................................... 26

*United States v. Liew* 11-CR-573-JW .................................................................. 24

*United States v. Malhotra*, 5:08-cr-00423 (JF) (N.D. Cal.) ................................. 24

*United States v. Menyweather,* 447 F.3d 625 (9th Cir. 2006) ...................... 12, 28

*United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006) ................................... 11

*United States v. Murphy*, 5:11-cr-00029 (DLJ) (N.D. Cal.) ................................ 23

*United States v. Nosal*, 08-CR-237-EMC .......................................................... 24

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ....................................... 22

*United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) ...................................... 12

*United States v. Ruff,* 535 F.3d 999 (9th Cir. 2008) ........................................... 12

*United States v. Suibin Zhang*, 5:05-cr-00812 (RMW) (N.D. Cal.) .................... 24

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) ...................................... 11

*United States v. West*, 5:08-cr-00709 (JW) (N.D. Cal.)...................................... 23

*United States v. Whitehead,* 532 F.3d 991 (9th Cir. 2008) ................................. 11

*United States v. Zhiqiang Zhang,*  5:10-cr-00827 (LHK) (N.D. Cal.)............................ 23, 24

iv

1

*Waymo v. Uber*, 3:17-cv-00939-WHA ............................................................. 7, 8, 9

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

On March 19, 2020, Mr. Levandowski signed a plea agreement with the government acknowledging his responsibility for a serious criminal violation. He stands ready to formally enter his guilty plea in open court and to accept the sentence this Court will fashion to hold him accountable for his own wrongdoing and deter others from traveling down this same misguided path. Mr. Levandowski knows that he, and he alone, is the one responsible for the tragic situation in which he now finds himself.  No matter what he else he has achieved, or may yet accomplish in his life, he will forever be known as a convicted felon.

We trust that, in fashioning a just sentence, this Court will appreciate that Mr. Levandowski is much more than this singular, inexcusable decision he made.  As demonstrated by the forty letters that his friends, family, colleagues, and other supporters we have submitted to this Court, he is also a fundamentally good and generous man—a man who has never before committed a criminal offense, a man who is an exceptional father to his two young sons, and a man who has contributed greatly to society with a great deal more to give.

It is also important to recognize the difference between the truth of what Mr. Levandowski actually did—the offense conduct now proven and admitted—and the far more brazen and sinister conduct he was originally accused of.  As this Court well knows, this case arose from the sensational and intensely-publicized allegations made against Mr. Levandowski in the underlying *Waymo v. Uber* civil litigation, where he was essentially accused of stealing thousands upon thousands of "crown jewel," billion-dollar self-driving car secrets from Google, selling those secrets to Uber for millions, and then exploiting them to accelerate Uber's competing autonomous driving program.  Because Mr. Levandowski could not answer these explosive accusations while at the same time maintaining his Fifth Amendment rights, Mr. Levandowski was abruptly fired by Uber, swiftly tried and convicted in the court of public opinion, and cast in the national media as the most notorious trade secret thief of our day.

But the truth is far less dramatic. While it was never in dispute that Mr. Levandowski possessed some Google documents after leaving his job, there is no evidence that Mr. Levandowski used or shared any of Google's proprietary or trade secret information with employees at Uber or anyone else. As this Court knows, during the underlying litigation, Google

1

engaged an army of lawyers and forensic experts to comb through Uber's facilities, servers, source code, design files, and prototypes—making 12 separate inspections in all.  The government and the grand jury then spent more than two years investigating the matter.  None of these efforts produced any evidence that Mr. Levandowski used any of Google's trade secrets after leaving Google's employment, whether at Uber or anywhere else.

As reflected in the plea agreement, Mr. Levandowski did improperly take one weekly project-tracking spreadsheet, a version of the Chauffeur Weekly Update, an acknowledged trade secret; and Mr. Levandowski admits that he did so with improper intent. The Chauffeur Weekly Update contains sensitive proprietary information disclosing the state of Google's project development efforts.  It should be noted, however, that this document cannot, on its own, be used to replicate any of the proprietary self-driving car technology developed by Google, since it does not contain core technical information, such as schematics, designs, computer code, or blueprints.

It was improper, and unquestionably a breach of Google's information security, for Mr. Levandowski to take the Chauffeur Weekly Update document. But the fact that he did not commit the more egregious act of actually using the information contained in the document, to cause competitive harm to Google or advantage himself, must also be weighed by the Court in evaluating the overall magnitude of Mr. Levandowski's offense.

In determining what constitutes "just punishment" in this matter, we believe it is also important to consider the significant collateral consequences Mr. Levandowski has already suffered.  For the past three and a half years, Mr. Levandowski has been embroiled in various lawsuits stemming from his decision to leave Google with information still in his possession.  He was summarily fired by Uber for broadly asserting his Fifth Amendment rights in the *Waymo* litigation.  And when Google and Uber ultimately settled the civil suit, they did so subject to the unusual proviso that ███████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████.  Further, while Mr. Levandowski was rewarded handsomely for the

milestones Google's self-driving-car initiative achieved under his stewardship, Google has through arbitration now clawed back all of those earnings, plus an additional $50 million.  In March of this year, a superior court judge affirmed Google's $179 million arbitration award against Mr. Levandowski, driving him into bankruptcy.  Mr. Levandowski signed the plea agreement in this criminal case soon thereafter.

Every step in Mr. Levandowski's downfall has played out under the intense glare of constant national media coverage. Branded in the media as one of the worst-ever trade secret thieves, Mr. Levandowski's name, sadly, has become almost synonymous with greed run amok in Silicon Valley.  We do not raise this point to elicit sympathy from the Court.  Mr. Levandowski knows that he has himself to blame for the reputational damage he has suffered. We raise it instead to address the Court's need to ensure that the sentence it imposes on Mr. Levandowski provides appropriate general deterrence.  The notoriety and range of negative consequences Mr. Levandowski has already suffered for his actions present a unique opportunity for him to be proactive in carrying this valuable cautionary message to other tech-company engineers who may be tempted to download company documents when leaving for a new venture.

Mr. Levandowski has given a good deal of thought to how he went astray and how others can learn from his mistakes. To that end, Mr. Levandowski asks the Court to impose a significant term of community service as a component of his sentence.  He proposes to offer himself as an object lesson in "what not to do," by candidly sharing the story of his misdeeds and speaking about the devastating consequences that followed.  Given his national notoriety, Mr. Levandowski is uniquely situated to reach a wide and interested audience.  We submit that the true story of Mr. Levandowski's conduct and the litany of consequences he suffered as a result, including the punishment to be imposed by this Court, will present a powerful deterrent to anyone who considers following in his footsteps.  His message is clear: taking a trade secret to the next venture is a "life-altering terrible decision," never worth it. Exhibit A (Anthony Levandowski letter).

For the reasons set forth below, the defense submits that a sentence of 12 months of home

3

confinement, a fine of $95,000 (the high end of the guidelines), and a substantial community service requirement is "sufficient" and "no greater than necessary" to fulfill the statutory objectives of federal sentencing.  The Covid-19 pandemic informs our sentencing recommendation.  Over the past 6 years, Mr. Levandowski has had repeated respiratory illnesses, including overcoming pneumonia in 2015 and 2017.  The CDC recognizes respiratory ailments as a significant comorbidity that leads to greater illness and more serious symptoms for those afflicted with the novel coronavirus.  It is, unfortunately, no exaggeration to say that a prison sentence today can amount to the imposition of a serious health crisis, even a death sentence, given the BOP's current inability to control the spread of the coronavirus.  While Mr. Levandowski certainly must be punished for his crime, we submit that, given the grave risks it carries, a custodial sentence right now is unnecessary and unwarranted in this case.  Rather, as discussed below, a sentence of home confinement is more in line with the types of sentences regularly imposed in criminal trade secret cases involving conduct comparable to Mr. Levandowski's, where a trade secret was taken but never actually used.  A sentence of home confinement is all the more appropriate when factoring in the extraordinary dangers presented by incarceration during this pandemic.  Accordingly, we submit that the defense's sentencing proposal "is sufficient but not greater than necessary" to comply with the purposes set forth in § 3553(a).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

## II.  BACKGROUND

### A.  Personal Background

Mr. Levandowski, though an American citizen, was born and raised in Belgium. PSR, ¶ 51. His first language is French.  *Id.* 69. Before moving to the United States as a teenager to attend school, Mr. Levandowski did not regularly read or write in English. *Id.* ¶ 55.  And when learning this new language, he was diagnosed with dyslexia.  *Id.* ¶ 69.  These challenges he faced as a teen, however, did not hinder his ability to learn or limit his enthusiasm for education.  Mr. Levandowski obtained both his undergraduate degree and master's degree from U.C. Berkeley in just five years. *Id.* ¶ 68.  At Cal, he was a member of the freshman volleyball and crew teams,

along with several engineering societies.  He also started his own internet development and hosting services company.  But Mr. Levandowski's passion—then, as now—was to improve the world through artificial intelligence and automation.

### i. The DARPA Challenge

In 2003, while still an undergraduate, Mr. Levandowski began the multi-year project of building a self-driving, self-balancing, two-wheeled motorcycle to compete in the DARPA Grand Challenge, a competition for autonomous vehicles funded by the Defense Advanced Research Projects Agency ("DARPA"), a research organization of the United States Department of Defense.[1] *Id.* ¶ 70.  Mr. Levandowski recruited a small group of fellow engineering students to help him.  Together they worked 16-18 hours a day, and sometimes through the night, in Mr. Levandowski's garage, using crowd-sourced donations and sponsorships. They named their finished entry the "GhostRider."  At the DARPA Grand Challenge, the GhostRider competed against well-funded submissions from Stanford University, Carnegie Mellon University, and a number of large private corporations—and was selected to compete in the final race.  Although it did not win either year it competed, Mr. Levandowski's remarkably innovative and daring design–the only two-wheeled vehicle entered in the competition–captured the interest of many prominent technology leaders in the engineering world and beyond.  And in 2007, at the request of the Smithsonian Institution, Mr. Levandowski donated the GhostRider to the Institution, where it is has been displayed, alongside a small-scale model and a photo of the young design team, in the Smithsonian's Museum of American History. *Id.*



Photo: The Smithsonian National Museum of American History https://americanhistory.si.edu/collections /search/object/nmah_1332301

---

[1] Mark Harris "GhostRider: The Self-Driving Motorbike That Launched Anthony Levandowski" (Feb. 27, 2018), https://spectrum.ieee.org/cars-that-think/transportation/self-driving/ghostrider-the-self-driving-motorbike-that-launched-anthony-levandowski

*ii. Mr. Levandowski's work at Google*

The GhostRider so impressed Dr. Sebastian Thrun—whose Stanford team won the 2005 competition—that he recruited Mr. Levandowski to work for his mapping company, called VuTool. *Id.*.  VuTool was subsequently acquired by Google, where Mr. Levandowski and Dr. Thrun went on to develop "Street View," a technology that provides interactive panoramas of streets and roadways, and which powers Google Maps' Street View feature all over the world. PSR, ¶ 6.

On his own time, Mr. Levandowski continued to develop technologies to enable self-driving vehicles navigate both on and off-road. *Id.* ¶ 7.  In 2007, Mr. Levandowski co-founded 510 Systems, a start-up that developed several different mobile mapping systems, as well as sensors, including Light Detection and Ranging technology ("LiDAR"). *Id.*  While 510 Systems' main application for its technology was to support agricultural equipment and other off-road self-driving applications, in 2008, Mr. Levandowski expanded its scope after being approached by the Discovery Channel asking to use the GhostRider to make an autonomous pizza delivery.  With the GhostRider in the Smithsonian (and thus unavailable), Mr. Levandowski founded a new company called Anthony's Robots and he created the "Pribot," a self-driving Toyota Prius to meet the Discovery Channel's challenge. *Id*. ¶ 74.  In 2008, Mr. Levandowski's Pribot delivered a pizza from San Francisco to Treasure Island, becoming the world's first self-driving car to drive unmanned on public roads in the process. *See* https://www.youtube.com/watch?v=deivMCMh0g8 (YouTube clip of the Pribot's first drive).

In 2009, Mr. Levandowski and Dr. Thrun founded and launched a self-driving car initiative at Google, naming the program "Project Chauffeur." PSR, ¶ 6.  In 2011, about two years later, Google purchased both 510 Systems and Anthony's Robots from Mr. Levandowski to accelerate the advancement of Project Chauffeur with the innovative technologies Mr. Levandowski had independently developed at his outside companies. *Id.* ¶ 6.  Shortly after the acquisition of 510 Systems and Anthony's Robots, Google created the Chauffeur Bonus Plan, an incentive bonus plan that was expressly designed to give the Project Chauffeur team the same sort of economic incentives they would have received if they were operating as a small start-up. *Id.* ¶ 8.  The point of the program was to reward Mr. Levandowski (and the other team members)

handsomely if the Chauffeur team was successful in achieving certain aggressive milestones. The team met these milestones, and Mr. Levandowski, in turn, was paid a great deal for doing so. *Id.* ¶ 77.

Over time, however, Mr. Levandowski became dissatisfied with the direction of Project Chauffeur and the progress it was making. *Id.* ¶ 10. In his last few months before leaving Google, Mr. Levandowski had multiple communications with Larry Page, Google's founder and then-CEO, regarding the problems he saw with Project Chauffeur and he suggested solutions to address these problems. *Id.* Mr. Levandowski also shared with Mr. Page that, if he could not improve Project Chauffeur from the inside, he might leave the company and work on autonomous driving outside of Google. *Id.*

Mr. Levandowski ultimately left Google on January 27, 2016, and shortly thereafter helped start Ottomotto LLC, a company that retrofitted semi-trucks with self-driving technology, and also designed and developed autonomous driving hardware and software. *Id.* ¶ 16. On August 18, 2016, when Uber announced publicly that it was acquiring Ottomotto, Google intensified its dormant internal investigation into Mr. Levandowski's conduct prior to his departure from the company. And on February 24, 2017, Waymo (a company spun out of Google using the Project Chauffeur assets) filed a federal civil lawsuit against Uber, raising explosive allegations of trade secret thievery by Mr. Levandowski and senior executives at Uber. *Waymo v. Uber*, 3:17-cv-00939-WHA (Dkt. 1).

**B. Procedural Background**

    *i.   Waymo v. Uber*

Although Mr. Levandowski was not a party to Google/Waymo's lawsuit, he was unquestionably at its center. Google's case was premised on its allegation that, when Mr. Levandowski chose to leave Project Chauffeur, he stole some 14,000 files, representing "billions" of dollars in value, with the intent of replicating Google's LiDAR devices at Uber. Google's complaint trumpeted as fact its characterization that Uber had acquired Ottomotto for a reported "$680 million, a remarkable sum for a company with few assets and no marketable product." *Waymo v. Uber*, 3:17-cv-00939-WHA (Dkt. 23) at ¶55. The inference was plain: the

only reason Uber would buy Mr. Levandowski's company for more than half a billion dollars (a sum that was later shown to be vastly overstated) was because it was actually buying Google's misappropriated trade secrets.

Amidst the onslaught of criminal accusations lodged against him, in a lawsuit to which he was not a party, Mr. Levandowski accepted the advice of his counsel and broadly asserted his Fifth Amendment rights in the *Waymo v. Uber* litigation.  On May 11, 2017, this Court *sua sponte* referred Mr. Levandowski and Uber to the United States Attorney's Office for investigation of possible theft of trade secrets. *Waymo v. Uber*, Case No. 17-cv-00939 WHA, Dkt. 428.

As a result of the *Waymo v. Uber* litigation and the enormous press attention it received, Mr. Levandowski was quickly transformed into the poster boy for high-tech trade secret theft. Article after article showcased Mr. Levandowski's alleged greed and villainy. But the facts established in discovery and in the courtroom fell well short of these dramatic accusations.  For instance, it was insinuated that the only reason Mr. Levandowski would have downloaded the entire set of 14,000 LiDAR files was to replicate these designs at Uber.  But the Waymo engineer who set up the external "SVN" sever, where the LiDAR design files were hosted, testified, that in order to review even just a single one of the files, an authorized user such as Mr. Levandowski would have to initiate a "checkout" command that would automatically download all 14,000 files at one time.  Exhibit G to Craig Decl. at ZBROZEK-002

It also came to light that this same Waymo engineer, the employee responsible for maintaining the repository for the files in question, had previously informed Google's lawyers that Mr. Levandowski's "checkout" activity didn't "ring the alarm bells for" him.  *Id.* at ZBROZEK-013. And he stated on another occasion that "[w]e all do full checkouts, and it makes me uncomfortable that lawyers are trying to ascribe suspicion to it."  *Id.* at ZBROZEK-007.  This same Waymo engineer also stated in internal emails that the files on the SVN server were considered "low value" by the company–so much so that Google had elected to host them on a third-party server. *Id.* at ZBROZEK-013.

Many of the other claims advanced by Google/Waymo in the litigation proved to be just

1  as shaky.  For instance, the very first supposed trade secret that Google claimed Mr.

2  Levandowski had misappropriated (labelled Trade Secret No. 1) was actually a basic principle of

3  optics known to all competent engineers—as this Court memorably put it, "nothing more than

4  Optics 101." *Waymo v. Uber*, 3:17-cv-00939-WHA, Dkt. 2219 at 15.  When Google sought to

5  defend another alleged trade secret it claimed Mr. Levandowski had stolen (Trade Secret 96), by

6  having its expert draw a superficial comparison between the Petzval surfaces of two lenses, this

7  Court was even more blunt in rejecting Google's overreaching: "██████████████████████

8  ████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ████████████████████████████  Exhibit I to Craig Decl. (Excerpt of Transcript of 9/20/17

11  proceedings at 102-03); *see* also Dkt. 2219 (striking Trade Secret 96, and stating that Waymo's

12  expert's "emphasis on the similarity of the Petzval surfaces is a trick — smoke and mirrors").

13        The much-touted $680 million purchase price for Ottomotto proved to be equally

14  illusory.  The reality is that Uber paid just $100,000 in cash to acquire Ottomotto.  Exhibit H to

15  Craig Decl. (Excerpt from June 19, 2017 Depo. of Cameron Poetzscher at 135:5-17).  The

16  remaining sums were based on Uber shares that were to be awarded only if the Ottomotto team

17  met specific milestones tied to performance.  But, soon after Waymo initiated its litigation, Uber

18  fired Mr. Levandowski, long before his team was in a position to reach any of these milestones,

19  and thus long before any of Mr. Levandowski's shares could vest.  Mr. Levandowski did not get

20  rich by partnering with Uber.  In fact, quite the opposite.

21        On February 9, 2018, after five days of trial, Google and Uber reached a settlement. In a

22  rather unusual provision, ████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████.  Exhibit F

24  to Craig Decl. at ¶ 5 (excerpted below):

25        ████████████████████████████████████████:

26  ████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████,

Anthony Levandowski's Sentencing Memorandum
Case No. CR 19-377-WHA

[redacted].

[redacted]

[redacted]

[redacted].

### ii. Google v. Levandowski

In addition to its civil suit against Uber, Google brought two arbitration actions against Mr. Levandowski personally, for breach of contract, breach of fiduciary duty and the duty of loyalty, and unfair competition. PSR, ¶ 78.  Google did not assert a trade secrets claim in the arbitration.  In its suits, Google sought to claw back all of the money Mr. Levandowski had been paid for his work on Project Chauffeur, approximately $127 million.  Because of the ongoing criminal investigation, Mr. Levandowski maintained his Fifth Amendment rights.  And Google succeeded, plus some.  In March of 2019, a three-judge arbitration panel awarded Google a $179 million arbitration award against Mr. Levandowski.  *Id.*  On March 4, 2020, a California superior court judge affirmed that award. *Id.*

As a result of the arbitration award, Mr. Levandowski was forced to file for chapter 11 bankruptcy protection, which he did on March 4, 2020, after the judgement against him was affirmed.  That case is now pending before Judge Blumenstiel. *In re Levandowski*, NDCA Bankr. Case No. 20-30242 (HLB).

### iii. United States v. Levandowski

On August 15, 2019, approximately 27 months after the Court referred the matter, the government indicted Mr. Levandowski, alleging 33 counts of trade-secret theft, mirroring the allegations in Waymo's civil lawsuit. Dkt. 1. As soon as Mr. Levandowski learned of the indictment, he immediately came to the courthouse to self-surrender. PSR, ¶ 4. He also moved quickly towards accepting responsibility for his actions and resolving the case with the U.S. Attorney's Office.  On March 19, 2020, after weeks of productive discussions with the prosecutors, Mr. Levandowski signed a plea agreement acknowledging his criminal responsibility for one of the counts that was filed against him—Count 33—based on his misappropriation of a document titled "Chauffeur TL weekly updates – Q4 2015."  Dkt. 77-1.

1  Mr. Levandowski stands ready to plead guilty before this Court on August 4th and to be

2  sentenced for his crime.

3                          **III. THE LEGAL STANDARD**

4          This Court must determine the consequences that will achieve a just sentence given the

5  facts and circumstances of this particular case.  The "overarching statutory charge" under 18

6  U.S.C. § 3553 is for the district court to "'impose a sentence sufficient, but not greater than

7  necessary [to accomplish the statutory objectives]." *Carty*, 520 F.3d at 991 (quoting 18 U.S.C. §

8  3553(a)); *see Kimbrough v. United States*, 552 U.S. 85, 101 (1997).  Towards that end, the

9  Supreme Court directs "the sentencing judge [to] consider every convicted person as an

10  individual and every case as a unique study in the human failings that sometimes mitigate,

11  sometimes magnify, the crime and punishment to ensue."  *Gall v. United States*, 552 U.S. 38, 52

12  (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

13          Although the trial court must first determine the applicable Guidelines range, that range is

14  merely the "starting point and the initial benchmark." *Gall*, 552 U.S. at 49; *Carty*, 520 F.3d at

15  991.  A trial court "may not presume" that the Guidelines range is reasonable.  *Gall*, 552 U.S. at

16  50.  The Supreme Court's decision in *Gall* and its progeny have "breathed life into the authority

17  of district court judges to engage in individualized sentencing" *United States v. Whitehead*, 532

18  F.3d 991, 993 (9th Cir. 2008) (quoting *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir.

19  2008) (en banc)), and confirmed the power of district courts to depart from the Guidelines in

20  appropriate cases.  *See United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006) ("any

21  deviation from the applicable advisory guidelines range [is] viewed as an exercise of the district

22  court's post-*Booker* discretion and reviewed only for reasonableness.")

23          To meet its mandate of imposing a sentence that is "sufficient, but not greater than

24  necessary" the sentencing judge must consider all of the factors listed in 18 U.S.C. § 3553(a),

25  including the nature and circumstances of the offense, the history and characteristics of the

26  defendant, the kind of sentences available, and the need for the sentence imposed to reflect the

27  seriousness of the offense and afford adequate deterrence.  *See* 18 U.S.C. §3553(a). In

28  undertaking this analysis, this Court must examine the factors unique to the defendant—namely,

his lifetime of good conduct, hard work, and commitment to family obligations—as those factors are highly relevant to determining whether a particular sentence is reasonable and not greater than necessary.  *See, e.g., United States v. Ruff,* 535 F.3d 999, 1001, 1003 (9th Cir. 2008) (history of strong employment, family support), *United States v. Whitehead,* 532 F.3d 991, 993 (9th Cir. 2008) (devotion to building a business, dependence of family); *United States v. Menyweather,* 447 F.3d 625, 634 (9th Cir. 2006) (family responsibilities); *United States v. Ameline,* 409 F.3d 1073, 1093 (9th Cir. 2005) (Wardlaw, J. concurring and dissenting) ("defendant's family ties and responsibilities, his or her educational and vocational skills, and his or her military, civic, charitable, or public service record" and other factors are "essential to sentencing consistent with 18 U.S.C. § 3553(a)"); *United States v. Prosperi*, 686 F.3d 32, 48-49 (1st Cir. 2012) (dependence of family); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (public service and good works, commitment to helping persons in distress).

As a result of the COVID-19 pandemic, courts across the nation have also weighed what constitutes a "sufficient, but not greater than necessary" sentence within the context of the grave danger inherent in a custodial sentence during this time.  Recognizing these concerns, the Department of Justice has offered guidance that underscores the need to make use of alternative sentences.  On March 26, 2020, the Attorney General directed the Bureau of Prisons to "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," particularly for those "at-risk inmates who are non-violent and pose minimal risk of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities."[2] These steps protect not only the transferred inmates, but all of the inmates, as well as the corrections staff.

Although, the Attorney General's guidance was directed at those already incarcerated, its animating principle applies equally to any sentencing determination: proactive steps must be taken to protect the lives of individuals who are particularly vulnerable to COVID-19.

---

[2] Off. of the Att'y Gen., Mem. for Dir. of Bureau of Prisons, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020) https://www.justice.gov/coronavirus.

## IV.  PRESENTENCE REPORT

Mr. Levandowski has just one objection to the factual recitations in the Probation Officer's Presentence Report ("PSR"): paragraph twenty needs to explicitly note that the assertions regarding whether certain files fall "within the statutory definition of 'trade secret'" are merely the government's allegations.  As currently written, the second to last sentence of that paragraph does not make that clear.

Mr. Levandowski agrees with the Probation Officer's calculation of the applicable guidelines range. Mr. Levandowski's total offense level is 17; he has no criminal history; and his advisory guidelines range is therefore 24-30 months.  PSR, ¶ 82.  The fine range for his offense is from $10,000 to $95,000.  *Id.* ¶ 89; USSG §5E1.2(c)(3).

## V.  SECTION 3553(A) FACTORS COMPEL A DOWNWARD VARIANCE

The Probation Office recommends that the Court impose a sentence of 24 months.  Mr. Levandowski recognizes that he must be held accountable for his inexcusable misconduct with punishment that is meaningful and sufficient.  We respectfully submit, however, that the Probation Office's recommendation does not fully take into account the applicable 18 U.S.C. § 3553(a) factors, Mr. Levandowski's substantial childcare obligations for his two young children, or the unprecedented risks inherent in the ongoing COVID-19 pandemic.  All of these factors, weighed together, lead to the conclusion that a below-guidelines sentence of 12 months of home confinement, coupled with both a fine of $95,000 (the high end of the guidelines) and a substantial community service requirement, is sufficient but not greater than necessary to comply with the statutory purposes of sentencing in this case.

## A.  Nature and circumstances of the offense.

### i.  *Mr. Levandowski never used any of the Google documents in his possession.*

When this investigation began, it was premised on the allegation that Mr. Levandowski had pilfered highly technical trade secrets worth billions of dollars and that he then used for his own and Uber's financial benefit.  But that sinister narrative was never established—because it was never true.  Mr. Levandowski fully acknowledges that, shortly before leaving Google, he downloaded a project-tracking document known as the Chauffeur Weekly Update, a document

13

that constituted a trade secret, and that he did so with the intention of someday using it to his own or Uber's benefit. That act was inexcusable, criminal, and deserving of punishment. But, at the same time, it must be recognized that Mr. Levandowski never followed through on the wrongful intent he earlier harbored: he *never* used the Chauffeur Weekly Update or any of the other Google documents in his possession to benefit either himself or Uber.

This is not because Mr. Levandowski was somehow "caught" before he had the chance to plunder the documents to his advantage. Mr. Levandowski had months during which he could have copied and incorporated any proprietary information contained in the Chauffeur Weekly Update document he took, or in any of the other Google documents then still in his possession. The simple, important, and undisputed truth is that he never did. We know this because, during the Waymo litigation, Google hired armies of lawyers and forensic experts to scour Uber and Ottomotto's assets for any sign of the trade secrets that it had alleged Mr. Levandowski stole. Google spent hundreds of hours on its inspections, searching Uber's computers, servers, facilities, source code, design files, and prototypes twelve separate times. It found nothing.

Put simply, Mr. Levandowski took a trade secret document that didn't belong to him with wrongful intent. At that moment the offense was complete. But equally important is the fact that Mr. Levandowski never took the far more culpable step of exploiting that proprietary information to his own advantage or to the disadvantage of Google, its rightful owner.

*ii. The Chauffeur Weekly Update cannot be used to replicate Waymo's technology.*

The only document in Mr. Levandowski's possession that the parties agree both (1) constitutes a trade secret, and (2) was taken by Mr. Levandowski with illicit intent is the "Chauffeur TL weekly updates – Q4 2015," described in Count 33 of the Indictment, the sole count to which Mr. Levandowski has pled guilty. Dkt. 77-1 (Plea Agreement) ¶2. As its name indicates, the Chauffeur Weekly Update was "an internal tracking document" used by the engineers working on Project Chauffeur. *Id.* It is an excel spreadsheet that listed the various tasks the team was working on. Mr. Levandowski acknowledges that this document, as a whole, constitutes a Google trade secret, since it contains quarterly goals, weekly metrics, objectives, and key results for his team at Google. To be clear, however, this document could not be used to

replicate any of Google's self-driving car technologies.  It does not contain designs or blueprints; nor does not it include any detailed information about how to build or integrate any of the technology developed by the Project Chauffeur team.  Exhibit E to Craig Decl.

In addition, Mr. Levandowski's conduct in taking and holding the Chauffeur Weekly Update (but not using it) caused no tangible competitive harm or diminution in revenue to Google.  Indeed, the $756,499.22 in restitution agreed to by the parties is not compensation for any operating losses Google suffered, but rather it "represents costs incurred by Waymo and/or Google in the course of assisting the government's investigation"; more specifically, it accounts for the fees of Google's three law firms lawyers in communicating with, and producing documents to, the prosecutors.  Dkt. 77-1 (Plea Agreement) ¶9.

**B. History and characteristics of the defendant.**

The PSR notes that Mr. Levandowski "has been a law-abiding citizen except for his involvement in the instant offense; has maintained stable employment; and is a pioneer in his field." PSR, Sentencing Recommendation at 3.  But these bare facts don't begin to capture "the type of father, son, brother and friend Anthony is and has always been."  *See* Exhibit B at 013, (Peter Skewes-Cox, Jr. letter).  To fill this gap, we have provided the Court with testimonials from the people who actually know Mr. Levandowski and who have seen how he operates in every facet of his life.  *See* Exhibits B and C to the Declaration of Amy Craig.  These individuals tell of a man far different than the one portrayed in the media.  They paint a portrait of a man who is "uncommonly brilliant and highly capable," "fiercely intelligent, kind, and deeply offended by unfairness," "humble, aware of his failings [and who] works incredibly hard," "a huge proponent of meritocracy," "an advocate and a dedicated mentor" who "is unreasonably free with his time," "a thoughtful, patient and attentive father" who inspires others to become better parents to their own children, and a "fundamentally a good and trustworthy person." *See, e.g.,* Exhibit B at 049-050 (Eyal Cohen letter); 014-15 (Jibril Jackson letter); 050; 005 (Ognen Stojanovski letter); 034 (Robbie Miller letter); 023 (Suzanna Musick letter); 030 (Randy Miller letter).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i.   *Mr. Levandowski exhibits an incredible work ethic.*

Mr. Levandowski's resume would seem to speak for itself.  Few engineers can state that the Smithsonian Institution now houses a project they worked on in their garage.  Experience teaches us that pedigreed resumes can often be the product of luck and connections.  But that is not the case for Mr. Levandowski.  He is both extremely talented and extremely hard working.  These traits are readily apparent to those who know him.  Even as a teenager, Mr. Levandowski's friends found him to be "the hardest working, most driven person we'd ever met, [who] was going to change the world for the better." *Id*. at 012 (Peter Skewes- Cox, Jr. letter).  David McConnell writes that "[t]he truly remarkable and unique thing about Anthony" is his ability to "envision the future and [] how he thought specific new technologies might be leveraged together to create a new world  . . . . [and] then sets about creating and doing what is required to bring it to life."  *Id*. at 051.

Mr. Levandowski has used his unique combination of skills to build company after company, mostly small start-ups that nevertheless produce a major impact—globally, by advancing public safety through automation, and locally, by improving the lives of the individuals he employs.  As Steven Orchard points out, given his proliferation of ventures, "[d]irectly and indirectly, Anthony's unique capabilities paid for mortgages, schooling, family vacations, healthcare, and retirement savings" for hundreds of individuals, all doing important work, in Mr. Orchard's case, "providing abundant, low-cost, and high-quality housing."  *Id*. at 060.

Despite the professional heights he has attained, Mr. Levandowski's extraordinary work ethic has never flagged.  He is still the first one in and the last to leave the office, "eagerly taking on grunt work or helping others whenever needed." *Id*. at 006 (Ogen Stojanovski letter). Mr. Stojanovski recounts that, as CEO of Ottomotto, Mr. Levandowski "personally changed the fans in the bathroom stalls—and insisted that I help him—because, as he rationalized it, we were the tallest people around so it was easiest for us to just do it rather than bother the janitorial staff." *Id.* Similarly, as CEO of Pronto, Mr. Levandowski, "took out the trash to the curb at night and picked up the syringes from drug addicts abandoned in front of our office in the morning." *Id.* Ruth Kanfer similarly recalls a time when Mr. Levandowski drove to help a Pronto employee

16

safely change a flat tire on the highway on a weekend. *Id.* at 048.  In short, Mr. Levandowski readily takes on any of the tasks that need doing, without ego.  He has "never given an instruction to a subordinate to do a task that he would not gladly do himself."  *Id.* at 006.

### ii. Mr. Levandowski's relentless determination to realize self-driving vehicles is founded in his desire to prevent traffic fatalities due to driver error.

Mr. Levandowski has spent his entire adult life working toward his mission of making the life-saving potential of autonomous vehicles a reality.  Many assume his relentless drive is motivated by a desire to accumulate great wealth, but "nothing could be further from the truth." *Id.* at 030 (Randy Miller letter).  The truth is that Mr. Levandowski lives "a very modest lifestyle"—"he didn't so much as buy a new car for years after making $100 million[,] [i]nstead he continued to drive a junker with 140,000 miles on it." *Id.*  He "does not party, does not drink, does not schmooze, [does] not shamelessly self-promote (he is extremely self-critical), does not have an 'entourage' or 'handlers,' and he can't stand opulent displays of wealth." *Id.* at 005.

Daniel Gruver observes that Mr. Levandowski's "intensity comes from his excitement and desire to improve transportation." *Id.* at 045.  His motivation is personal.  In 2010, when Anthony's then-partner was nine months pregnant with their first child, she was involved in a serious accident, which totaled her car.  *Id.* at 012.  Although she recovered without any harm to the baby, the experience sparked in Mr. Levandowski a resolve to use his talents to realize his vision of removing human error as a contributing factor in car accidents.  *Id.*  As recounted by his uncle, in Mr. Levandowski's view:

> Once you make the car better than the driver, it's almost irresponsible to have him there . . . every year that we delay this, more people die . . . I want to see this through.  What we've done so far is cool; it's scientifically interesting, but it hasn't changed people's lives.

*Id.* at 028.  This drive animates Mr. Levandowski's work.  David Goldwater writes that, after spending "hundreds of hours working with Anthony," he can attest that Mr. Levandowski is driven by the desire to "improv[e] the lives of ordinary working people . . . and make the world a better place." *Id.* at 046.  Randy Miller writes: "For decades I've seen Anthony motivated by a simple will to drive progress in the world and a joy he finds in breaking down the boundaries of

17

what's possible." *Id.* at 030.

  *iii. Despite his demanding work schedule, Mr. Levandowski never hesitates to take the time to mentor others, freely giving them his time and attention.*

 A recurring theme throughout the letters submitted to the Court is that Mr. Levandowski is willing to take a chance on people, give them the tools they need to succeed, and provide ongoing mentorship. Asheem Linaval writes that Mr. Levandowski hired him at 510 Systems when he was eighteen with only a high school diploma. *Id.* at 042. When Google chose not to hire him after acquiring 510 Systems, Mr. Levandowski "found a way" to include Mr. Linaval in Project Chauffeur, bringing him in through a staffing company. *Id.* In Mr. Linaval's words, "[h]e gave me the opportunity to prove myself, a rarity in a time when hiring managers often sort applicants by which institution they attended." *Id.* Gaetan Pennecot similarly writes that "Anthony helped me and the other engineers on his teams develop by having us work on the right projects, with the right tools, regardless of where we were coming from." *Id.* at 37. Eyal Cohen notes that Mr. Levandowski "is at his best when mentoring, coaching or inspiring . . . . [h]e prioritizes the individual, often dropping everything when they are faced with tricky problems." *Id.* at 49; *see also id.* at 38-40 (Catherine Culkin Letter).

  The fact that so many colleagues have followed Mr. Levandowski from company to company is a testament to the fact that he is a natural leader with whom people are excited to work. *See, e.g., Id.* at 42, 45, 58. Daniel Gruver explains that Mr. Levandowski "built teams that supported each other and felt like a community" and that, "[e]ven as project and team size grew at Google, Anthony would take time to talk with me about career and life goals . . ." and that, while "[w]orking for Anthony at times has been challenging, [] those challenges came when I was being pressed to be more creative, to consider more complex systems and to more diligently defend my ideas with research and engineering rigor." *Id.* at 45. Robbie Miller recalls that, while at Google, Mr. Levandowski "was my biggest advocate and a dedicated mentor, and through his support and encouragement I regained purpose and excitement for my future." *Id.* at 33.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*iv. Mr. Levandowski has never hesitated to step up to help others in their time of need, freely offering his time, advice, money, a place to stay, or job.*

Another theme that echoes through the letters is how, when someone was going through a rough time in their life, Mr. Levandowski stepped up and offered advice, money, a place to stay, or a job opportunity.  The recipients of these overtures ranged from family members to friends to mere acquaintances and even to strangers.  Mr. Levandowski's younger brother, Max, shares how Anthony brought him to California when Max was feeling directionless after graduating from college.  *Id.* at 001-002.   Once in the United States, Anthony pushed Max out of his comfort zone, instilling him with the confidence that he was capable of doing "'it, [w]hatever the 'it' might be.'" *Id.* Erik Kampmann, a family friend from Belgium, writes that, when he was going "through a very tough period in [his] life," Mr. Levandowski invited him to come spend the summer in Berkeley, in Anthony's home, all expenses paid, for the sole purpose of giving him a much-needed change of scenery.  *Id.* at 53. Another friend describes Mr. Levandowski writing "an extremely generous check," with no strings attached, so that an old high-school friend could hire "outside software developer help in hopes it would push him towards his dream."  *Id.* at 12 (Peter Skewes-Cox, Jr. letter).

In each instance, Mr. Levandowski didn't hesitate to use his personal resources to provide someone a much-needed lifeline.  Indeed, in one instance he offered a literal lifeline – running into the water to save a girl from drowning while at the beach with his brother and mom. *Id.* at 001-002, (Maxime Levandowski letter), 026 (Slyvie Woelffle letter).  While one is not given many opportunities to literally save another's life, Mr. Levandowski has often been in a position to uplift others who have been traditionally kept out of the ranks of big tech.  And he has used his power to do just that.  Mr. Stojanovski writes that Mr. Levandowski has "a long track record of empowering women in teams that he's managed, promoting women and minorities to senior leadership positions  . . . and [] actively remedying equal pay discrepancies."  *Id.* at 005. Jibril Jackson, an African American entrepreneur, similarly shares that Mr. Levandowski's willingness to invest both his time and money into Mr. Jackson's venture was "the first time anyone both white and pedigreed was willing to kick the tires on [his] code."  *Id.* at 015.

*v. Mr. Levandowski is an exceptional father to his two young sons.*

Mr. Levandowski's commitment to his mission of advancing public safety through automation is matched only by his commitment to being a good father, one who is fully present and actively engaged in his sons' lives. From the moment each of his sons was born, Mr. Levandowski has brought his considerable talents to bear to protect them and nurture their development. ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████                    *Id.* at 21. And, even though they are no longer life partners, Ms. Olsen notes that they continue to amicably co-parent with the best interests of the children at the forefront of their decisions. *Id.* They share custody, ███████████████████████████████████████████████. PSR, ¶ 58. Ms. Olsen writes that the boys "adore their father in so many ways—they see him as a hero inventor, a loving protector, a hard worker, and a playful father who is always happy to see them, and who would travel to the ends of the earth for them." Exhibit B at 21. ████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

The presence of two actively-engaged parents has become all the more crucial given the global pandemic, which has brought society to a halt. Like every other parent in the country, Mr. Levandowski and Ms. Olsen have had to find ways to occupy two rambunctious boys without the normal outlets provided by school, sports, and playdates. But Mr. Levandowski has risen to this challenge with compassion and creativity. Early on in the pandemic, when one of his son's expressed fear about touching a gate at a public park due to the coronavirus, Mr. Levandowski encouraged him to think of a solution to the problem. His sons' brainstorming led them to design and build small devices that allow individuals to open and close doors without having to

touch the door handle. Mr. Levandowski, his brother, and his boys then went around and installed their devices at local businesses for free. *Id.* at 002-003.

    *vi. Mr. Levandowski will continue to use his expertise for the public good.*



## C. The purposes of sentencing—just punishment, specific deterrence, and general deterrence.

For the past three and a half years, Mr. Levandowski has lived under a spotlight.  As part of the Waymo litigation, teams of attorneys and experts combed over every email and text message he had written leading up to his decision to leave Google and join Uber.  Countless articles have been written about his misdeeds.  He was branded a thief in the public eye long before the government even started its investigation.  And he has suffered significant consequences for his mistakes: he has been embroiled in litigation for years, fired from his job, ▮▮▮▮▮▮▮ and forced into bankruptcy.  His story is already held up in legal articles and compliance trainings as a cautionary tale of "what not to do."

Mr. Levandowski accepts responsibility for what he has done, and what happened to him.  He cannot change the past, but the lessons he has learned can guide his course forward, and he can use these lessons to educate others. With Pronto, Mr. Levandowski has deliberately moved away from LiDar, the hardware that was at issue in the Waymo litigation.  Pronto builds safety systems for trucks using only cameras, radars, and state of the art machine learning.  Pronto does not use any LiDAR in its products or technology.  Exhibit A (Anthony Levandowski letter).[3]

---

[3] *See also* Kirsten Korosec, "Levandowski's Pronto.ai plans to ship automated driving systems for trucks in 2019" https://techcrunch.com/2018/12/18/anthony-levandowski-prontoai-self-driving-trucks/

And in building this new company, Mr. Levandowski instituted rigorous compliance procedures. He put two attorneys, both active members of the bar, in positions of control as Chief Operating Officer and General Counsel. Both individuals are well aware of this criminal matter and they have both submitted letters to the Court. Exhibit B at 004-010 (Ognen Stojanovski letter) and 0048 (Ruth Kanfer letter). Eyal Cohen writes that "[e]very element of [the Pronto] organization was built professionally, from the caliber of its executives to its adherence in good governance and process." *Id.* at 50. Jibril Jackson, a graduate of Stanford Law School, wrote that "Pronto's commitment to a culture of ethics was evident from day one." *Id.* at 015-016.

Mr. Levandowski has spent the last three and half years paying an enormous price for his misconduct. These collateral consequences bear on his sentencing. *See, e.g., United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id*. § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)). Mr. Levandowski has taken these hard lessons learned to heart, and he has shown through his actions that he will go nowhere close to crossing the line. Mr. Levandowski will not re-offend. No further specific deterrence is needed. We understand, however, that in fashioning a sentence the Court must also ask a separate question: Would someone tempted to commit a similar offense be *adequately deterred* from doing so by the consequences and penalties imposed on Mr. Levandowski for his conduct?

Given the very steep and very public consequences he has already experienced for the offense he committed, we submit that the answer is: Yes. The sentence we ask this Court to impose will further deter any reasonable person who considers downloading and taking a company document for their own personal benefit. If the Court adopts our proposal, Mr. Levandowski will be confined to his home for a year, ordered to pay a $95,000 fine (after already having had to file bankruptcy), and ordered to perform considerable amount of

community service, sharing his misdeeds and subsequent downfall with numerous people, in a presentation that will require a further reckoning with where he went wrong.  These are significant deterrents—both to Mr. Levandowski, personally, and to the broader public.

**D.  The need to avoid unwarranted sentencing disparities**

Section 3553(a)(6) also requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Based on our review of trade secret sentences resolved by guilty plea in this District, Mr. Levandowski's conduct in wrongfully taking—but not using—a single trade secret document is most analogous to cases in which the courts have imposed a probationary sentence, rather than a term of incarceration.

For instance, in *United States v. Zhiqiang Zhang*,  5:10-cr-00827 (LHK) (N.D. Cal.), the defendant pled guilty to replicating trade secret source code belonging to his old employer at the new firm he founded. Dkt. 134, p. 2.  He was sentenced to 60 months of probation and a fine of $20,000, and paid restitution of $75,000.  Similarly, in *United States v. West*, 5:08-cr-00709 (JW) (N.D. Cal.), the defendant, an engineer who generated 12 patents, copied trade secret computer files from his prior employer.  At his new employer, he accessed files "sporadically" before his crime was discovered. *Id.* at Dkt. 15, p. 4.  He was sentenced to 36 months of probation, a fine of $5,000 and ordered to pay $100,000 in restitution. *Id.* at Dkt. 18.

Further, in *United States v. Murphy*, 5:11-cr-00029 (DLJ) (N.D. Cal.), the defendant-engineer brought trade secrets from KLA Tencor, his former employer, to the new company he founded, but he was not alleged to have used them.  *Murphy*, 5:11-cr-00029, Dkt. 1.  After pleading guilty, Mr. Murphy was sentenced to 36 months of probation with six months of electronic monitoring.  *Id.* at Dkt. No. 10.

By contrast, cases in this District where the defendant actually used trade secrets for his personal benefit or shared them with a new employer for their benefit, have yielded custodial sentences.  For instance, in *United States v. Malhotra*, 5:08-cr-00423 (JF) (N.D. Cal.), the defendant pled guilty to taking a trade secret document from his old employer, IBM, and sharing it with his new employer, HP.  The document contained data on costs of materials and supplies

23

for IBM's Output Management Services group.  *Malhotra*, 5:08-cr-00423 at Dkt. 12, at 12.  This defendant was sentenced to five months of custody and ordered to pay a $3,000 fine.  *Id.* at Dkt. 17.  Similarly, in *United States v. Suibin Zhang*, 5:05-cr-00812 (RMW) (N.D. Cal.), a case where the defendant went to trial and was convicted of five trade secret theft counts for illegally downloading multiple files from his old employer, Marvell, before leaving to join Broadcom. The indictment alleged that Zhang downloaded the trade secrets from his old employer just after accepting a job with a direct competitor and then copied those trade secrets onto a laptop computer belonging to his new employer, a month after he began his new job.  *Zhang*, 5:05-cr-00812 at Dkt. 118, Superseding Indictment. According to the government, he also lied to the FBI.  *Id.* at Dkt. 318 at 2.  Mr. Zhang was sentenced to three months in custody, three years of supervised release, and $75,000 in restitution.  *Id.* at Dkt. 323.

Criminal trade secret cases in this District in which lengthier sentences have been imposed have involved economic espionage, which involves the taking of trade secrets in order to benefit a foreign entity, conduct never alleged here.  *See, e.g., United States v. Liew*. 11-CR-573-JW (Dkt. 893) (Defendant was convicted by jury of 8 counts arising from economic espionage and theft of trade secrets, as well as tax fraud, bankruptcy fraud, and obstruction of justice. The defendant's conduct involved the theft of trade secrets from DuPont to sell to Chinese state-owned companies; defendant sentenced to 180 months, later reduced to 144 months after an appeal).  Others involved multiple convictions after lengthy trials.  *See, e.g., United States v. Nosal*, 08-CR-237-EMC, at Dkt. 509 (Defendant convicted by jury of 6 counts of conspiracy, trade secret theft, and unauthorized computer access; sentenced to 12 months and 1 day).  In contrast, Mr. Levandowski pled guilty promptly and now stands convicted of taking a single trade secret document, a secret he did not use to his own advantage or to the detriment of his former employer, and certainly not to the advantage of any foreign country. Dkt. 77-1. These factors all militate strongly in favor of a non-incarceration sentence, similar to the sentences imposed in *Zhiqiang Zhang*, *West*, and *Murphy*, the most analogous cases we could find from this District.

**E.  The need to provide restitution to any victims of the offense.**

Mr. Levandowski has already agreed as part of the plea agreement to immediately reimburse Google for the costs it incurred in hiring several teams of lawyers to assist with the government's criminal investigation into his conduct. He placed that sum of money aside months ago to be paid to Google as soon as sentence was imposed.  Dkt. 83. Through its separate suit against Mr. Levandowski, Google has also already clawed back all of Mr. Levandowski's earnings from his work at Google on Project Chauffeur.  He has been ordered to pay a $179 million arbitration award – a significant sum by any measure.  PSR, ¶ 78.

Put simply, aside from the legal expenses for which it will be fully reimbursed through Mr. Levandowski's payment of restitution, Google has not suffered any tangible economic harm from Mr. Levandowski's offense conduct because the trade secret he took was never used.  The argument for a non-custodial sentence is always strongest when measurable injury to a victim is absent or relatively small and the collateral consequences for innocent third parties are great. *See, e.g., United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (Probation plus "the fact of a felony conviction" serve as adequate deterrence against future commission of similar offense).  This factor thus also weighs in favor of a non-custodial sentence.

**F.  The types of sentences available.**

Assuming the Court agrees with the Probation Officer, the statutory sentencing guideline range is 24-30 months.  For the reasons articulated in the Attorney General's guidance, we ask this Court to use its authority to order Mr. Levandowski to a term of home confinement, instead of a period of incarceration, as the Guidelines would otherwise recommend with a sentencing range in Zone D.  A home confinement sentence is also most appropriate given Mr. Levandowski's responsibilities as primary caregiver for his two young sons for half of the week, every week.

*i.  The dire threat posed by COVID-19 calls for a sentence of home confinement.*

This Court is well aware of the devastating impact of the COVID-19 pandemic to those incarcerated in our nation's penitentiaries.  Those dangers have not abated.  The danger of this virus is particularly acute for those incarcerated given their inability to engage in protective

practices, such as social distancing and frequent sanitation. As of July 27, 2020, more than 10,000 inmates have been infected, and at least 101 have died from COVID-19.[4]  The infection rate is skyrocketing—despite the Bureau of Prisons' ("BOP") best efforts.  A study released in July found the BOP infection rate to be 5.5 times higher than that of the United States as a whole.[5]  Courts in this district have taken these dangers into account in fashioning recent sentences.  *See, e.g., United States v. Lance Green*, CR 20-74 CW (N.D. Cal.) (Dkt. 28) (imposing a concurrent sentence of time served (7 months) for a defendant with Type 1 diabetes, convicted of a Form 12 violation and new charge of felon-in-possession; government had requested a 37-month sentence (Dkt. 20); *United States v. Hernan Padilla*, CR 19-603 WHA (N.D. Cal.) (Dkt. 91) (42 months of probation with a condition of 172 days of home confinement (with 8 days credit for time served) for defendant convicted of selling a semi-automatic weapon with an obliterated serial number.)

The fact that Mr. Levandowski is not elderly does not offer him protection.  Nearly 70% of COVID-19 cases in California are of those under the age of 49.[6]  Mr. Levandowski's gender makes him more vulnerable to COVID-19's worst effects as "men face a higher risk of death than women."[7]  And Mr. Levandowski's history of contracting respiratory infections, including pneumonia in 2015 and 2017, increases his risk.  *See* Exhibit D to Craig Decl; PSR, ¶ 64.  The CDC recognizes respiratory ailments as a significant comorbidity that leads to greater illness and more serious symptoms for those afflicted with the novel coronavirus.[8]  Even without those

---

[4] BOP COVID-19 Resource Page at https://www.bop.gov/coronavirus/ (last visited July 27, 2020). Note: the BOP's site does not include deaths at private prisons.

[5] Saloner B, Parish K, Ward JA, DiLaura G, Dolovich S. COVID-19 Cases and Deaths in Federal and State Prisons. *JAMA.* Published online July 08, 2020. doi:10.1001/jama.2020.12528

[6] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID-19-Cases-by-Age-Group.aspx

[7] Richard V. Reeves and Tiffany Ford, COVID-19 much more fatal for men, especially taking age into account, Up Front, https://www.brookings.edu/blog/up-front/2020/05/15/covid-19-much-more-fatal-for-men-especially-taking-age-into-account/

[8] CDC "People with Certain Medical Conditions" ("Having COPD (including emphysema and chronic bronchitis) is known to increase your risk of severe illness from COVID-19.")

1   vulnerabilities, the risks are too great.  This virus can prove lethal even to previously healthy

2   individuals.  And, even for those who do survive, the long-term health impact of contracting

3   COVID-19 are unknown.  These same concerns led to the court's cessation of nearly all in-

4   person hearings and trials for the foreseeable future.  *See, e.g.,* General Order 72-5 In Re:

5   Coronavirus Disease Public Health Emergency.  Aside from his age, Mr. Levandowski falls

6   squarely within the class of individuals for whom the Attorney General has asked the BOP to

7   grant sentences in home confinement rather than a BOP facility: he is non-violent, poses minimal

8   likelihood of recidivism, and would be safer serving his sentence at home.

       *ii. The pandemic also reinforces the need for Mr. Levandowski to be available to care for his*
9
         *young sons.*
10

11          Mr. Levandowski is an exceptional and irreplaceable caregiver to his two young sons,

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Under his custody arrangement with his sons' mother, Mr.

13   Levandowski ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  PSR, ¶

14   58. The letters submitted to the Court, discussed above, provide concrete and specific examples

15   of his engagement with his children and the central role he plays in their lives. ▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

23       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Mr. Levandowski

25   realizes, of course, that he is not unique in having a family who will suffer if he were to be

26   incarcerated.  Indeed, studies shows that the incarceration of a parent often results in lifelong

27   _____

28   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-
     conditions.html#copd

trauma for any child.[9]  The impact of having an incarcerated parent would be felt even more greatly now, given the global pandemic. These are not ordinary times.  Schools are closed for the foreseeable future, team sports are cancelled, and playdates have been put on hold.  The social networks parents rely upon to engage the active minds and bodies of their young children have disappeared.

This is a challenge that every family in the country is facing.  It is also one that is more keenly felt for those families who need to take extra precautionary measures – and thus further social isolation— ███████████████████████████████████ . ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

Sentencing courts can take a defendant's family obligations into account when fashioning an appropriate sentence. *See, e.g., United States v. Menyweather*, 447 F.3d 625, 634-35 (9th Cir. 2006), *overruled on other grounds*, 621 F.3d 967 (9th Cir. 2010) (affirming departure to probation for defendant who was sole parent and primary source of financial support for 11-year old daughter).  It is within the Court's discretion to minimize the impact of a sentence on small children by ordering a sentence be served in home confinement, rather than a federal penitentiary.  A sentence structured in this way would adequately serve the goals of punishment and deterrence while enabling Mr. Levandowski to continue to provide his critical caretaking responsibilities.

*//*

---

[9] *See, e.g.,* Gjelsvik, Annie, et al. "Adverse childhood events: Incarceration of household members and health-related quality of life in adulthood." Journal of Health Care for the Poor and Underserved, vol. 25 no. 3, 2014, p. 1169-1182. Project MUSE, doi:10.1353/hpu.2014.0112, https://muse.jhu.edu/article/552192

# VI.  CONCLUSION

For the foregoing reasons, the defense respectfully requests that this Court sentence Mr. Levandowski to 12 months of home confinement, with an obligation to perform community service, and to pay a $95,000 fine and restitution in the amount of $756,499.22.


Date: July 28, 2020                                                  Respectfully submitted,


                                                                     /s/  _____
                                                                     RAMSEY & EHRLICH LLP
                                                                     Miles Ehrlich
                                                                     Ismail Ramsey
                                                                     Amy Craig

                                                                     ***Counsel for Anthony Levandowski***

29