Pages 1 - 78

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

UNITED STATES OF AMERICA,              )
                                       )
          Plaintiff,                   )
                                       )
   VS.                                 )        NO. CR-00377 WHA
                                       )
ANTHONY SCOTT LEVANDOWSKI,             )
                                       )
          Defendant.                   )
_____)

                          San Francisco, California
                          Tuesday, August 4, 2020

                   **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                         DAVID L. ANDERSON
                         United States Attorney
                         450 Golden Gate Avenue, 11th Floor
                         San Francisco, California  94102
                   BY:   **KATHERINE L. WAWRZYNIAK**
                         **ANDREW F. DAWSON**
                         **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                         RAMSEY & EHRLICH LLP
                         803 Hearst Avenue
                         Berkeley, California 94710
                   BY:   **ISMAIL RAMSEY, ATTORNEY AT LAW**
                         **MILES EHRLICH, ATTORNEY AT LAW**
                         **AMY CRAIG, ATTORNEY AT LAW**

Also Present:            **Karen Mar, U.S. Probation**
                         (Telephonically)

REPORTED TELEPHONICALLY BY:   ANA M. DUB, CSR NO. 7445
                              RDR, CRR, CCRR, CRG, CCG
                              OFFICIAL UNITED STATES REPORTER

**Tuesday - August 4, 2020**                                          **1:59 p.m.**

### P R O C E E D I N G S

---o0o---

   (The following proceedings were had in open court, the defendant being personally present, out of custody, together with counsel:)

   **THE CLERK:**  All rise.  This court is now in session.
The Honorable William Alsup presiding.

   Calling Criminal Action 19-377, United States versus
Anthony Scott Levandowski.

   Counsel, please state your appearances for the record.

   **MS. WAWRZYNIAK:**  Good afternoon, Your Honor.
Katherine Wawrzyniak and Andrew Dawson for the United States.

   **MR. RAMSEY:**  Good afternoon, Your Honor.  Ismail
Ramsey on behalf of Mr. Levandowski, and I'm here with two of
my co-counsel.

   **MR. EHRLICH:**  Good afternoon, Your Honor.  Miles
Ehrlich on behalf of Mr. Levandowski.

   **MS. CRAIG:**  Good afternoon.  Amy Craig on behalf of
Mr. Levandowski.

   **THE COURT:**  Mr. Levandowski, welcome to you.

   **MR. RAMSEY:**  Your Honor, if it's okay with the Court,
I was going to ask to use a face shield.

   **THE COURT:**  All right with me.

   **MR. RAMSEY:**  I also discussed it with --

1          **THE COURT:**  Anyone object?

2          **MS. WAWRZYNIAK:**  No, Your Honor.

3          **THE COURT:**  All right.

4          **MR. RAMSEY:**  Thanks.  With my glasses, it makes things

5     a little --

6          **THE COURT:**  You can take your -- yeah.  Take off your

7     mask, if you wish.  And your glasses are -- there we go.

8          **MR. RAMSEY:**  Thank you, Your Honor.

9       (Stenographer interrupts for clarification of the record.)

10         **MR. RAMSEY:**  I'm sorry.  This is Mr. Ramsey.  And I'll

11    try to make sure that I speak into the microphone and announce

12    myself before -- any time I speak.

13         **THE COURT:**  All right.  Mr. Levandowski, you're going

14    to have to come up here so we can do the guilty plea part

15    first.

16       And let me say to the members of the public, every time

17    you come on and off the line, it makes an irritating noise.  So

18    at least once you get on the line, please stay on the line so

19    that we don't have those noises.

20       Let's wait a few minutes to see if anyone else is going to

21    be making that noise.

22                      (Pause in proceedings.)

23         **THE COURT:**  All right.  So what I understand we're

24    going to do today is, first, have a guilty plea and, second,

25    have sentencing, at the request of the lawyers.  Correct?

1            **MR. RAMSEY:**  That is correct.

2            **MS. WAWRZYNIAK:**  Yes, Your Honor.

3            **MR. RAMSEY:**  That is correct, Your Honor.  This is

4    Mr. Ramsey speaking.

5        I would just note for the court reporter that right now,

6    with respect to Mr. Levandowski, it's going to be Mr. Ramsey

7    doing all the speaking unless indicated otherwise.

8        (Stenographer interrupts for clarification of the record.)

9            **MR. RAMSEY:**  I said unless -- this is Mr. Ramsey

10   speaking, and I'm going to be doing all the speaking for the

11   defense unless otherwise noted.

12           **THE COURT:**  Very good.

13       And because of that face shield, you need to have the

14   microphone under the shield rather than in front of it.

15   Otherwise, it comes out --

16           **MR. RAMSEY:**  Yes, Your Honor.

17           **THE COURT:**  -- garbled.

18       Okay.  Well, the other lawyers can sit down, if you wish.

19       Okay.  The clerk will now swear in Mr. Levandowski.

20       Please raise your right hand.

21                        (Defendant sworn.)

22           **THE DEFENDANT:**  I do.

23           **THE COURT:**  Thank you.  You can put your hand down.

24       All right.  So I'm going to take mine off -- I've got this

25   plastic shield here -- just so you can hear me better.

1          Please tell us your full and correct name.

2              **THE DEFENDANT:**  My name is Anthony Scott Levandowski.

3              **THE COURT:**  How old are you?

4              **THE DEFENDANT:**  I'm 40 years old.

5              **THE COURT:**  How far did you go in school?

6              **THE DEFENDANT:**  I obtained my graduate degree from

7  UC Berkeley.

8              **THE COURT:**  And are you thinking clearly today?

9              **THE DEFENDANT:**  Yes, I am, Your Honor.

10             **THE COURT:**  Are you under the influence of anything?

11             **THE DEFENDANT:**  No, Your Honor.

12             **THE COURT:**  Are you being treated for any mental

13  illness?

14             **THE DEFENDANT:**  No, Your Honor.

15             **THE COURT:**  Do you understand what you'd be pleading

16  guilty to?

17             **THE DEFENDANT:**  Yes, Your Honor.

18             **THE COURT:**  Please tell us in your own words what that

19  would be.

20             **THE DEFENDANT:**  I took the Chauffeur Team weekly

21  notes, and I intended to --

22     (Stenographer interrupts for clarification of the record.)

23             **THE CLERK:**  If anyone listening in on the phone could

24  please mute your phone, that would be appreciated by the Court.

25             **THE COURT:**  I need to tell everyone listening on the

1   phone, we can hear background noise.   Somebody has not muted

2   their phone.

3       If this continues, I'm going to direct the clerk to

4   terminate the telephone part so that we can hear in the

5   courtroom.   So please be respectful of the proceedings.

6       My last question is:   Do you understand what the charges

7   against you are and what you would be pleading -- at least what

8   you'd be pleading guilty to?

9           **THE DEFENDANT:**   My answer is yes, Your Honor.   It's

10  one count of theft and attempted theft of trade secrets.

11          **THE COURT:**   All right.   Have you discussed this with

12  your counsel?

13          **THE DEFENDANT:**   Yes, I have, Your Honor.

14          **THE COURT:**   Have you gone over with him all the ways

15  to defend against this case?

16          **THE DEFENDANT:**   Yes, I have, Your Honor.

17          **THE COURT:**   What is the name of your lawyer?

18          **THE DEFENDANT:**   I have many of them, but Izzy is

19  standing next to me, and we have Miles on the left and Amy.

20          **THE COURT:**   All right.   Are you fully satisfied with

21  their advice and counsel?

22          **THE DEFENDANT:**   Yes, I am, Your Honor.

23          **THE COURT:**   I understand your willingness to plead

24  guilty is a result of discussions between your lawyers and

25  the Government lawyer that led up to this thing called a plea

1  agreement.  Is that true?

2          THE DEFENDANT:  That is correct, Your Honor.

3          THE COURT:  And have you read the agreement?

4          THE DEFENDANT:  Yes, I have, Your Honor.

5          THE COURT:  Did you understand it?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  Did you discuss it with your lawyers?

8          THE DEFENDANT:  I discussed it with my attorneys, yes.

9          THE COURT:  Did you sign this agreement?

10         THE DEFENDANT:  I did sign it, yes.

11         THE COURT:  All right.  Is this your full and complete

12 agreement with the U.S. Government?

13         THE DEFENDANT:  That's my understanding, yes.

14         THE COURT:  Okay.  Now, I'd like to go over with you

15 what the -- what the elements are of this offense that you

16 would be pleading guilty to.

17     This is a theft and attempted theft of trade secrets.  And

18 the elements are that you intended to convert -- that basically

19 means steal -- a trade secret to the economic benefit of

20 somebody other than the owner; and that the trade secret was

21 related to or intended for use in interstate or foreign

22 commerce; that you intended or knew that the offense would

23 injure the owner; and that you stole or, without authorization,

24 appropriated, took, carried away, or concealed such trade

25 secret information.

1          Do you understand that?

2              **THE DEFENDANT:**  I do, Your Honor.

3              **THE COURT:**  Now, if you plead guilty to that, you

4    could get up to ten years in prison, up to a $250,000 fine, and

5    requirement to pay restitution to the victim, supervised

6    release for three years, and a $100 mandatory special

7    assessment.

8          Do you understand all that?

9              **THE DEFENDANT:**  I do, Your Honor.

10             **THE COURT:**  Okay.  Now, I need to go over with you

11   what the procedure will be for deciding on the actual sentence.

12         If you plead guilty, we will proceed today to a sentencing

13   hearing.  And the Court would have to consider the guidelines,

14   the information in the PSR, and the arguments of counsel and,

15   of course, your own statement.  And there were quite a lot of

16   materials submitted, especially by your side, and videos

17   that -- voluminous.  All that would be considered.

18         The judge is required to select the lowest sentence that

19   will carry out the sentencing objectives of our Congress as set

20   forth in the Sentencing Act.

21         Now, until I go through this argument and hear everything,

22   I can't tell you what the answer is going to be.  It could be

23   higher than the guideline range.  It could be lower than the

24   guideline range.  It could be right in the middle of the

25   guideline range.  So you're taking a gamble by pleading guilty.

```
 1   And the gamble is that you may wind up getting a more harsh

 2   sentence than you expect or you could get an easier sentence

 3   than you expect, but you just don't know.

 4        Understand?

 5             THE DEFENDANT:  I understand, Your Honor.

 6             THE COURT:  All right.  Now, this will be a felony

 7   that you're pleading to.

 8        Do you understand?

 9             THE DEFENDANT:  I do understand that, Your Honor.

10             THE COURT:  And for the rest of your life and career,

11   you would be known as a convicted felon.

12        Do you understand that?

13             THE DEFENDANT:  I understand that, Your Honor.

14             THE COURT:  In our system, we don't have parole in the

15   federal system.  So whatever prison sentence you get, you would

16   serve it without the benefit of parole.

17        Do you understand?

18             THE DEFENDANT:  I understand that, Your Honor.

19             THE COURT:  And when you plead guilty, you're stuck

20   with it.  You can't take back your guilty plea.

21        You understand?

22             THE DEFENDANT:  I understand, Your Honor.

23             THE COURT:  All right.  Now, I want to change the

24   subject.

25        You have the right to go to trial and see if
```

1    the Government can prove the case.

2        Understand?

3            **THE DEFENDANT:**  I understand, Your Honor.

4        **THE COURT:**  Sometimes even a guilty person goes to

5    trial and the Government can't persuade the jury so the guilty

6    person gets off.

7        Do you understand that?

8            **THE DEFENDANT:**  I understand, Your Honor.

9        **THE COURT:**  You'd be giving up that opportunity.

10       Do you understand?

11           **THE DEFENDANT:**  I do.

12       **THE COURT:**  Mr. Ramsey, lift the microphone so that it

13   will catch your client's voice a little better.  He has to bend

14   over every time.

15       Okay.  You have the right to go to trial.  And

16   the Government cannot use you as a witness against yourself.

17   The Government has to try to prove the case the hard way, by

18   calling other witnesses.  You have the right to be here to see

19   and hear all witnesses against you and to work with your

20   excellent counsel for the best possible cross-examinations of

21   all of those witnesses.

22       Understand?

23           **THE DEFENDANT:**  I understand.

24       **THE COURT:**  When the Government finishes putting on

25   its case, you have the option to put on a defense, but you're

1  not obligated to because the burden is never on you; it's

2  always on the Government.  And so while you have the option,

3  you have no requirement to put on a defense.

4       Understood?

5            THE DEFENDANT:  I understand, Your Honor.

6            THE COURT:  If you chose to exercise it, we would

7  subpoena the people you wanted to call as witnesses, obligate

8  them to tell the truth by placing them under oath.  You could

9  testify in your own defense, subject to cross-examination; but

10  if you chose not to testify, that would be perfectly okay.  And

11  we would explain to the jury that you have a constitutional

12  right not to testify and that the jury cannot hold it against

13  you because you exercised that right.

14       Understand?

15            THE DEFENDANT:  I do, Your Honor.

16            THE COURT:  Once all the evidence was before the jury,

17  the jury, 12 people, would go into the jury room and ask this

18  question:  Has the Government proven the case beyond a

19  reasonable doubt?

20       If all 12 people said, "Yes, the Government had done

21  that," then they would convict you.  On the other hand, if even

22  one person on the jury said, "No, no.  The Government fell

23  short in its proof," then that jury could not convict you.

24       Do you understand that?

25            THE DEFENDANT:  I do, Your Honor.

1          **THE COURT:**  And if you were convicted, you would

2     ordinarily have the right to appeal to the Court of Appeals,

3     both the verdict of guilty as well as the sentence.

4          Understood?

5          **THE DEFENDANT:**  I understand.

6          **THE COURT:**  But if you plead guilty today, you will be

7     giving up those rights of appeal.

8          Do you understand that?

9          **THE DEFENDANT:**  I do, Your Honor.

10         **THE COURT:**  Well, here's the thing.  All of those

11    rights that I recited to you about going to trial and appeal,

12    do you think you understand those rights?

13         **THE DEFENDANT:**  I do, Your Honor.

14         **THE COURT:**  Do you want to give up those rights and

15    plead guilty?

16         **THE DEFENDANT:**  Yes, Your Honor.

17         **THE COURT:**  One second.

18         Mr. Ramsey?

19         **MR. RAMSEY:**  Could I just approach Ms. Wawrzyniak for

20    just a second?

21         **THE COURT:**  Of course.

22         **MS. WAWRZYNIAK:**  Your Honor, we would like to point

23    out one change that has been made to the plea agreement since

24    it was filed on March 19th.  It's a change to paragraph 5, and

25    the parties have agreed to strike the last sentence, which

1   reads (reading):

2          "I also agree not to seek relief under

3       18 U.S.C., Section 3582."

4       That's a waiver of the right to file a motion for

5   compassionate release.  And since March, my office has made a

6   policy change and removed that language from all plea

7   agreements.  So in fairness to Mr. Levandowski, before we enter

8   the plea today, I want to note for the record that that last

9   sentence should be stricken.

10          **THE COURT:**  All right.  So --

11      (Stenographer interrupts for clarification of the record.)

12          **THE COURT:**  That's Ms. Wawrzyniak.

13      Okay.  Thank you for that clarification.

14      All right.  So to go back to where I was, you want to

15  plead guilty and give up all of those rights.  True?

16          **THE DEFENDANT:**  That's correct, Your Honor.

17          **THE COURT:**  And you want to do that freely and

18  voluntarily?

19          **THE DEFENDANT:**  Yes.

20          **THE COURT:**  Has anyone put any pressure on you to

21  plead guilty?

22          **THE DEFENDANT:**  No, Your Honor.

23          **THE COURT:**  How about making any threats?  Has anyone

24  threatened you?

25          **THE DEFENDANT:**  No, Your Honor.

```
 1            THE COURT:  Anyone given you any promises?

 2            THE DEFENDANT:  No, Your Honor.

 3            THE COURT:  Do you want to plead guilty of your own

 4   free will?

 5            THE DEFENDANT:  I do, Your Honor.

 6            THE COURT:  All right.  I need to go over with you the

 7   basis for your plea.  And what I'm going to do is paraphrase

 8   from the statement in the plea agreement.  I won't read it

 9   exactly, but I will paraphrase, and then I'll ask you after

10   each statement if it's correct.  So listen carefully.

11        In April 2007, you joined Google.  True?

12            THE DEFENDANT:  Yes.

13            THE COURT:  As part of the V-u Tool Team, VuTool Team.

14   True?

15            THE DEFENDANT:  Yes.

16            THE COURT:  That was to work on Google Street View;

17   right?

18            THE DEFENDANT:  That's correct.

19            THE COURT:  And in about 2009 you co-founded

20   Project Chauffeur; right?

21            THE DEFENDANT:  Correct.

22            THE COURT:  And that was the self-driving car program.

23   True?

24            THE DEFENDANT:  Yes.

25            THE COURT:  And you worked on the self-driving car
```

1    program for approximately seven years.  True?

2              **THE DEFENDANT:**  That's correct.

3              **THE COURT:**  In the course of doing that, you were

4    aware that your employment agreement obligated you to keep

5    Google's valuable non-public information confidential.  True?

6              **THE DEFENDANT:**  That's correct.

7              **THE COURT:**  And you understand that non-public

8    information related to Project Chauffeur was sensitive and

9    subject to that confidentiality requirement.  True?

10             **THE DEFENDANT:**  That's true.

11             **THE COURT:**  In late 2015, you considered leaving

12   Google.  True?

13             **THE DEFENDANT:**  That's correct.

14             **THE COURT:**  And that was to start a new self-driving

15   company.  True?

16             **THE DEFENDANT:**  Correct.

17             **THE COURT:**  Initially, it was called 280 Systems.

18   Right?

19             **THE DEFENDANT:**  Correct.

20             **THE COURT:**  But later you changed the name to

21   Ottomotto, O-t-t-o-m-o-t-t-o.  True?

22             **THE DEFENDANT:**  That's correct.

23             **THE COURT:**  About the same time, you began having

24   discussions with Uber about Uber's potential investment in

25   Ottomotto.  True?

1          THE DEFENDANT:   That is correct.

2          THE COURT:   These negotiations intensified in

3    December 2015 while you were still a Google employee.   True?

4          THE DEFENDANT:   That is true.

5          THE COURT:   Uber ultimately acquired Ottomotto in

6    about August 2016.   True?

7          THE DEFENDANT:   That is true.

8          THE COURT:   Your employment with Google ended on or

9    about January 27, 2016.   True?

10         THE DEFENDANT:   That is correct.

11         THE COURT:   Prior to your departure, you downloaded

12   thousands of files related to Project Chauffeur.   True?

13         THE DEFENDANT:   That is correct.

14         THE COURT:   On or about December 11th, 2015, you

15   downloaded approximately 14,000 files from an internal

16   password-protected Google server known as SVN, which was hosted

17   on Google's network.   True?

18         THE DEFENDANT:   That is true.

19         THE COURT:   On December 14th, 2015, you transferred

20   those SVN files from your Google-issued laptop to your personal

21   laptop.   True?

22         THE DEFENDANT:   True.

23         THE COURT:   In addition, prior to your departure from

24   Google, you downloaded a variety of files from a corporate

25   Google Drive repository to your personal laptop.   True?

1              THE DEFENDANT:   That is true.

2              THE COURT:   You downloaded these files with the intent

3    to use them for your own personal benefit and understood that

4    you were not authorized to take the files for that purpose.

5    True?

6              THE DEFENDANT:   That is true.

7              THE COURT:   In all, you downloaded at least 20 files

8    from Google Drive between October 2015 and January 2016,

9    including an internal tracking document entitled "Chauffeur TL

10   Weekly Updates Q4 2015," hereinafter "the Chauffeur weekly

11   update."   True?

12             THE DEFENDANT:   That is true.

13             THE COURT:   Now, I need to ask counsel a question; so

14   just hold your thought there.

15        This says at least 20 files, but up above, it says 14,000.

16   So how do you reconcile that?

17             MS. WAWRZYNIAK:   So there's a distinction here,

18   Your Honor.

19        There were 14,000 files that were in the SVN server, which

20   was a digital repository.  Those files were the engineering

21   schematics, pieces and parts that went into the hardware, and

22   they were all in a collection from this one server.

23        And then, in addition, the defendant was separately going

24   to a different repository of information, the Project Chauffeur

25   Google Drive, and downloading from the Google Drive individual

1    documents.

2        So in this paragraph, he's admitting both to getting the

3    files from the SVN and also downloading other documents from

4    the Google Drive.

5            **THE COURT:**  All right.

6        Did you understand what counsel just said?

7            **THE DEFENDANT:**  I do.

8            **THE COURT:**  Is that correct?

9            **THE DEFENDANT:**  That is correct.

10           **THE COURT:**  All right.  You down- -- I'm continuing

11   now.

12       You downloaded this file with the intent to use it for the

13   benefit of someone other than Google.  Correct?

14           **THE DEFENDANT:**  Correct.

15           **THE COURT:**  The Chauffeur Weekly Update contained a

16   variety of details regarding the status of Google's

17   self-driving car program.  True?

18           **THE DEFENDANT:**  That is true.

19           **THE COURT:**  It included the Project Chauffeur Team's

20   quarterly goals and weekly metrics, your team's OKRs, as well

21   as summaries of technical challenges currently faced by the

22   program and notes related to previous challenges that had been

23   overcome.  True?

24           **THE DEFENDANT:**  That is true.

25           **THE COURT:**  You downloaded the Chauffeur Weekly Update

1  to your personal laptop on or about January 11, 2016, and you

2  accessed the document after your resignation from Google, which

3  occurred on or about January 27, 2016.  True?

4          **THE DEFENDANT:**  I did, Your Honor.

5          **THE COURT:**  In particular, you understand and admit

6  that, as indicated by a third-party review of your laptop, you

7  last accessed this file on February 24, 2016, nearly a month

8  after your departure from Google.  True?

9          **THE DEFENDANT:**  That is true, Your Honor.

10         **THE COURT:**  You admit that as of January or

11 February 2016, the Chauffeur Weekly Update was Google's

12 property and qualified as a trade secret.  True?

13         **THE DEFENDANT:**  That's true, Your Honor.

14         **THE COURT:**  The document was not generally known or

15 readily ascertainable through proper means by another person in

16 the public who could obtain economic benefit from the

17 disclosure or use of the information.  True?

18         **THE DEFENDANT:**  That is true, Your Honor.

19         **THE COURT:**  Google took reasonable measures to keep

20 the document secret, and the document derived independent

21 economic value, actual or potential, from being secret.  True?

22         **THE DEFENDANT:**  That is true, Your Honor.

23         **THE COURT:**  You further admit that you intended to

24 convert the Chauffeur Weekly Update for the economic benefit of

25 somebody other than the owner.  True?

1              THE DEFENDANT:  That is true.

2              THE COURT:  In particular, you intended to use the

3      Chauffeur tracking document to benefit yourself and Uber.

4      True?

5              THE DEFENDANT:  That is true.

6              THE COURT:  You also admit that the weekly --

7      Chauffeur Weekly Update was related to Google's self-driving

8      car technology.  True?

9              THE DEFENDANT:  True.

10             THE COURT:  And that the product was intended for use

11     in interstate and foreign commerce.  True?

12             THE DEFENDANT:  True.

13             THE COURT:  And that you knew your misappropriation

14     and unauthorized -- unauthorized -- possession of the Chauffeur

15     Weekly Update would injure Google.  True?

16             THE DEFENDANT:  That is true, Your Honor.

17             THE COURT:  And finally, for purposes of the

18     sentencing guidelines, the lost value for purposes of

19     Section 2B1.1 of the guidelines is more than 550,000 but less

20     than or equal to 1.5 million.  True?

21             THE DEFENDANT:  That is true, Your Honor.

22             THE COURT:  And you and the Government agree that this

23     represents a reasonable estimate of the loss attributable to

24     your offense conduct, a loss that is real but difficult to

25     calculate.  True?

1            THE DEFENDANT:  That is true.

2            THE COURT:  You understand that Google and its

3    successor-in-interest, Waymo, are not bound by the parties'

4    agreement and may assert in this or future proceedings that the

5    loss amount associated with Chauffeur Weekly Update was lower

6    or higher.  True?

7            THE DEFENDANT:  True.

8            THE COURT:  Anything more the Government wishes to add

9    to that statement?

10           MS. WAWRZYNIAK:  No, Your Honor.

11           THE COURT:  Mr. Ramsey, anything more?

12           MR. RAMSEY:  No, Your Honor.

13           THE COURT:  All right.  So we're coming to the key

14   point.  Do you still wish to go forward and plead guilty today?

15           THE DEFENDANT:  I do, Your Honor.

16           THE COURT:  And do you have any questions for me

17   before we do so?

18           MR. RAMSEY:  I just -- this is Mr. Ramsey speaking.

19       Your Honor, I just have one question.  I just ask

20   the Court to formally strike that last sentence in paragraph 5

21   from the plea agreement.

22           THE COURT:  It's the sentence that reads (reading):

23            "I also agree not to seek relief under

24       18 U.S.C. 3582."

25           MR. RAMSEY:  Correct.

```
 1              MS. WAWRZYNIAK:  Correct, Your Honor.

 2              THE COURT:  I am striking that out, putting my

 3    initials by it.

 4              MS. WAWRZYNIAK:  And before you take the plea,

 5    Your Honor, if you could ask the defendant to affirm that he's

 6    agreeing to pay restitution in the amount of $756,499.22, as

 7    provided in paragraph 9?

 8              THE COURT:  Sir?

 9              THE DEFENDANT:  I agree, Your Honor.

10              THE COURT:  Is that the check?

11              MR. RAMSEY:  That is the check, Your Honor.

12              THE COURT:  All right.  Great.

13        Okay.  So do you have any questions for me?

14              THE DEFENDANT:  I do not, Your Honor.

15              THE COURT:  All right.  It's Count 33?

16              MS. WAWRZYNIAK:  Yes, Your Honor.

17              THE COURT:  Okay.  So with respect to Count 33 in the

18    Indictment, Mr. Levandowski, I'm now going to ask you the

19    official question.  Are you ready?

20              THE DEFENDANT:  Yes.

21              THE COURT:  How do you plead to Count 33 in the

22    Indictment?  Guilty or not?

23              THE DEFENDANT:  I plead guilty, Your Honor.

24              THE COURT:  Very well.  I'm going to do what you've

25    asked and find that you're fully competent and capable of
```

entering an informed plea; that you are aware of the nature of

the charge against you and the possible consequences of

pleading guilty.  Your plea is supported by a factual basis.

Your plea is voluntary and informed.  Therefore, I'm going to

accept your plea of guilty and adjudge you convicted on that

count.

So good for you.  Normally, we would have sentencing about

90 days from now; but because of the way you lawyers have

organized it, we're going to proceed to sentencing immediately.

Correct?

**MS. WAWRZYNIAK:**  Yes, Your Honor.

**MR. RAMSEY:**  Correct, Your Honor.

**THE COURT:**  Okay.  So, Mr. Levandowski, do you

understand that we'll proceed immediately to sentencing?

**THE DEFENDANT:**  I understand, Your Honor.

**THE COURT:**  Okay.  Great.

So I need to ask you if you have read this document called

a Presentence Investigation Report.

**THE DEFENDANT:**  I have, Your Honor.

**THE COURT:**  Okay.  Are there any unresolved

objections?

**MR. RAMSEY:**  Yes, there are, Your Honor.

Again, this is Mr. Ramsey, for the record.

The Government and the defense has conferred on these two

issues and I believe we agree.  But I would point you to two

1    places.

2        First is paragraph 20, Your Honor, of the PSR, which is on

3    the report page 7 in the bottom.  And so at the beginning of

4    that paragraph it states (reading):

5            "The government alleged that 33 of the files

6        Levandowski took were trade secrets."

7        Two sentences after that it says (reading):

8            "The 26 files were 'engineering....'"

9        We are just requesting that the word "allegedly" be

10   entered between "were" and "engineering" at the bottom of the

11   page.

12       And, again, I don't think either -- the parties have

13   conferred, and that's acceptable.

14       And when the Court is ready to move on --

15           **THE COURT:**  Wait a second.

16       Did you say you agree to that change?

17           **MS. WAWRZYNIAK:**  Yes, Your Honor.

18           **THE COURT:**  All right.  So --

19           **MS. WAWRZYNIAK:**  It should read "The 26 files were

20   allegedly 'engineering information' within the statutory

21   definition of 'trade secret.'"

22           **THE COURT:**  All right.  I make that change, and my

23   probation officer will make that change.

24       What's next?

25           **MR. RAMSEY:**  Next, Your Honor, is on page 20 of the

report, and this goes to the balance sheet.  But on page 20 of

the report, it's in paragraph 78, at the very top, two lines

down, it describes the asset -- one of the assets of

Mr. Levandowski, $170,743,444.  That is described as "Total

Investments."  I think that is more accurately described as an

indemnification claim.

     And that is consistent with what -- with how

Mr. Levandowski has described it in his bankruptcy filing.

          **THE COURT:**  I'm just -- sorry.  What is the change?

          **MR. RAMSEY:**  The change is to change the term "Total

Investments" to "Indemnification Claim."  It's not an

investment as much as it is a claim against Uber that he

possesses.

          **THE COURT:**  Are you okay with that?

          **MS. WAWRZYNIAK:**  Yes, Your Honor.  And I'll address

this indemnification claim in my oral argument today.

          **THE COURT:**  All right.  Okay.  "Total Investments -

Pass Through" is changed to what?

          **MR. RAMSEY:**  The term that should be changed is just

where it says -- excuse me -- two lines below that, Your Honor.

So you said "Total Investments - Pass Through."  Then below

that is "Total Pensco Roth IRA," and then below that it says

"Total Investments."

     So the bottom "Total Investments" should just be changed

to "Indemnification Claim."

1          **THE COURT:**  And the number that's associated with that

2     is 170-plus?

3          **MR. RAMSEY:**  Yes, Your Honor.

4          **THE COURT:**  Okay.  Did my probation officer get that?

5          **MS. MAR:**  Yes, Your Honor.  This is Karen Mar from

6     Probation.  I did get that information.

7          **THE COURT:**  Thank you.  Make that change.

8       All right.  Okay.  So those are the two changes to the

9     report.  And no other changes?

10          **MR. RAMSEY:**  That is correct, Your Honor.

11          **THE COURT:**  All right.  So the way I would like to

12     proceed here -- by the way, Mr. Levandowski is free to stand

13     there if he wishes.  He's also free to have a seat because we

14     could be talking for a long time.  It's completely up to him.

15     I don't want to inconvenience anyone.

16       All right.  We're going to start first with Mr. Ramsey,

17     and then we'll go to the Government, and then we'll go to

18     Mr. Levandowski, and then the Court will have to make a

19     decision.

20       Now, Mr. Ramsey, please remember that you need to speak

21     with the microphone under your shield so that it doesn't get

22     garbled.  I can hear you fine most of the time.  Sometimes it's

23     a little hard.

24          **MR. RAMSEY:**  Yes, Your Honor.  If you give me just a

25     second, then I can arrange the microphone so that it's closer.

1          **THE COURT:**  Oh, by the way, is there any victim

2     present on the phone or otherwise?

3          **MS. WAWRZYNIAK:**  No, Your Honor.  My understanding is

4     that the victim of this -- in this case, Waymo, they submitted

5     a victim impact statement which was attached to my sentencing

6     memo, but they do not wish to address the Court today.

7          **THE COURT:**  All right.  I got it.  Okay.

8          So, Mr. Ramsey, the floor is yours.  I'm going to put my

9     mask back on, since I'll mostly be listening.

10          **MR. RAMSEY:**  Thank you, Your Honor.

11          Your Honor, you pointed out earlier that the sentence --

12     that what the Court is charged with doing today is fashioning a

13     sentence that would be sufficient but not greater than

14     necessary to meet the statutory objectives of sentencing as

15     laid down by the Congress.

16          We believe that in this case, a sentence of 12 months home

17     confinement, a maximum guidelines range fine of $95,000, and

18     three years of supervised release, additionally with the

19     condition that Mr. Levandowski do 200 hours of community

20     service, a component of which must be 12 public talks online

21     or, if possible, in person to relevant engineering and

22     engineering school communities about what he's learned from

23     this case and what he's learned about it and attempting to

24     avoid or to prevent and deter potential trade secret thefts in

25     the future.  In addition, finally, a restitution order of the

$766,000 that's been discussed.

I'd like to talk to you today about some of those statutory factors.  I know that the Court has reviewed, as you noted, the voluminous papers that we submitted, as well as the video, but I'd like to highlight a couple of things.

First, I'd like to talk about Mr. Levandowski's personal background, his history and characteristics, which is one of the factors under 3553(a).

I think what is clear from the letters that were submitted to this Court is that Anthony is someone who never hesitates to help other people and to do so in times of need. Unfortunately, today, because of the pandemic, we're not able to have individuals here present in the courtroom; but I think the sheer volume of letters demonstrates the amount of support that Mr. Levandowski has from his family and his community. I think it was noteworthy the number of longtime friends who've known him for years who could talk to his character and the sort of things that he's done over the years.  The video itself was particularly useful in that, and the reason we submitted the video was because of the pandemic and to give you a sense of the individuals who can't be here today but who wanted to make clear, in a personal way, the way that Anthony has touched their lives.

What was clear from it was the period over which Mr. Levandowski has touched people.  These were people who'd

known him from as far back as his time living in Belgium,

individuals who'd known him since he was five years old to

people who had known him while he was at University High to

people who had known him while he was at UC Berkeley to people

who knew him while he was working on the VuTool Project, all

the way through Street View and beyond, and also people who

know him today during his time at Pronto and could talk about

his character and the life's experiences and how he has felt

coming out of -- out of this after his indictment.

I would note just a couple of key things.  I thought it

was telling that Mr. Levandowski has been a champion without

notoriety for all sorts of equity, and that showed his

character.  There were people who talked about his decisions

with respect to gender, with respect to forwarding racial

equity, to trying to help individuals who aren't necessarily

advantaged in this society, and he did that without personal

reward often and without urging from anyone.  He is someone

who's helped those who are less fortunate than him.

Another very telling anecdote or experience was what he

had done for a young disabled child when -- really, quite

frankly, while he was young.  And his brother had indicated

even 25 years later, he's still involved in that individual's

life.

To Bill Jackson, another individual who had known him

for years, when he started to do something entrepreneurial, the

generosity that Mr. Levandowski showed in helping him get started, both in his time and financially.

There were numerous people who talk about Mr. Levandowski extending his home and allowing them to come in and stay with him when they were facing hard times or when they needed a boost to be able to get things -- a helping hand to get things started, just telling how open he is, that he would bring people into his own personal circle to help them in times of need.  So those were some of the things I wanted to highlight.

But I also wanted to talk about, at least point the Court to that he's a family man also.  While he is not married, he is very involved in his kids' life.  There's some aspect of the medical records that we submitted that are under seal; so I'm not going to speak to those on the record, but I do want to make the Court aware of that.  And those were not only medical issues with respect to his son, but also with respect to the mother of his children and the co-parent of his two children and the sorts of things that he has done and continues to do to this day to help her in her medical issues, in her recovery.  And numerous people attested to how unique he is as a father and the care that he shows for the children and in terms of fostering their development.

All of these things went to really demonstrate just his character as a person and his compassion for people and how he expresses that over time or has expressed that over time and

1    continues to express that.

2        There are also numerous statements and testimonies with

3    respect to his work ethic, and that's something that has

4    continued today and that has been there ever since high school.

5    Again, coming to the country not speaking English showed the

6    commitment that he had to work hard, to learn the language, to

7    immediately excel in school, even when he had the difficulties

8    of English -- of learning English before him and not speaking

9    the language in the school that he initially enrolled; then

10   moving on to University High, excelling.  As numerous

11   individuals pointed out, he was as hard a worker as anyone that

12   these individuals had seen.  And that continued.

13       That continued straight to his time at UC Berkeley, when

14   his mother suggested that he look into the DARPA Challenge that

15   really started him on this road to being involved in

16   self-driving cars.  He read about the motorcycle Ghostrider,

17   and that right now is in the Smithsonian Institution.  But even

18   at a young age in college, when many of us were probably having

19   more fun than maybe we should have, Mr. Levandowski's fun for

20   him was attempting to work on this project.  It was a

21   two-year-long project, 16, 18 hours a day.  And the success

22   that he had was rather striking for someone at that age, but

23   really reflects on his extraordinary work ethic that he's

24   shown.  I think that really does speak to his character.

25       And, again, it's a work ethic that just continued; that,

quite frankly, it was relentless.  And when he faced a personal

problem with respect to the mother of his children while she

was pregnant, nine months pregnant, having that car accident

that you read about, it fueled a flame, a flame that was

already burning, but it made it a personal mission, not so much

simply from an academic or perspective of trying to solve a

problem; it really brought to light the real issue of the

mission that he's lived his life on, and that is trying to

bring a safer way for cars to operate.  And that's something

that has carried on throughout, but it did become in that way

very personal for him.  And many people have talked about that.

And he has been tireless in his efforts over the years

continuously working on this problem.

     And I would note, even after this case, first the civil

case and now the criminal case, it's not deterred

Mr. Levandowski from working on those issues.  He continues to

work difficult -- work hard.  His hours put into Pronto, coming

up with a completely different type of self-driving car system

that doesn't involve LiDAR, demonstrates that.

     I could go on about that, but I won't.  But I think all

that comes through when you see the letters, the video, the

testimony that really speaks to his character.  Sometimes he

has been portrayed, I think, publicly as a sinister character.

I think sometimes these stories can take on a life of their

own.  And unfortunately, that happens.  He recognizes that.

1    And how he's been portrayed is essentially the poster child for

2    wrongdoing in Silicon Valley.

3         But I think the whole picture, the true picture is

4    different than that.  And I think that the letters and the

5    testimony demonstrates that.  He is a person of character.  He

6    is a person who did something wrong.  And you can tell from his

7    letter, he fully acknowledges that and he fully regrets it.

8    He's learned from that.

9         But I would ask this Court, as it should under the 3553(a)

10   factors, not only to look at that wrongful act, but to look at

11   his overall history and background and his personal

12   characteristics.

13        And I think what we've submitted showed clearly that he is

14   not what he sometimes is portrayed as in the public.  He is a

15   loving father.  He is someone who is a caring partner.  And he

16   is someone who helps.  He's deeply loyal to friends and helps

17   even those who he doesn't know, who aren't necessarily friends

18   but who are less fortunate and who are facing obstacles that he

19   may not have -- he may not have faced himself.  He is someone

20   who does this because he thinks it's the right thing to do.

21        And I hope the Court will consider that in fashioning the

22   sentence.

23        And that leads me to the second factor that I'd like to

24   talk about, Your Honor, and that's deterrence, and fashioning a

25   sentence that meets the sentencing objective of both specific

1    deterrence and general deterrence.

2        I think with respect to specific deterrence, with respect

3    to Mr. Levandowski, you don't have to worry about him being in

4    front of you reoffending.  Several individuals in their letters

5    had discussed the way that he has gone about setting up the

6    culture at Pronto, his new company, his new self-driving

7    company.  And they are clear that it has been incredibly

8    professional and has been focused on compliance.  And that is a

9    lesson that he has personally learned, how important that is,

10   and that's for various reasons.

11       But one thing that I do want to point to is that there

12   have been significant collateral consequences that have

13   resulted from this case that will continue to deter him.  And

14   we know about the arbitration award, which has driven an

15   otherwise wealthy individual into bankruptcy for now, I'm sure.

16   There is an issue about the indemnification that he's fighting

17   for.  But that is clearly a consequence.

18       There have been numerous negative financial consequences

19   from this.  He's obviously been dragged into a variety -- by

20   his own doing, but he still has suffered through a variety of

21   legal proceedings which have created all sort of negative

22   consequences.

23       His public and professional reputation has been damaged.

24       As I indicated as well, also, Google has obtained a

25   judgment that has forced an otherwise wealthy individual into

1    bankruptcy.

2        Also, I want to make sure that I don't violate any

3    confidentiality.  We filed the settlement agreement between

4    Waymo and Uber under seal.  And in our pleadings, in our memo,

5    we pointed to some of the negative consequences that have come

6    to him as a result of that.

7        So I don't think there is a fear of Mr. Levandowski

8    reoffending.  I believe that the Government would agree with

9    that.  But I think the primary thrust of their argument, at

10   least in part, has been one of general deterrence and that a

11   message needs to be sent to those in Silicon Valley.  We agree

12   that general deterrence obviously is an important factor; but,

13   again, it is the sentence that is sufficient but not greater

14   than necessary to accomplish that.

15       The collateral consequences that I've talked about I think

16   will continue to offer general deterrence to others, whether

17   it's the arbitration award, whether it's the damage to

18   professional and personal reputation.

19       But I think Mr. Levandowski realizes that he needs to do

20   more than just that.  He can't just sit back and say:  Hey,

21   these things happened to me.  He needs to be active and

22   proactive in getting the message out to those in Silicon Valley

23   and those who may go work in Silicon Valley and those who may

24   go work in other industries in other locations and be part of

25   the engineering and technological revolution.

1        And in that regard, he's uniquely situated to discuss this

2   issue.  Because of the extreme press coverage that's happened

3   in this case, because of the interest in self-driving car

4   technology just generally and his notoriety in that area, he's

5   in a position to reach people and to have people listen to him.

6   So that is why -- and he can provide, widely, caution about the

7   perils of what he did and why it was wrong.

8        So that is why we suggested the 200 hours of community

9   service.  But even more importantly, in that 200 hours of

10  community service, we think it would make sense for the Court

11  to order Mr. Levandowski to do at least 12 sessions in which he

12  speaks about this case and the lessons he's learned and trying

13  to deter others from doing that.  We'd like it to be across a

14  variety of platforms and to different people, to try to reach

15  as many people as possible.  So what we're suggesting is 12

16  different sessions.

17       Obviously, because of the pandemic, it may be that these

18  need to be all online, which there's an advantage and a

19  disadvantage to that.  The advantage is it can reach more

20  people more readily.  The disadvantage is it may not be as

21  onerous on him to do.  But I think when you're talking about

22  general deterrence, the most important thing is that he reach

23  the most amount of people.

24       Mr. Levandowski talked about this.  We think people --

25  engineers who are currently practicing, particularly in Silicon

1    Valley, we think an effective way to do this would, for

2    example, to be doing a Reddit talk, which potentially could

3    reach thousands, if not tens of thousands, of individuals.

4         He could also reach out to universities and speak to

5    students.  As you know, lecturers and professors at

6    universities are always looking for someone like

7    Mr. Levandowski to come speak.  I know myself and Ms. Craig

8    have, in the past, specifically.  But for him to go to

9    engineering schools and to teach those, either in Zoom classes

10   or in a Zoom form or, if possible, to do it in person, could

11   really make an impact on a whole 'nother next generation of

12   engineers.

13        So what we have tried to do is fashion some sort of

14   community service that will address this issue, and we've

15   fallen down on 12 sessions, leaving it a little open to combine

16   online and in-person, if possible, and also to combine with

17   current engineers and engineering students.

18        I think it might also make sense to spread that out over

19   the course of 12 months so it's not just everything done in a

20   week or in a day, but knowing that that message is continuing

21   to be out there and that there's a steady drumbeat of that.  If

22   he was to be doing that once a month, 12 times, for a year, we

23   think that would be very effective in helping to deter other

24   people.  We think that would be as strong as anything to

25   combine with the other consequences that he's suffered,

1    including the collateral consequences.

2          And then, with respect to the sentence this Court is

3    imposing, we are recommending a greater fine than is actually

4    being recommended by either the Government or by the probation

5    officer.  We have recommended -- the guidelines range for fines

6    tops out at 95,000.  I believe that the probation officer has

7    recommended $40,000.  We are recommending that, with respect to

8    that, you go to the top end, Your Honor, and that there be a

9    $95,000 maximum guidelines fine.  We think that those things

10   combined will address the -- are sufficient to address the

11   issue of general deterrence.

12         I do want to speak briefly to sentencing disparities,

13   which I think also touches on the nature of the offense here.

14         In no way does Mr. Levandowski want to minimize his

15   conduct, but we do want to put it into context.  We think that

16   it's important to recognize the fact here that there was no use

17   of trade secret or proprietary information that was found at

18   Uber.  Clearly, he had criminal intent when he took the

19   Chauffeur weekly document.  But the evidence bears out that,

20   fortunately, there was no use of it at Ottomotto or at Uber,

21   despite two years of investigations by the U.S. Attorney's

22   Office and then inspection by an army of lawyers and experts

23   involved in the *Waymo versus Uber* trial.  There was no evidence

24   that any of this information, trade secret or proprietary, was

25   used in the Uber or Otto programs, and there was simply no

 1   evidence that it worked its way onto Uber servers.  And it's

 2   worth noting that the Government does not allege that sort of

 3   use in the Indictment here.

 4        So I understood that there's been some speculation about

 5   whether he would have -- would have used it or whether he might

 6   have.  Some could imagine he used it during negotiating or

 7   talking to Uber in the negotiations about the acquisition of

 8   Uber.  But for sentencing purposes, obviously, we should stay

 9   on the factual record.  And the factual record is that with

10   respect to trying to duplicate what was happening at Google at

11   Uber, there's no evidence.  There's no evidence that that

12   happened, that there was use of that.  So that puts that into

13   context.

14        And with respect to -- there are numerous examples of

15   sentences in trade secret theft cases -- and we've pointed

16   the Court to some of them.  And I know they're not always

17   perfect analogies, but it is useful still to have some sense of

18   the type of sentences that have been applied in this area.

19        And we pointed you to the cases of *Murphy*, *West*, and

20   *Zhang*, all Northern District cases, where there was no use or

21   limited use of a trade secret that was taken.  And in each of

22   those cases, there were combinations of probation or supervised

23   release sentences combined with some amount of electric

24   monitoring or home confinement.  With respect to those cases,

25   one was six months; the other, ten months; the other one, six

1   months of location or electronic monitoring.

2       We actually think here, the 12 months of home confinement,

3   we actually think it would make sense to combine that with

4   location --

5           THE COURT:  Are you saying that no one has ever gone

6   to prison in our district for theft of trade secrets?

7           MR. RAMSEY:  No, I'm not saying that at all.  I'm

8   just --

9           THE COURT:  That's what it sounds like.

10          MR. RAMSEY:  No, I'm not -- I'm not saying that.

11      And I'm trying to say we --

12          THE COURT:  And you say -- well, there's a difference

13  between the Government not having evidence that it was used

14  because it's kind of hard after the fact.

15      He had it in his possession.

16          MR. RAMSEY:  Absolutely.

17          THE COURT:  He had it in his possession, and he could

18  have looked at it at any time.

19          MR. RAMSEY:  Yes, Your Honor.

20          THE COURT:  We don't know whether he looked at it or

21  not.

22          MR. RAMSEY:  Yes, that is correct, Your Honor.

23          THE COURT:  So he had the opportunity.  He certainly

24  had a motive to look at it.  And because the Government can't

25  prove it, you want me to go easy?  I don't know.  I don't get

1  that argument.  I think you're stretching a point.

2      Now, it probably is true that the Uber design was going to

3  be different enough from the Waymo design that much of what was

4  in those files turned out not to be too relevant.  That, I

5  would grant you.

6      But there was still material in those files and in

7  Number 33 that would be very useful for a competitor to know.

8      **MR. RAMSEY:**  Yes, Your Honor.  And he indicated that

9  he did have intent to convert that for the benefit of himself.

10 He did provide a snapshot.

11     One of the things that the Government has pointed out in

12 their memo is talking about, one, it could be useful in

13 negotiating time for -- negotiating milestones, such as

14 the Government posits.  That's possible.

15     The other thing, it would clearly be useful in

16 understanding the state of the industry and the state of where

17 a competitor was and what they were doing when they made the

18 rolling A --

19     **THE COURT:**  Well, it's having the game plan.

20     **MR. RAMSEY:**  Yes.

21     **THE COURT:**  It's having the competitor's game plan.

22 Any football coach in America would love that.  So I don't --

23 to me --

24     **MR. RAMSEY:**  And also understanding different parts

25 of -- parts of the -- that exact value, but understanding what

```
 1    the time frame was.  It absolutely would be useful.  That is

 2    part of the intent.

 3         But not trying to minimize, again, Your Honor, and so I

 4    don't want you to say we're asking you to go lenient because of

 5    that.  What I'm trying to do is at least just put it into

 6    context and try to give some reference to some of the

 7    distinctions that we saw with respect to different sentences.

 8         But he understands that what he did was wrong a

 9    hundred percent, and that would be part of what he'd be

10    talk- -- hopefully will be talking to individuals and engineers

11    about.

12         But at least -- I'm just at least trying to put it in

13    context.  And the type of sentences that we have seen in the

14    district, there have been some lengthy sentences.  Those

15    sentences that we've seen tend to have to do with economic

16    espionage on behalf of a foreign power.

17         So we're trying to put it in that context, but I think --

18    I don't want you to think at all that he is stepping away from,

19    you know, his criminal intent and that he did something wrong.

20    I think his letter makes that very clear.

21         And just in trying to address this particular factor, I'm

22    trying to put it in context.  But it's not at all that we don't

23    think what he did was not serious and that the Court should

24    not -- should be going light and not looking at what the actual

25    3553(a) factors are and how a sentence can be fashioned to
```

```
 1   accomplish those.

 2       I think the Court started, before we talked, about trying

 3   to institute -- I think you described it as the lowest

 4   sentence --

 5       (Stenographer interrupts for clarification of the record.)

 6           MR. RAMSEY:   -- that institutes the lowest sentence

 7   that accomplishes those objectives.

 8       I've talked about it in the statutory language of

 9   sufficient but not greater than necessary.

10       And that's what we're trying to do, Your Honor, is to give

11   that context, but I don't at all want you to think --

12           THE COURT:   That's exactly what I'm trying to do too.

13   I think you put your finger on the standard.

14       The question is -- the key question here is deterrence and

15   whether someone in the future, who is in Mr. Levandowski's

16   position, with billions -- not just millions -- billions of

17   dollars in some new technology are in play, and that person in

18   the future, that engineer in the future, who, let's say, is

19   brilliant, has the opportunity to go start their own company

20   and they're thinking to themselves:  "Do I steal these trade

21   secrets so it'll give me a heads-up?  Maybe I won't get

22   caught" -- so they're factoring in the risk of detection --

23   "and if I do get caught, well, they'll just give me probation

24   like they gave Mr. Levandowski."

25       So that's the problem you have with your argument.  You're
```

1  inviting -- you're giving a green light to every future

2  brilliant engineer to steal trade secrets when billions of

3  dollars are on the line.  That's the problem I have.

4          **MR. RAMSEY:**  Yes, Your Honor.  And I --

5          **THE COURT:**  Prison time is the answer to that.

6          **MR. RAMSEY:**  Well, one thing I did want to talk about

7  later on, and that I have to talk about, is the time that we're

8  in and the unique impact that that might have on

9  Mr. Levandowski with respect to COVID-19 and the coronavirus.

10          **THE COURT:**  Okay.  Make your point there on COVID-19.

11      Look, people can't just be let -- I can postpone prison

12  time until COVID-19 goes away.  That, we can do.

13      But somebody who deserves prison time ought to get prison

14  time, unless it's going to just be a matter of a couple of

15  months, then maybe I let it go.  But I don't know.

16          **MR. RAMSEY:**  And --

17          **THE COURT:**  Can we do this before we get to the

18  COVID-19 thing?  Is that what you have left to go through?

19          **MR. RAMSEY:**  That's primarily --

20          **THE COURT:**  I want to give Ms. Wawrzyniak a chance to

21  make her argument.  Then I'll give you a chance to, because you

22  covered a lot of ground here, and I think it'd be good to have

23  her respond on the merits to that.  Then I'll give you another

24  round to --

25  \\\

```
 1          (Discussion off the record between the law clerk and the

 2   Court.)

 3               THE COURT:  Okay.  I'm going to come --

 4          MR. RAMSEY:  Yes, Your Honor.

 5               THE COURT:  -- back to you.

 6          MR. RAMSEY:  The two areas we have left is COVID-19

 7   and restitution as well.

 8               THE COURT:  And what?

 9          MR. RAMSEY:  Restitution.

10               THE COURT:  Restitution.  Okay.  We'll come back to

11   those.  All right.

12          MS. WAWRZYNIAK:  Thank you, Your Honor.

13          THE COURT:  Let me just say, Ms. Wawrzyniak, don't you

14   agree -- I want to say a few things because even though I was

15   jumping on Mr. Ramsey, he has made some good points.

16          And I'm going to make one that he hasn't made, which is

17   that we're talking about a brilliant engineer.  We're not

18   talking about some ordinary engineer.  Mr. Levandowski is a

19   brilliant, groundbreaking engineer that our country needs.  We

20   need -- engineers are great.  I respect them.  But we

21   particularly need those people with vision, and so I'm going to

22   give him that.

23          He's also, up to this point, had a flawless record, and he

24   seems to be a good person.

25          All of those things work to his advantage.  So you ought
```

1    to address those points too.

2        Go ahead.

3        **MS. WAWRZYNIAK:**   Thank you, Your Honor.

4        I want to start, first, by kind of refocusing on the

5    offense conduct here.   In Mr. Ramsey's remark, I think you

6    could lose sight of the fact that we are here today because

7    Anthony Levandowski stole over 14,000 files from Google as he

8    prepared to depart the company.

9        At the time he took those 14,000-plus files, he was

10   already deep into secret negotiations with Uber.   And the

11   14,000-plus files that he took would undoubtedly have been

12   useful to him, first as he negotiated with Uber and then if he

13   launched his own company, Ottomotto.

14       The defendant doesn't want the Court to focus on those key

15   inarguable facts.   Instead, it's to his advantage to obscure

16   the full scope of his criminal conduct and to distract

17   the Court with other issues, issues of the day.

18       This very Court saw defendant's conduct for what it was

19   back in 2017, writing (reading):

20           "It would strain credulity to imagine that

21       Levandowski plundered Waymo's vault the way he did

22       with no intent to make use of the downloaded trove."

23       You were so troubled by Mr. Levandowski's conduct that you

24   referred the matter to my office for investigation.

25       The chronology that the Court sketched out way back in

2017 essentially proved to be correct.  There's the negotiations with Uber that begin in the summer.  They intensify in December.  The talks turn to acquisition.  And it's right in that period of time that Mr. Levandowski downloads everything from SVN, and he also takes these other critical business documents from the Google Drive before he abruptly resigns from Google at the end of January.

The key dates and events which are laid out in my sentencing memo, they track through numerous court records and multiple court proceedings.  They're in Your Honor's orders from the civil case.  They're in the JAMS arbitration award.  They're in the plea agreement, and they ended up in the PSR.

And as for whether defendant used the documents he stole, I think the Court hit the nail right on the head a few minutes ago.  We're never going to know for sure, for the majority of the documents, whether and how the defendant used them.  It's true that he did not succeed in replicating Waymo's technology at Uber, but he may well have consulted the files when he was home; he may have consulted them before he provided input at meetings, before he drew on a whiteboard, before he gave guidance to his team when they were troubleshooting issues.

**THE COURT:**  Ms. Wawrzyniak, since I let Mr. -- I know you don't have your face shield here; but if you want to remove your mask -- it seems to be slipping down at times -- I'll let you do that.

1    Is that okay with everybody?

2           **MR. RAMSEY:**  Yeah.  I believe she has a face shield as

3    well.

4           **THE COURT:**  Right.

5           **MS. WAWRZYNIAK:**  Yeah.  I can put --

6           **THE COURT:**  You can use it or not, if you wish.

7           **MS. WAWRZYNIAK:**  If you don't mind, Your Honor, this

8    is easier.  I do have trouble talking through the mask.

9           I wanted to point out that we know for sure that with

10   Trade Secret 33, the document that he has pled guilty to,

11   Count 33, he last looked at that document on February 24th,

12   2016, which is almost a month after he resigned from Google.

13   So the Government disagrees that this is a case where the

14   defendant did not use the trade secrets that were stolen.

15          Now, the Government did agree to resolve this case based

16   on a guilty plea to one count, and that meant that the

17   defendant was only required to admit that one of the documents

18   he stole was a trade secret.  But just because the defendant

19   didn't admit that any of the other 14,000-plus documents were

20   trade secrets doesn't mean that those documents are somehow

21   irrelevant or disappear from the case.  In fact, the sentencing

22   guidelines, particularly Chapter 1, counsel just the opposite.

23   The Court is supposed to look at the full scope of relevant

24   conduct.  There's no limit under the statute as to what

25   the Court can consider at sentencing.

1      And the Government certainly didn't agree in the plea

2  agreement to put some sanitized version of the facts in front

3  of the Court for sentencing.  And I submit to you that that's

4  what the defendant is trying to do.

5      It was noted in the PSR and also in my sentencing memo

6  that the defendant wanted to excise from the PSR about seven

7  paragraphs, paragraphs 13 to 20.  Those are paragraphs that

8  contain uncontroverted facts about the defendant's intense

9  negotiations with Uber at the end of 2015, beginning of 2016.

10  Now, ultimately, he dropped that objection.  Those paragraphs

11  are in the PSR.  But that goes to show you the way that he was

12  trying to curate the information that's in front of the Court

13  today.

14      And moreover, if you read the sentencing materials as a

15  whole, they're written very much to suggest that

16  Mr. Levandowski took one lone document, and that's just simply

17  not correct.

18      So my first ask here today is that we not lose sight of

19  the full scope of what the defendant did.  This was a brazen

20  theft, and it still shocks the conscience today.

21      I'm going to turn now to an argument that Mr. Ramsey made

22  about, in essence, the collateral consequences, this idea that

23  Mr. Levandowski has already been punished enough.  He says that

24  he's been punished financially and reputationally, and I want

25  to take on each of those arguments.

1    First, financially.  It is not at all clear that this

2    defendant is going to pay the $179 million arbitration award.

3    As this Court will recall, in connection with the acquisition

4    of Ottomotto, Uber promised to indemnify Mr. Levandowski to,

5    quote, the maximum extent permitted by law.  The agreement and

6    plan of merger contained an indemnification section, and then

7    there was a separate indemnification agreement that was entered

8    into in April of 2016.

9        Now, in the pending bankruptcy proceeding, which is

10   pending here in this district, Mr. Levandowski has filed a

11   complaint seeking to enforce the indemnification agreement.

12   It's Document 147 in the bankruptcy case, and it was just filed

13   last month on July 16th.  In that complaint, Mr. Levandowski

14   alleges that he sought indemnification and that Mr. Kalanick,

15   then the CEO of Uber, promised it to him.

16       In the complaint, Mr. Levandowski makes it sound like he

17   sought indemnity because he feared that Google was going to sue

18   him out of some sort of vengeance or revenge for leaving.  But

19   I submit to you that an equally plausible inference is that the

20   reason that this defendant sought indemnity from Uber is

21   because he knew at the time that he was doing that acquisition

22   that he had stolen trade secrets.

23       Now, Uber is contesting its obligation to pay the

24   $179 million.  Their response to the complaint is due later

25   this month, on August 17th.  However, in its public filings,

1  including 10-Qs and 10-Ks, Uber has said that it may be liable

2  for the entire arbitration award.

3      The defendant's sentencing papers leave out this issue of

4  indemnity completely.  We just made a minor change to the PSR,

5  noting that the indemnification claim is worth $170 million.

6  The defendant has given you the false impression that he's

7  already been financially ruined by the facts of this case; but,

8  in fact, he has not paid any of the $179 million award.  Google

9  is still waiting to collect on it.  And, in fact, as reflected

10  in the PSR, his net worth is over $60 million today.  So the

11  narrative that this defendant has already lost all of his vast

12  fortune is just not true.  It's false.

13      In his papers -- I'm going to turn now to the reputational

14  harm argument -- the defendant bemoans his treatment by his

15  former employers and the press, and he talks specifically about

16  losing his job and being branded a notorious trade secret thief

17  in the media.  He urges this Court to consider these collateral

18  consequences in fashioning the sentence.

19      This collateral consequences argument is not something

20  that's available to most defendants, and I would urge the Court

21  to discount it.  To see why this argument is problematic we

22  really need to unpack it.

23      First, this argument comes from a place of extreme

24  privilege.  Yes, Mr. Levandowski has fallen from grace, but

25  that necessarily means he was on a pedestal to begin with.  As

1    Your Honor just said, this is someone who is a brilliant

2    engineer.  No one's disputing that he has a very unique mind.

3    In his own words, he was a pioneer in this field and a star

4    engineer.  He earned $120 million in bonuses from Google.

5        He was in the unique position of basically playing two

6    tech titans off one another:  Google on the one hand, Uber on

7    the other.  Given that profile, of course there has been public

8    interest in this case.  His elite status in the industry is

9    what makes his conduct all the more shocking and inexplicable.

10       Most defendants that come before this Court for sentencing

11   don't have a fraction of the resources or opportunities that

12   Mr. Levandowski had.  Many, many crimes are committed against

13   the backdrop of difficult circumstances and limited resources.

14   The law doesn't forgive crime in those instances.  And if

15   anything, we should judge a defendant more harshly when the

16   crime is entirely gratuitous and motivated by ego or by greed.

17       Second, this collateral consequences argument is an

18   invitation to give white collar defendants a structural break

19   that other defendants just don't get.  In effect,

20   Mr. Levandowski is asking this Court to give him a break

21   because he was famous, because he was wealthy, because he's

22   exceptional.  And nothing in the Code or in the guidelines

23   supports that.

24       And third and relatedly, this argument centers the

25   defendant.  It puts a myopic focus on the defendant at

1   sentencing and pushes to the side the experiences of all the

2   people who were negatively impacted by his behavior.  There's

3   the employer that he betrayed, the other engineers whose work

4   he stole, and the people who had faith in him and followed him

5   from one company to the next.

6        The bottom line is that focusing on adverse collateral

7   consequences to white collar defendants and then using those

8   collateral consequences to justify a more lenient sentence

9   gives wealthy, well-educated defendants a leg up on other

10  defendants.  There shouldn't be two systems of justice in this

11  country, one for the well-to-do and one for everyone else.

12  Anyone who commits a federal felony should face criminal

13  punishment above and beyond social sanction.

14       The sentence that defendant is requesting amounts to

15  having to stay in his million dollar home with ocean views for

16  12 months and paying about $850,000.  That is not justice.

17       And as Your Honor has already sort of indicated, if that's

18  the sentence here today, the message that's going to

19  reverberate throughout the Valley is that you can calculate, in

20  dollars and cents, the cost of stealing trade secrets.  And

21  that's dangerous, because once people can quantify that cost,

22  they're going to do just what Your Honor said, which is to

23  discount it by the probability that you get caught, discount it

24  by the risk of detection.

25       Entrepreneurs are constantly balancing risk versus reward,

1   and if there's no jail time here, some entrepreneurs are

2   definitely going to decide that the potential upside of

3   stealing trade secrets is worth it.

4        And so for those reasons, the Court is urging this

5   Court -- the Government is urging this Court to hand down a

6   sentence that's commensurate with the conduct and that's going

7   to deter others from committing similar crimes.

8        **THE COURT:**  And your recommendation is 27 months;

9   correct?

10        **MS. WAWRZYNIAK:**  It is, Your Honor.  That's the middle

11   of the guidelines range, and we think that that's fair, given

12   the conduct, and that it would also stack up to other trade

13   secret sentences.

14        **THE COURT:**  What do you say about the disparate --

15   Mr. Ramsey pointed to a number of trade secret cases where the

16   defendant got home confinement or probation.  So what do you

17   say to that?

18        **MS. WAWRZYNIAK:**  Well, I think that the conduct here

19   did shock the conscience.  It was a lot of files.  It's a very

20   high-profile case.  And a sentence of 27 months pales in

21   comparison to some of the other sentences in the cases that

22   involve foreign espionage, as Mr. Ramsey alluded to.  There are

23   defendants in this district who have gotten 120-month sentences

24   for theft of trade secrets.  And so the sentence that we're

25   recommending is somewhere in the middle of the scale.

1          **THE COURT:**  Are there defendants in our district who

2    are not espionage -- foreign espionage cases but, like,

3    domestic theft of trade secret cases where they have gotten

4    jail time?

5          **MS. WAWRZYNIAK:**  Yes, Your Honor.  One example that

6    comes to mind is the *Nosal* case, N-o-s-a-l.  I believe the

7    sentence there was 12 months and a day.  That was a domestic

8    espionage case.  And the documents that were at issue there

9    were recruiting lists, contact information, nothing technical.

10         **THE COURT:**  Okay.  All right.  Let me ask you a

11   different question before we go back to Mr. Ramsey on COVID-19.

12         If the Court were to impose a prison sentence, does

13   the Court have the discretion to postpone the report date, the

14   surrender date, until such time as the COVID-19 threat has

15   passed?

16         **MS. WAWRZYNIAK:**  Yes, absolutely, Your Honor.  I think

17   that Judge Seeborg has done something similar recently.

18         I do have an argument on the specific COVID-19 issue

19   that's been raised.

20         **THE COURT:**  We'll come back to it, but I just wanted

21   you to answer that question first.

22         **MS. WAWRZYNIAK:**  Yes, Your Honor.

23         **THE COURT:**  Mr. Ramsey, we'll come back to you now.

24   And you had two remaining points you wanted to make.

25         **MR. RAMSEY:**  Yes, Your Honor.  I have at least a

1  couple of other things to address.

2      **THE COURT:**  In the interest of fairness, since your

3  opponent didn't use a mask or a head shield, if you would like

4  to take yours off -- it's up to you.  You're doing fine as you

5  are, but I'll give you the option.

6      **MR. RAMSEY:**  I'll take it off, Your Honor.  As I'm --

7  being diabetic, I try to be -- create a safe --

8      **THE COURT:**  All right.  Very good.  Thank you.

9      **MR. RAMSEY:**  Thank you, Your Honor.

10     There's just a couple of points that I want to address

11  before I jump into the COVID.

12     At least because we just were talking about sentencing

13  disparities and *Nosal*, I just want --

14  (Stenographer interrupts for clarification of the record.)

15     **MR. RAMSEY:**  Yeah.  Seeing how we were talking about

16  sentencing disparities and specifically with respect to the

17  case *Nosal*, which, first of all, was not only for trade secret

18  theft; it was after a trial.  There were six counts of

19  conspiracy, trade secret theft, and unauthorized computer

20  access.  I also believe that there was use of the database that

21  was stolen from the recruiting service.  And in that case,

22  pre-pandemic, he was sentenced to 12 months and a day.

23     I do think the Court hit upon something, which there is

24  the distinction in past sentences between non-espionage cases

25  and espionage cases.  The 120-month sentence that

1   Ms. Wawrzyniak was referring to is the *Walter Liew* case, where

2   there was a fairly brazen theft of technology from DuPont being

3   transferred to the Chinese government.  And, again, there was

4   use there as well.  So I think there is that -- this

5   distinction between non-espionage cases and use and non-use.

6        And, again, I want to make clear, Your Honor, we're not

7   asking that nothing happen here.  The 12 months, we are asking

8   for it to be in home confinement and electronic monitoring, and

9   that will move me into the COVID-19 argument.

10        This is a situation where the Attorney General has put out

11   guidelines about where alternative sentences should be

12   considered, which we pointed you to from the Department of

13   Justice itself.  And it said when they're non-violent offenders

14   who suffer from co-morbidities that may make them more likely

15   to suffer negative consequences from COVID-19, alternative

16   sentences should be considered.

17        Mr. Levandowski is an individual who has had repeated

18   respiratory issues, which the CDC has addressed as making it

19   likely that you will have more severe symptoms.  And he twice

20   had pneumonia, in 2015 and 2017.  We provided the medical

21   records.

22        Also we --

23        **THE COURT:**  Can I interrupt you one second?

24        **MR. RAMSEY:**  Yes.

25        **THE COURT:**  Someone is on the telephone, typing away,

1  some reporter probably, who has got -- is unmuted, is typing

2  away.  Or I don't know who it is.  It could be a lawyer.

3      Anyway, you can't do that to us.  We hear every click here

4  in the courtroom.  And if this continues, I'm going to direct

5  the clerk to terminate the telephone line so that none of you

6  will be able to hear.

7      So, I'm sorry, Mr. Ramsey, for that, but I want to hear

8  every word you say, and somebody on the line is disturbing us.

9  All right.  Please, go ahead.

10     **MR. RAMSEY:**  Thank you.  I appreciate that,

11  Your Honor.

12     And Mr. Levandowski does have a history of respiratory

13  illness that's set forth in the medical records and in the

14  cover letter from his primary-care physician.  So he is a

15  high-risk individual, and I think the Court can consider that.

16     And unfortunately, the BOP has -- as many places in this

17  country, has not been able to get a full grasp on the COVID-19

18  problem.

19     **THE COURT:**  But the time is going to come when it'll

20  be -- the pandemic will be over.  And we can postpone the

21  prison time until it's safe to go into prison.  So I can do

22  that.

23     **UNIDENTIFIED SPEAKER:**  Don't leave it hanging over

24  him.

25     **THE COURT:**  I'm sorry.  Somebody is talking on the

1    phone again.

2        So, go ahead.  Finish.  You had another point about

3    restitution.

4            MR. RAMSEY:  Yes, Your Honor.

5        And so -- well, and then also I want to at least -- just

6    so the Court -- just very quickly on the COVID-19 is also the

7    effects of him as a co-parent with respect to his wife and his

8    child.  But I will -- I think the Court understands all of

9    those arguments.

10           THE COURT:  I read all of that.

11           MR. RAMSEY:  Yeah.

12       And with respect to restitution, he is prepared to pay the

13   restitution.  Your Honor, we did bring a check today.  He's

14   deposited in escrow with our law firm, which the Court is

15   aware, a -- the funds to meet what the parties have and Waymo

16   has agreed to for proper restitution.

17       The one thing I would point out, just so the Court knows,

18   the Court gave us an order that we could pay -- lodge the

19   restitution with the Court.  We have not yet done that, and I

20   just want to let the Court know why.  Because of the bankruptcy

21   proceeding, Mr. Levandowski's bankruptcy counsel has informed

22   us that we need to get a comfort order, an order from the

23   Bankruptcy Court, making sure that it's acceptable for us, who

24   has the money in escrow, to deposit that money.  There have

25   been filings made in the Bankruptcy Court, and that will be

```
 1   heard on the 13th of this month.  That's the only reason we

 2   have not yet deposited.

 3         THE COURT:  Well, you're just holding up the check

 4   like it's in the mail, but it hasn't been paid.

 5         MR. RAMSEY:  No, it hasn't.  And I wanted to let

 6   the Court know, we're prepared.

 7         THE COURT:  Prepared when?

 8         MR. RAMSEY:  We just don't --

 9         THE COURT:  When is it going to be paid?

10         MR. RAMSEY:  We don't want to violate a court order.

11   So --

12         THE COURT:  When is it going to be paid?

13         MR. RAMSEY:  Immediately when -- if you tell us to do

14   it, we'll do it now.  But we don't want to violate the

15   bankruptcy's automatic stay.

16         THE COURT:  I'll order that now.

17         MR. RAMSEY:  You'll order that now.  We will --

18         THE COURT:  I'll order it now.  You go to the Clerk's

19   Office after this hearing, pay that money, and tell the

20   bankruptcy judge that's what I said.

21         MR. RAMSEY:  Absolutely, Your Honor.

22         THE COURT:  There should be no delay on that.

23         MR. RAMSEY:  All right.  So I can sign that myself.

24   I'll give that to Mr. Ehrlich.  It's addressed to the Clerk of

25   the United States District Court.  And we've got 30 minutes to
```

1   get it there; so we will do that.

2       **THE COURT:**  Well, we may not be done in 30 minutes.  I

3   don't know.

4       **MR. RAMSEY:**  We'll get it first thing tomorrow

5   morning.

6       **THE COURT:**  All right.

7       **MR. RAMSEY:**  First thing in the morning.

8   So thank you, Your Honor.  So the restitution will be paid

9   tomorrow or later today --

10      **THE COURT:**  That's fine.

11      **MR. RAMSEY:**  -- if possible.

12  I did want to point out, you did point out that

13  Mr. Levandowski does have much to offer, both to society and

14  Silicon Valley.

15      **THE COURT:**  No question.  I totally agree.  He's a

16  brilliant man, and the world would learn a lot by listening to

17  him.

18      **MR. RAMSEY:**  And I did want to bring your attention,

19  Your Honor, to the one letter that was under seal from --

20      **THE COURT:**  There have been about 45 letters.  So

21  which one are you talking about?

22      **MR. RAMSEY:**  This is specific from Mr. Taylor.

23      **THE COURT:**  What does it say?

24      **MR. RAMSEY:**  It's under seal; so I wanted to be

25  careful not to --

1           **THE COURT:**  Tell me what it said.

2           **MR. RAMSEY:**  It talks about the usefulness that

3    Mr. Levandowski can be to our government and some of the

4    efforts that have been made in that respect, both present and

5    future.  I'm happy to hand this up.

6           **THE COURT:**  If you want, you can hand it up.  I don't

7    remember that letter.

8           **MR. RAMSEY:**  I have this two-sided.  So if you just

9    ignore the back side of this, you will see the front and the

10   back.

11          **THE COURT:**  Has the Government seen this?

12          **MS. WAWRZYNIAK:**  Yes, Your Honor.

13               (Document handed up to the Court.)

14          **THE COURT:**  Okay.  I've read it, and I'm going to hand

15   it back to you.

16               (Document handed down.)

17          **MR. RAMSEY:**  Thank you, Your Honor.

18      And just two other things that I wanted to talk about just

19   briefly, briefly about collateral consequences and then also

20   briefly about the offense conduct.

21      Excuse me, Your Honor.

22      We clearly are not trying to mislead the Court in any way.

23   We talked about the indemnification claim.  There's no

24   certainty.  All of that has been put forward in the bankruptcy

25   court.  But that's a real possibility that there may or may not

1    be an indemnification claim.

2        There is an arbitration award which is final and which has

3    been then upheld by the Superior Court, and that arbitration

4    award is for $180 million.

5        **THE COURT:**  Well, isn't he living right now in some

6    fancy home overlooking the ocean?

7        **MR. RAMSEY:**  He's renting a two-bedroom one-story

8    house.  It is clearly in a nice location.

9        If you look at the description in the PSR --

10       **THE COURT:**  Well, people who are bankrupt are usually

11   not like that.  You're making him sound poor and destitute.  I

12   don't believe that.

13       **MR. RAMSEY:**  Your Honor --

14       **THE COURT:**  I believe he's on the verge of hundreds of

15   millions of dollars, and he's just in a bad patch right now.

16   But he is -- he's had hundreds of millions recently and will in

17   the future.  And I don't believe that he's destitute.

18       **MR. RAMSEY:**  One thing I will point out to you,

19   Your Honor, is he is -- and this is just clear across the

20   board.  Everyone has indicated this in the letters.  He is not

21   someone who has lived an ostentatious life or -- or lived in

22   extravagance.

23       The places that he's lived at up until this of just a year

24   or two was literally a two-bedroom duplex in Rockridge.  He

25   drove -- when we met him, he drove a 1994 beat-up Lexus, which

1   you can see, with 140,000 miles on it.

2       That being true, he right now, with his fiancée, is living

3   in a nice area in Marin County, but it is not a mansion.  It is

4   a two-bedroom house for he, himself, and his two children live

5   there as well, and it has a room for an office and a living

6   room, as been described in the PSR.  So it is not an

7   extravagant living situation where --

8       **THE COURT:**  Home confinement in such a location would

9   be pretty nice, wouldn't it?

10      **MR. RAMSEY:**  Well, we could always change that, if we

11  had to.

12      Part of the aspect of home confinement is also to allow

13  him to help with his children --

14      **THE COURT:**  Yes, I get that part.

15      **MR. RAMSEY:**  -- who have somewhat unique situations.

16      But that's, again, a two-bedroom house with two children.

17  And I'm not saying that it's not --

18      **THE COURT:**  Your partner just brought up a note; so

19  you must have another point to make.

20      **MR. RAMSEY:**  That had to do with the collateral

21  consequences.

22      And in addition to, obviously, restitution fees, the

23  settlement agreement that also is under seal has some

24  provisions that are very unique to him which provides for some

25  blackballing in the industry.

1          And so those are other significant consequences and things

2     that, in an appropriate way, not violating any

3     confidentiality -- and perhaps the Court may find that -- we

4     placed it under seal in an abundance of caution because it had

5     been marked by the Government as "Confidential" with respect to

6     the settlement agreement.  It may be that the Court doesn't

7     find that the settlement agreement really has any proper basis

8     for confidentiality and that it shouldn't be under seal and

9     that it should be open to the public.

10         But that, again, could be part of the discussions, the

11    speaking engagements that he could have with engineers

12    throughout to make sure that they understand that strong

13    consequence in your prospects moving forward, that is also a

14    strong deterrent beyond -- beyond simply probation.

15         He is a felon, et cetera, but I won't belabor that.

16         I do want to move on to the offense conduct, unless

17    the Court has specific questions about that, Your Honor.

18         **THE COURT:**  Well, are you done?

19         **MR. RAMSEY:**  No.

20         **THE COURT:**  What do you mean, offense conduct?  We've

21    heard about it.  You already covered that.

22         **MR. RAMSEY:**  Well, the one thing I did want to talk

23    about is because we talked about these 14,000 files and why he

24    downloaded those.

25         We agree that he downloaded the 14,000 files, but there

are factual disagreements about his intent.   The timing on when

he downloaded those files were -- there was -- it was at a time

where he was having meetings regarding the Chauffeur Weekly.

    We agreed on the Chauffeur Weekly, the use that he could

have with those, particularly keeping -- having certain files

that were there later on.

    But there are real factual disagreements about that in the

timing.   That is a month apart.   We think we should be --

that what we have tried to talk about is the intent on the --

where there aren't these factual disagreements.   And there are

different inferences, discussions on different ways about those

purposes.   But we do believe that there are real factual

disagreements there.

    All of that, again, is not to minimize or justify what he

did.   He is pleading guilty.   He realizes what he did was

wrong.   He will be a felon forever.   But we do think it puts it

in context.

             **THE COURT:**   Okay.

    **MR. RAMSEY:**   So with all of that, not greater than

necessary -- sufficient but not greater than necessary, we

think that you do need to look at things such as his personal

background, which you've pointed out, and a variety of other

factors.

    He does have much to give to society.   He has much to give

to government.   He has much to give in terms of deterring

 1   others from doing this.

 2        And this is a unique time in terms of COVID.  And we

 3   believe that a year, which is -- Nosal was a year and a day

 4   with more than just trade secret theft, with use and a full

 5   trial -- we believe that this would be an appropriate sentence.

 6        **THE COURT:**  Thank you.

 7        Ms. Wawrzyniak, on the subjects just covered, not

 8   everything, not the general issue anymore, but just material

 9   that's been covered by Mr. Ramsey.

10        **MS. WAWRZYNIAK:**  Yes, Your Honor.  I just want to

11   briefly address the COVID argument and then make some

12   concluding remarks.

13        I don't want to belabor the health issues, but the PSR

14   reflects that Mr. Levandowski is generally a healthy

15   40-year-old person.  And the medical records that were

16   submitted do not evidence any of the conditions that are

17   specifically listed in the CDC guidance as putting people at

18   increased risk of severe illness.  That is, you know, he's not

19   claiming that he has COPD; that he has asthma; that he has

20   pulmonary fibrosis.  He doesn't take any medications associated

21   with chronic lung disease.  He doesn't have to take an inhaler.

22        So basically, like thousands upon thousands of people, he

23   at one point has had pneumonia in the past on two occasions.

24   And from the medical records that were submitted, you see that

25   he was not hospitalized.  And there aren't any chest X-rays or

1    other proof that he has continuing decreased lung function.

2    The note that came from the doctor just said that based on his

3    medical history, he may have an underlying medical issue.

4        So on this record, it's hyperbole to say, as the defense

5    did in their sentencing memo, that a custodial sentence could

6    equal a death sentence.  We just don't think that's supported

7    by this record.

8        And if the Court does feel compelled to show some leniency

9    or mercy based on the pandemic, then we would suggest that you

10   do just what you said a moment ago, which is just delay the

11   self-surrender date.  But we are maintaining the request for a

12   custodial sentence here.

13       And in closing, I just want to address, again, the point

14   that Your Honor raised about how Mr. Levandowski really is a

15   brilliant engineer.  And the Government agrees with that.

16   We're not here today to stand against his redemption.  You

17   know, redemption is a wonderful thing.  If he wants to give

18   these lectures and do the community service as a condition of

19   his supervised release, the Government absolutely supports

20   that.

21       But there is this notion -- and I addressed it in my

22   sentencing papers -- that when someone is as brilliant as

23   Mr. Levandowski and focused as he has been on this mission,

24   this mission to create a self-driving car that'll make the

25   world safer and better, that somehow the ends justify the means

or that that could somehow excuse his behavior.  And that's

wrong.

     You know, it was wrong for him to take all of these files,

and it erases the contributions of many, many other people that

have also put their blood, sweat, and tears into this project

of making a safer self-driving car.

     And so, you know, while it's absolutely appropriate to

consider the history and characteristics of this defendant, we

don't think that his exceptionalism or his contributions to the

science of self-driving cars should in any way excuse his

criminal behavior.  And that's why we're maintaining the

request for a 27-month sentence.

     Thank you, Your Honor.

     **THE COURT:**  All right.  Mr. Levandowski, you get to

have the last word.  So the floor is yours.

     Again, if you wish to take off your mask, you certainly

may.

     **THE DEFENDANT:**  Thank you, Your Honor.

     Your Honor, please forgive me.  I'm a bit nervous.

     **THE COURT:**  No problem.  Please take your time.

     **THE DEFENDANT:**  I want to keep my statement in court

brief and rely on the letter that I submitted to you earlier.

     I've worked hard to convey how I came to make such a

terrible mistake, as well as the shame I have felt ever since

it came to light.  The last three and a half years have forced

1    me to come to terms with what I did and how I can be better

2    going forward.   I deeply regret my actions.

3        I want to take this time to apologize to my colleagues at

4    Google for betraying their trust.   I also apologize to my

5    entire family for putting them through this and the price they

6    will continue to pay because of my actions.   But I do want to

7    thank them and my friends and colleagues who have stood by me.

8        I can't change what I did, but I can learn from my

9    mistakes and then not repeat them.   I can tell you with a

10   hundred percent certainty that I will never come close to

11   breaking the law again.

12       Thank you, Your Honor.

13           **THE COURT:**  You're most welcome.

14       All right.   Submitted?

15           **MS. WAWRZYNIAK:**  Yes, Your Honor.

16           **MR. RAMSEY:**  Yes, Your Honor.

17           **THE COURT:**  The sentencing guidelines call for 24 to

18   30 months because it's Offense Level 17, Category Number IV.

19   Under the law, I'm required to consider that, and that's as a

20   starting point.

21       Probation recommends 24 months.   The Government recommends

22   27.   The defendant recommends no custody time but 12 months of

23   home confinement and substantial community service.

24       So that's a brief summary of where we are.

25       I want to say, again, by repeating what I said earlier,

1   Mr. Levandowski is a brilliant engineer.  I think I'm qualified

2   to say that because I sat through and presided over the *Waymo*

3   *v. Uber* case and at one point in my life, I was headed off to

4   be an engineer before I veered into law.  But I still

5   understand science and math.  And I have tremendous respect for

6   engineers.

7          And Mr. Levandowski is maybe the best I've ever seen, at

8   least in my experience, now 75 years.  He has vision.  And that

9   vision, in this case, was self-driving cars.  We don't get too

10  many of those in our country.  Most engineers are workaday

11  engineers who crunch the numbers, solve small problems.  But

12  Mr. Levandowski can solve big problems.

13         I respect that.  I want you to know that.  So that's what

14  makes this job all the harder.

15         I also think he's a good person at heart.  And all those

16  things you said about him being -- helping others get some

17  credit in my mind for that record of good behavior.

18         Mr. Ramsey is correct that the law requires that I give

19  the lowest sentence that will carry out the sentencing

20  objectives of Congress as set forth in the Sentencing Act.

21         There is one express consideration that drives -- I

22  consider all of it, but the one that in these white collar

23  cases always is important is deterrence.  I am required to give

24  a sentence that, when someone else in Mr. Levandowski's

25  position a few years from now, someone else who is considering

 1   stealing trade secrets and going off to start a competing

 2   company will be deterred from doing that.  They're right at the

 3   cusp of doing it.  And I want them to think:  Wait a minute.

 4   If I do this, I could wind up in federal prison like

 5   Mr. Levandowski.  Or are they going to think:  Oh, I can get

 6   away with it because even if I get caught, I'll get home

 7   confinement.  Then I'll take the risk because billions of

 8   dollars, or at least millions and millions are in play.

 9        Now, this was not a small crime.  I've practiced for

10   25 years in this district, in this very courthouse,

11   representing clients like Waymo and some other smaller ones

12   too, I admit, but I had my share of the bigger clients.  I've

13   been in this job 21 years.  So I speak from a lot of experience

14   in this district and in Silicon Valley.  This was the biggest

15   trade secret crime I have ever seen.  This was not small.  This

16   was massive in scale.

17        Mr. Levandowski pled to Count 33 and admits that was a

18   trade secret, and I totally agree it was.  That was the game

19   plan, the game plan that the opposing coach would love to have.

20        That alone was bad enough.  But I want you to know, from

21   the *Waymo* case, I looked at some of those -- not every one of

22   them but a lot of those 14,000 files.  There's no doubt in my

23   mind there were a lot of trade secrets in there.  Yes, it would

24   be a little problematic to isolate it page by page, paragraph

25   by paragraph, but it was chock-full of how Waymo was going to

do it.  That was a trade secret.

Some of that stuff was in the public domain, but the vast majority of it was a trade secret.  So there's no doubt in my mind, the reason he stole that on December 11th, 2015, was to have it at the ready in case he needed it when he landed on his feet outside of Waymo.  Otherwise, why would anyone take it?  There's no explanation.  It was just theft of something he knew he shouldn't take.

Now, as it turned out, the Waymo design and the Uber design were sufficiently different that it was hard to track specific trade secrets into the Uber design, but that doesn't change the fact that the Uber trade secrets were in his possession -- I'm sorry -- the Waymo trade secrets were in his possession and that he had wanted to have them at the ready in case he needed them.

Why did he do this?  Of course it was bad judgment, but billions in the future were in play.  And when that kind of money and financial incentives are there, people, good people -- good people -- will do terrible things, and that's what happened here.

Now, when this is -- when the next Mr. Levandowski in two or three years is in Silicon Valley waiting to see whether or not he will do the same thing, what will be the deterrence message from what happens here today?

Will it be:  No.  Even if you get caught, which is

1  always -- not possible; maybe you'll get away with it.  But

2  even if you get caught, you get home confinement?

3       I can tell you, most of those people would take that risk.

4       On the other hand, if they say, "I'm going to go to

5  federal prison, and my family and my children are going to have

6  to visit me in federal prison," that has a deterrent effect.

7       Some of the considerations that Mr. Ramsey had mentioned

8  that would mitigate in favor of a lower sentence, I accept

9  that.  His family situation counts for something.  His good

10 conduct for most of his life counts for something.  The

11 contribution he has made to science counts for something, in my

12 mind, even though you haven't quite argued it in that way.

13      So I am balancing all of those considerations.  And the

14 proper answer in this case is 18 months in federal prison with

15 a self-surrender date to be selected in the future when the

16 COVID-19 threat has passed.  That's the right answer in this

17 case.  I have no doubt about that.

18      Now, it is my job to read the full sentence; so I will do

19 that now.

20      Pursuant to the Sentencing Reform Act, it is the judgment

21 of the Court that Anthony Scott Levandowski is hereby committed

22 to the custody of the Bureau of Prisons for a term of

23 18 months, a self-surrender date to be selected in the future

24 when the COVID-19 danger has passed from the federal prison.

25      Upon release, he will be on supervised release for

1   three years.   Within 72 hours of release from the Bureau of

2   Prisons, he will report in person to the Probation Office in

3   the district to which he is released.

4       While on supervised release, the defendant shall not

5   commit any more crimes, shall comply with the standard

6   conditions of the Court, except mandatory drug testing is

7   suspended.

8       And here are some more additional conditions.

9       First, I'm going to add one here, which is that he will

10  give speeches to up to 200 people.   It can be spread over

11  several speeches, but a total of 200 recipients.   And the title

12  of the speech is "Why I Went to Federal Prison."   I want

13  Probation to attend each speech and report back to me.   But the

14  point is, I want the deterrent effect to those young engineers

15  or young entrepreneurs or whoever, students, I want them to

16  know the example of Mr. Levandowski.

17      Next, you must have no contact with victims Waymo and

18  Google.

19      You must pay the restitution and the fine and special

20  assessment.

21      No new lines of credit without okay of Probation.   You

22  must provide Probation all the financial information they want.

23  You must check your voice mail and answering machine every day

24  and follow instructions left by Probation.

25      You must not own or possess any firearms, ammunition,

1  destructive devices, or other dangerous weapons, and must not

2  be present in a vehicle where you know any such thing is

3  present.

4       You must cooperate in the collection of DNA as directed by

5  Probation.

6       You must submit your person, residence, office, vehicle,

7  electronic devices and their data, including cell phones,

8  computers, and electronic storage media or any property under

9  your control to a search to be conducted by Probation or any

10  peace officer at any time with or without suspicion.

11       Defendant is directed to pay to the U.S.A. a special

12  assessment of $100 and a fine in the amount of --

13       What is the maximum fine I can give under the guidelines?

14  Is it 40,000?

15       **MS. WAWRZYNIAK:**  No, Your Honor.  The guidelines range

16  for the fine ranges -- I believe 40,000 is a mid-range point.

17       **MR. RAMSEY:**  95,000.

18       **MS. WAWRZYNIAK:**  95,000 is the maximum.

19       **THE COURT:**  All right.  95,000 is the amount.  A fine

20  in the amount of 95,000.  This can be paid off through the

21  Inmate Responsibility Program.

22       It is further ordered that defendant pay Waymo and/or

23  Google $756,499.22.  This can be worked off through the Inmate

24  Responsibility Program too.

25       Then there is the $100 special assessment.

1          All right.  Have I left anything out, Ms. Wawrzyniak?

2          **MS. WAWRZYNIAK:**  No, Your Honor.  At this time,

3   however, the United States will move to dismiss Counts 1

4   through 32 of the indictment.

5          **THE COURT:**  Motion granted.

6      Yes, Mr. Ramsey?

7          **MR. RAMSEY:**  Yes, Your Honor.  We would ask for a

8   recommendation of the Court that he be designated to a facility

9   near his home here in the Bay Area.

10         **THE COURT:**  Yes.  So I do make that recommendation.

11     And I think we should set a control date to see how we're

12  doing on the -- something like, I'm going to guess, February to

13  come back here to see if we can set a date for self-surrender

14  at that time.  But I'm pretty sure we won't be able to do that

15  between now and the end of the year.

16     What do you think, Ms. Wawrzyniak?

17         **MS. WAWRZYNIAK:**  I think February is fine, Your Honor.

18  About six months.

19         **THE COURT:**  Give me a date in February, Teddy.

20         **THE CLERK:**  February 9th.

21         **THE COURT:**  2:00 p.m. February 9.

22     I think -- I don't want him to go to prison until BOP has

23  the COVID-19 under control.  And by that, I mean it's out of

24  the system.  It's not enough just to put people in quarantine.

25  That won't work.  It's got to be COVID-free.  We've got to get

1   there.

2       So he's a young man, and if it takes even a year for him

3   to self-surrender, that's okay with me, until we get the jail

4   safe, prison safe.

5       All right.  Anything more today?

6           **MR. RAMSEY:**  No, Your Honor.

7           **THE COURT:**  Please pay the check tomorrow.

8       All right.  Mr. Levandowski, this is a sad day for you and

9   for the people who've depended on you.  And it pains me to have

10  to do this to you, but it's my responsibility to do it.  It's

11  the best answer I can give under the circumstances.

12      So good luck to you, sir.

13                  (Proceedings adjourned at 3:56 p.m.)

14                          ---o0o---

**CERTIFICATE OF REPORTER**

        I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:  Thursday, August 6, 2020



_____

Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
        Official Reporter, U.S. District Court